## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
### Richmond Division

| | |
|---|---|
| DARLENE GIBBS, STEPHANIE EDWARDS, LULA WILLIAMS, PATRICK INSCHO, LAWRENCE MWETHUKU, GEORGE HENGLE, TAMARA PRICE, and SHERRY BLACKBURN, *on behalf of themselves and all individuals similarly situated* | Civil Action No. 3:18-cv-676 (MHL) |
| Plaintiffs, | |
| v. | |
| MIKE STINSON; LINDA STINSON; THE STINSON 2009 GRANTOR RETAINED ANNUITY TRUST; 7HBF NO. 2, LTD.; SEQUOIA CAPITAL OPERATIONS, LLC; SEQUOIA CAPITAL FRANCHISE PARTNERS, L.P., SEQUOIA CAPITAL IX, L.P, SEQUOIA CAPITAL GROWTH FUND III, L.P., SEQUOIA ENTREPRENEURS ANNEX FUND, L.P., SEQUOIA CAPITAL GROWTH III PRINCIPALS FUND, LLC, SEQUOIA CAPITAL FRANCHISE FUND, L.P., SEQUOIA CAPITAL GROWTH PARTNERS III, LP., STARTUP CAPITAL VENTURES, L.P.; STEPHEN J. SHAPER, | |
| Defendants. | |

## FIRST AMENDED CLASS ACTION COMPLAINT

COME NOW Plaintiffs, Darlene Gibbs, Stephanie Edwards, Lula Williams, Patrick Inscho, Lawrence Mwethuku, George Hengle, Tamara Price, and Sherry Blackburn (collectively, the "Plaintiffs"), *on behalf of themselves and all individuals similarly situated*, by counsel, and for their Class Action Complaint against Defendants, they allege as follows:

## INTRODUCTION

1.      This case involves a rent-a-tribe enterprise that was established to evade state usury laws and make illegal loans. As the Court is aware, Plaintiffs filed four cases against other

participants in the alleged enterprise. *See Gibbs v. Rees*, Case No. 3:17-cv-00386 (E.D. Va. 2017) (transferred to the bankruptcy court sitting in the Northern District of Texas); *Gibbs v. Plain Green, LLC*, Case No. 3:17-cv-00495 (E.D. Va. 2017); *Gibbs v. Haynes Investments, LLC*, Case No. 3:18-cv-00048 (E.D. Va. 2018); *Gibbs v. Curry*, Case No. 3:18-cv-00654- (E.D. Va. 2018). The present case seeks to hold those participants who started, financed, and profited from Think Finance, LLC's ("Think Finance") tribal lending enterprises financially responsible for their role in the schemes.

2.      For more than seven years, Think Finance and its subsidiaries (collectively "Think Finance") operated a rent-a-tribe scheme, which sought to evade the usury laws of certain states by using the Chippewa Cree, Otoe-Missouria, and Tunica-Biloxi Tribe (collectively, the "Tribes") as the conduit for their loans. Even though regulatory enforcement efforts and private lawsuits uncovered their misconduct as early as December 2014, Think Finance, Defendants, and others continued to engage in the scheme even though "[n]o one appear[ed] to seriously dispute" that these rent-a-tribe "loans violated a host of state and federal lending laws." *See Hayes v. Delbert Servs. Corp.*, 811 F.3d 666, 669 (4th Cir. 2016).

3.      Under the rent-a-tribe model, loans were made in the name of Plain Green, LLC, Great Plains Lending, LLC, and Mobiloans, LLC—three entities formed under tribal law to serve as the fronts to disguise Think Finance's role and to ostensibly shield the scheme by exploiting tribal sovereign immunity. In return for the use of their name, the tribal companies received a nominal flat-fee of the revenue from the loans, but they otherwise had no control over the income, expenses, or day-to-day operations of the businesses.

4.      Defendants are the owners and investors of Think Finance, and received the proceeds of its illegal enterprise. Through their ownership of Think Finance, Defendants

participated in the business's key decisions, strategies, and objectives and, in return, generated large profits from their ownership interest in Think Finance. Defendants personally participated in and oversaw the illegal lending enterprise rendering them personally liable to consumers. *Consumer Fin. Prot. Bureau v. CashCall, Inc.*, No. CV157522JFWRAOX, 2018 WL 485963, at *11 (C.D. Cal. Jan. 19, 2018) (finding a rent-a-tribe lending business owner liable for a $10.2 million-dollar judgment because "he directly participated in and had the ability to control" the deceptive acts).

5.      Alternately, the related Defendants collaborated with and were used by the direct investors to receive and shelter stock shares of Think Finance profits via an attempted corporate spin-off into a "new" company founded solely with the proceeds of the Think Finance shares.

6.      This lawsuit seeks to hold Defendants liable for their violations of state usury laws and federal laws in the collection of loans with usurious interest rates. Based on Defendants' conduct, Plaintiffs allege violations of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1961-1968. Defendants received tens of millions of dollars derived from the collection of unlawful debt. Further, Defendants acquired and maintained interests in the rent-a-tribe enterprise and were aware of its scheme to repeatedly violate state lending statutes resulting in the collection of unlawful debt from Plaintiffs and the class members. Defendants' acts described herein are unlawful as set forth in 18 U.S.C. § 1962(a)-(d).

7.      Plaintiffs also assert a class claim for violations of state usury laws and unjust enrichment. Because the loans exceed 12% annual percentage rate ("APR"), such loans are null and void and neither the lender nor any third party may collect, obtain, or receive any principal, interest, or charges on the loans. Va. Code § 6.2-1541. Accordingly, Plaintiffs and the class members seek to disgorge all amounts paid by Virginia consumers in excess of 12%, plus twice

the amount of such usurious interest that was paid in the two years preceding the filing of this action and their attorneys' fees and costs. Va. Code § 6.2-305(A).

## JURISDICTION

8.      This Court has subject matter jurisdiction pursuant to 18 U.S.C. § 1965 and 28 U.S.C. § 1332(d)(2). Moreover, the Court has supplemental jurisdiction over state law claims pursuant to 28 U.S.C. § 1367.

9.      Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) as a majority of Plaintiffs are residents of this District and Division and a substantial part of Plaintiffs' claims occurred in Virginia.

## PARTIES

10.      Plaintiff Lula Williams ("Williams") is a natural person and resident of this Division and District.

11.      Plaintiff Stephanie Edwards ("Edwards") is a natural person and resident of the Commonwealth of Virginia.

12.      Plaintiff Darlene Gibbs ("Gibbs") is a natural person and resident of the Commonwealth of Virginia.

13.      Plaintiff Patrick Inscho ("Inscho") is a natural person and resident of the Commonwealth of Virginia.

14.      Plaintiff Lawrence Mwethuku ("Mwethuku") is a natural person and resident of the Commonwealth of Virginia.

15.      Plaintiff Tamara Price ("Price") is a natural person and resident of Virginia.

16.      Plaintiff George Hengle ("Hengle") is a natural person and resident of Chester, Virginia.

17.     Plaintiff Sherry Blackburn ("Blackburn") is a natural person and resident of Chester, Virginia.

18.     Defendant Mike Stinson ("Mike Stinson") is a natural person. Upon information and belief, Stinson was the founder of Think Finance and owned between 15-25% of the interest in Think Finance at all times relevant hereto. Through his ownership of Think Finance, Stinson operated and participated in the affairs of the rent-a-tribe lending scheme and had direct personal involvement in the creation and day-to-day operations of the illegal enterprise.

19.     Defendant Linda ("Linda Stinson") is a natural person. Linda Stinson is the wife of Mike Stinson. Linda operated and participated in the affairs of the rent-a-tribe lending scheme as a board of director of Think Finance; and she received proceeds from the usurious loans through her joint ownership of Think Finance with her husband.

20.     Defendant The Stinson 2009 Grantor Retained Annuity Trust (collectively with Mike Stinson and Linda Stinson as the "Stinsons" hereafter) is a trust created for the benefit of Mike and Linda Stinson. Upon information and belief, Mike and Linda Stinson used this vehicle and entity participate in the control of Think Finance and thus to receive a large distribution of their profits in Think Finance in form of shares in Elevate, a publicly traded company that Think Finance spun-off to try and launder the profits of its unlawful enterprise.

21.     Defendant 7HBF NO. 2, LTD. ("7HBF") is a limited company. Upon information and belief, 7HBF owned at least 20% of the interest in Think Finance at all times relevant hereto. Through its ownership of Think Finance, 7HBF operated and participated in the affairs of the rent-a-tribe lending scheme and had direct personal involvement in the creation and day-to-day operations of the illegal enterprise. Further, the beneficial owner of this entity used this vehicle and entity to receive a large distribution of their profits in Think Finance in the form of shares in

Elevate, a publicly traded company that Think Finance spun-off to try and launder the profits of its unlawful enterprise.

22.     Defendant Sequoia Capital Operations, LLC ("SCO") is a venture capital firm. Upon information and belief, Sequoia owned approximately 25% of the interest in Think Finance at all times relevant hereto. Through its ownership of Think Finance, Sequoia operated and participated in the affairs of the rent-a-tribe lending scheme and had direct personal involvement in the creation and day-to-day operations of the illegal enterprise.

23.     Upon information and belief, SCO used Defendant Sequoia Capital Franchise Partners, L.P., to receive a large distribution of its profits in Think Finance in the form of shares in Elevate, a publicly traded company that Think Finance spun-off to try and launder the profits of its unlawful enterprise.  In order to have received Think Finance shares before the Elevate spin-off, Sequoia Capital Franchise Partners, L.P. would have had to have held shares of Think Finance and participated in its management and control.

24.     Upon information and belief, SCO used Defendant Sequoia Capital IX, L.P, to receive a large distribution of its profits in Think Finance in the form of shares in Elevate, a publicly traded company that Think Finance spun-off to try and launder the profits of its unlawful enterprise.  In order to have received Think Finance shares before the Elevate spin-off, Sequoia Capital IX, L.P, would have had to have held shares of Think Finance and participated in its management and control.

25.     Upon information and belief, SCO used Defendant Sequoia Capital Growth Fund III, L.P., to receive a large distribution of its profits in Think Finance in the form of shares in Elevate, a publicly traded company that Think Finance spun-off to try and launder the profits of its unlawful enterprise.  In order to have received Think Finance shares before the Elevate spin-

off, Sequoia Capital Growth Fund III, L.P, would have had to have held shares of Think Finance and participated in its management and control.

26.     Upon information and belief, SCO used Defendant Sequoia Entrepreneurs Annex Fund, L.P., to receive a large distribution of its profits in Think Finance in the form of shares in Elevate, a publicly traded company that Think Finance spun-off to try and launder the profits of its unlawful enterprise.  In order to have received Think Finance shares before the Elevate spin-off, Sequoia Entrepreneurs Annex Fund, L.P, would have had to have held shares of Think Finance and participated in its management and control.

27.     Upon information and belief, SCO used Defendant Sequoia Capital Growth III Principals Fund, LLC, to receive a large distribution of its profits in Think Finance in the form of shares in Elevate, a publicly traded company that Think Finance spun-off to try and launder the profits of its unlawful enterprise.  In order to have received Think Finance shares before the Elevate spin-off, Sequoia Capital Growth III Principals Fund, LLC would have had to have held shares of Think Finance and participated in its management and control.

28.     Upon information and belief, SCO used Defendant Sequoia Capital Franchise Fund, L.P., to receive a large distribution of its profits in Think Finance in the form of shares in Elevate, a publicly traded company that Think Finance spun-off to try and launder the profits of its unlawful enterprise.  In order to have received Think Finance shares before the Elevate spin-off, Sequoia Capital Franchise Fund, L.P, would have had to have held shares of Think Finance and participated in its management and control.

29.     Upon information and belief, SCO used Defendant Sequoia Capital Growth Partners III, LP., (collectively with SCO and each of the preceding related entities, "Sequoia") to receive a large distribution of its profits in Think Finance in the form of shares in Elevate, a

publicly traded company that Think Finance spun-off to try and launder the profits of its unlawful enterprise.  In order to have received Think Finance shares before the Elevate spin-off, Sequoia Capital Growth Partners III, L.P, would have had to have held shares of Think Finance and participated in its management and control.

30.     Defendant Startup Capital Ventures, L.P., ("SCV") is a venture capital firm. Upon information and belief, SCV owned approximately a material interest in Think Finance at all times relevant hereto. Through its ownership of Think Finance, SCV operated and participated in the affairs of the rent-a-tribe lending scheme and had direct personal involvement in the creation and day-to-day operations of the illegal enterprise.  Further, SCV received a large distribution of its profits in Think Finance in the form of shares in Elevate, a publicly traded company that Think Finance spun-off to try and launder the profits of its unlawful enterprise.  In order to have received Think Finance shares before the Elevate spin-off, SCV would have had to have held shares of Think Finance and participated in its management and control.

31.     Defendant Stephen J. Shaper is a natural person. Through his (direct and/or indirect) ownership of Think Finance, Shaper operated and participated in the affairs of the rent-a-tribe lending scheme and had direct personal involvement in the creation and day-to-day operations of the illegal enterprise. He received a large distribution of its profits in Think Finance in the form of shares in Elevate, a publicly traded company that Think Finance spun-off to try and launder the profits of its unlawful enterprise.

## **BACKGROUND**

**A.     Virginia law prohibits usury and provides for strict licensing requirements to protect consumers from predatory and abusive lending practices.**

32.     More than forty years before the signing of the Declaration of Independence, Virginia enacted its first usury law, which capped interest rates at 6 percent. John W. Edmonds III,

*Virginia Law of Interest and Usury*, 10 U. Rich. L.R. 77, 77 (1975), *available at* https://scholarship.richmond.edu/cgi/viewcontent.cgi?article=1313&context=lawreview.

33.　　Virginia's "usury laws serve a beneficial public purpose and are to be liberally construed with a view to advance the remedy and suppress the mischief." *Radford v. Cmty. Mortg. & Inv. Corp.*, 226 Va. 596, 601 (1984).

34.　　The Supreme Court of Virginia has repeatedly acknowledged that Virginia's "usury statutes represent a clarification of the public policy of the state that usury is not to be tolerated, and the court should therefore be chary in permitting this policy to be thwarted." *Id.* (quoting *Heubusch & Reynolds v. Boone*, 213 Va. 414 (1972)).

35.　　In accordance with this longstanding public policy, a person may not charge an annual percentage rate ("APR") exceeding 12% without first obtaining a consumer finance license from the Commonwealth. Va. Code §§ 6.2-1501(A), 6.2-303(A).

36.　　If a person violates the interest rate cap, Virginia's Consumer Finance Act imposes severe consequences, including criminal liability and forfeiture of all principal, interest, and any charges related to the loan. Va. Code § 6.2-1540 (making it a class 2 misdemeanor for any person who violates or participates in the violation of Virginia's interest rate cap); Va. Code § 6.2-1541(A) (declaring such loans "void" and principal uncollectible).

37.　　Virginia's Consumer Finance Act is a remedial statute that "originated to protect needy consumers from unjust terms and exploitation surrounding lending practices." *Com. v. Car Pawn of Virginia, Inc.*, 1995 WL 17044380, at *4 (Va. Cir. 1995); *see Greenberg v. Com. ex rel. Atty. Gen.*, 499 S.E.2d 266, 269 (Va. 1998). Thus, it was designed to protect Virginia consumers from the very type of predatory lending scheme Defendants participated in, which sought to evade state lending laws, including Virginia's, by entering into ventures with Native American tribes "so

they can use tribal immunity as a shield for conduct of questionable legality." *Michigan v. Bay Mills Indian Cmty.*, 134 S. Ct. 2024, 2052 (2014) (Scalia, J., dissenting) (citing Nathalie Martin & Joshua Schwartz, *The Alliance Between Payday Lenders & Tribes: Are Both Tribal Sovereignty & Consumer Protection at Risk?*, 69 Wash. & Lee L. Rev. 751, 758-59 (2012)).

**B.      The rent-a-tribe model was developed to evade state usury laws, such as Virginia's.**

38.      Predatory financial services, including high-cost installment loans and payday debt traps, often involve "high-cost, small dollar loans to low income, low-credit borrowers" and "a repayment system that involves the lender withdrawing funds directly from the borrower's bank account."[1] These types of debt traps "are heavily marketed to financially vulnerable consumers."[2]

39.      Over the past decade, payday lending has become "one of the fastest growing segments of the consumer credit industry," and as of 2005, "there were more payday-loan stores in the United States than McDonald's, Burger King, Sears, J.C. Penney, and Target stores combined." Martin & Schwartz, *supra* ¶ 37, at 759 (quoting Karen E. Francis, Note, *Rollover, Rollover: A Behavioral Law and Economics Analysis of the Payday Loan Industry*, 88 Tex. L. Rev. 611, 611-12 (2010)).

---

[1] *Payday, Vehicle Title, and Certain High-Cost Installment Loans*, 131 Harv. L. Rev. 1852, 1852 (2018).

[2] *See CFPB Finalizes Rule To Stop Payday Debt Traps*, CFPB (Oct. 5, 2017), https://www.consumerfinance.gov/about-us/newsroom/cfpb-finalizes-rule-stop-payday-debt-traps/. "A debt trap results when a borrower is repeatedly unable to repay a loan and must reborrow, paying additional fees each time." *See Payday, Vehicle Title, and Certain High-Cost Installment Loans*, *supra* note 1, at 1853.

40.     It is no secret that "internet payday lenders have a weak history of complying with state laws." *Id.* at 764. Prior to the rent-a-tribe business model, some payday lenders, including Think Finance, entered into partnerships with national banks to avoid compliance with state laws.[3]

41.     Beginning in 2005, federal regulators began cracking down on rent-a-bank arrangements, and they were nearly eliminated by 2010—largely by the assessment of penalties and fines against participating banks. *See, e.g.*, Creola Johnson, *America's First Consumer Financial Watchdog Is on A Leash: Can the CFPB Use Its Authority to Declare Payday-Loan Practices Unfair, Abusive, and Deceptive?*, 61 Cath. U. L. Rev. 381, 399 n.16 (2012).

42.     In response to the crackdown on rent-a-bank arrangement, several payday lenders reincarnated the lending model through associations with Native American tribes to avoid state laws. *Id.*; *see also* Martin & Schwartz, *supra* at ¶ 37.

43.     "In these partnerships, online payday lenders register businesses on Native American lands and claim to be exempt from lawsuits and state usury caps under tribal sovereign immunity. Using this doctrine, lenders argue that because their businesses are located on or headquartered within the borders of a Native American reservation, they are bound by the laws of that reservation only, not the laws of the state in which the reservation is located or the state in which the borrower resides." Johnson, *supra* ¶ 37, at 399 (footnotes omitted).

44.     A central feature of the rent-a-tribe business model is the choice-of-law provision used in the scheme's lending agreements. The non-tribal participants in the scheme will claim that they have no liability for their violations of state and federal laws because only tribal law applies

---

[3] *See, e.g.*, Jean Ann Fox & Edmund Mlerzwinkski, *Consumer Fed'n of Am. & U.S. Pub. Interest Research Grp.*, *Rent-a-Bank Payday Lending: How Banks Help Payday Lenders Evade State Consumer Protection* at 17-22 (2001), available at http://www.consumerfed.org/pdfs/paydayreport.pdf.

to the loans. Such claims have been uniformly denied by courts from a variety of jurisdictions across the country, thus demonstrating the illegality of the rent-a-tribe lending scheme.[4]

## C.     Think Finance developed the rent-a-tribe scheme to evade state usury laws, such as Virginia's.

45.     Prior to the creation of the lending scheme at issue, Think Finance used a rent-a-bank lending model. *See* Ex. 1.

46.     Under this arrangement, loans were originated in the name of First Bank of Delaware, but the bank served as nothing more than a nominal lender on behalf of Think Cash, Inc. ("Think Cash"), Think Finance's predecessor. Ex. 1 at TF-PA-504641.

47.     In return for the use of its name, First Bank of Delaware received 10% of the revenue from the loans. Ex. 1 at TF-PA-504640.

48.     By contrast, through its wholly owned subsidiary TC Administrative, Think Cash received the "excess" of the cash flow after accounting for losses, management fees, and fixed rate interest payments to investors, i.e., the third parties who invested money to allow Think Cash to grow the scheme. Ex. 1 at TF-PA-504640.

49.     In August 2010, the Federal Deposit Insurance Corporation took steps to shut down Think Finance's arrangement with First Bank of Delaware through a cease and desist order directing it to terminate its relationship with "all third-party lending programs."

---

[4] *Consumer Fin. Prot. Bureau v. CashCall, Inc.*, 2016 WL 4820635, at *7 (C.D. Cal. Aug. 31, 2016); *W. Sky Fin., LLC v. State ex rel. Olens*, 300 Ga. 340, 348 (2016), *reconsideration denied* (Dec. 8, 2016); *Inetianbor v. CashCall, Inc.*, No. 13-60066-CIV, 2015 WL 11438192, at *3 (S.D. Fla. Dec. 8, 2015); *State ex rel. Cooper v. W. Sky Fin.*, LLC, No. 13 CVS 16487, 2015 WL 5091229, at *10 (N.C. Super. Aug. 27, 2015); *MacDonald v. CashCall, Inc*, No. CV 16-2781, 2017 WL 1536427, at *10 (D.N.J. Apr. 28, 2017), *aff'd*, 883 F.3d 220 (3d Cir. 2018); *Dillon v. BMO Harris Bank, N.A.*, 856 F.3d 330, 336 (4th Cir. 2017); *Hayes*, 811 F.3d at 675; *Rideout v. CashCall, Inc.*, No.  2018 WL 1220565, at *8 (D. Nev. Mar. 8, 2018).

50.     In response, the owners and executives of Think Finance developed a solution—they decided to adapt their business model to use a tribal entity as a conduit for the loan. The purpose of adopting the rent-a-tribe model was to avoid banking regulatory issues and leverage Think Finance's existing sourcing, underwriting, and servicing platforms from the discredited rent-a-bank model.

51.     Think Finance identified state regulation, including interest rate caps and prohibitions on payday lending to be their primary regulatory concern.

52.     Think Finance modeled their rent-a-tribe model after CashCall, Inc., which they identified as their main competitor, and Think Finance retained the same legal counsel used by CashCall to construct the tribal lending model, Claudia Callaway.

53.     Instead of using a national bank as a nominal lender, Think Finance would use a business entity organized under the laws of a Native American Tribe as the nominal lender. The entity organized under tribal law would originate installment loans that were substantially similar to the loans originated under the rent-a-bank arrangement.

54.     Within a few days of origination, the loans would be purchased by a limited partnership controlled by Victory Park, GPL Servicing, Ltd. ("GPLS").

**D.     The role of GPLS in the lending scheme.**

55.     As a part of its repositioning from the rent-a-bank model to the rent-a-tribe model, Think Finance created GPLS.

56.     GPLS is an employee-less, Cayman Islands limited partnership, which would technically purchase a 99% participation interest in the loans within a few days of origination by the entity organized under tribal law.

57.     The participation interests were sold to GPLS at "book value" within two days of the origination of the loan. Ex. 2 at § 2(b).

58.     As a result of the purchase, GPLS was "considered for all purposes as, the legal and equitable owner" of the interest in each loan "and the associated Loan Documents… together with all of the rights, privileges and remedies applicable thereto." Ex. 2 at § 2(c).

59.     In return for the use of its name on the loans, the entity organized under tribal law would receive a nominal fee. For example, Great Plains received a "Service Fee" of 6%. Ex. 2 at § 1(fff); Ex. 2 at § 2(a).

60.     Through a separate agreement entitled "Administrative Agency Agreement," GPLS retained a Think Finance subsidiary, TC Administrative Service, as "the exclusive provider of the administrative services" for the loans. *See generally* Ex. 3.

61.     TC Administrative received an "Agent Fee," which was defined as "the interest and fees received on the Purchased Loans during such months," as well as the "principal collected in such month on Purchased Loans that were Non-Current Purchased Loans in the prior month." Ex. 3 at 2.

62.     TC Administrative's fee was reduced by: (1) a 20% "Fixed Return" of the outstanding principal amount loaned by GPLS, and (2) any and all expensed incurred by GPLS, "including, but not limited to, the Revenue Share paid to [Great Plains] for such months" pursuant to the Participation Agreement. Ex. 3 at 2.

**E.     Think Finance solicited the Otoe-Missouria to form Great Plains in furtherance of the rent-a-tribe scheme.**

63.     On or around January 12, 2011, representatives of Think Finance met with members of the Otoe-Missouria Tribe. *See generally* Ex. 4.

64.     Prior to this meeting, employees of Think Finance created a PowerPoint presentation entitled "Great Plains Lending Meeting," which contained an agenda of key points to present to the Otoe-Missouria Tribe. Ex. 4 at 1.

65.     The agenda of key points included a company overview of Think Finance, an overview of the loan program, the structure of the arrangement, contractual arrangements, operational responsibilities, and next steps. Ex. 4 at 2, 9-10.

66.     Great Plains had not been formed as of the date of this meeting, and, the presentation identified one of the "next steps" as "[c]reate tribal entity—Great Plains Lending, LLC. Ex. 4 at 13.

67.     The other steps included setting up a "tribal bank account at FBD," "[r]eview/approve consumer legal documents," and "[r]eview/sign contractual agreements." Ex. 4 at 13.

68.     Although Great Plains had not been incorporated as of the meeting, Think Finance had already registered the domain name for the Great Plains website and developed the text and graphics for the website—samples of which were included in the PowerPoints. Ex. 4 at pg. 5.

69.     In February 2011, Think Finance held another meeting with the Otoe-Missouria Tribe to promote the potential venture. *See generally* Ex. 5.

70.     As part of this process, Think Finance created a PowerPoint entitled "Emergency Cash Lending—A New Source of Tribal Revenue." Ex. 5 at 1.

71.     The PowerPoint claimed that "[o]nline emergency cash lending" represented "a significant opportunity for increased tribal revenue" and that Think Finance had "a unique turnkey solution for helping tribes enter this lucrative market." Ex. 5 at 2.

72.     The "[t]urn-key solution include[d] technology, marketing, risk management, compliance support, and access to capital funding," which could be "[u]p and running 90 days from signed contracts." Ex. 5 at 3.

73.     More specifically, Think Finance touted that it had: (1) a "proven technology platform," that had "millions of transactions processed to date," (2) a "marketing machine" that had "100,000 applications monthly," (3) "best in class underwriting," (4) "access to third party capital," including "up to $150" million for funding the loans, and (5) "extensive compliance experience," including multiple "successful FDIC and state exams." Ex. 5 at 6.

74.     Think Finance further explained that "[u]sing Think Finance technology and services," would allow tribes to "generate millions of dollars in cash flow with no investment in technology, lending capital, or marketing costs, and with no risk of loss." Ex. 5 at 2.

75.     The primary sources of this revenue were "[e]mergency cash users—mainstream Americans," who were "65% female," with household income of "$25K-50K" who primarily needed the emergency loans for unexpected bills, medical costs, car repairs, or to avoid overdrafts. Ex. 5 at 4.

76.     The PowerPoint further claimed that "Recent Rulings Have Confirmed that Tribes Can Provide These Services without State Regulatory Jurisdiction." Ex. 5 at 4.

77.     The PowerPoint included the following flow chart to help summarize the structure:



Ex. 5 at 18.

78.     On February 24, 2011, the Otoe-Missouria accepted Think Finance's proposal.

**F.      Think Finance solicited the Chippewa Cree Tribe to form Plain Green in furtherance of the rent-a-tribe scheme.**

79.     On March 11, 2011, Think Finance, the Chippewa Cree Tribe, Victory Park (through its ownership of GPLS), and Haynes Investment entered into the initial term sheet for a separate rent-a-tribe venture.

80.     Consistent with the rent-a-bank arrangement, Think Finance agreed to provide the infrastructure to run the lending operations, including the software, "risk management, application processing, underwriting assistance, payment processing, and ongoing service support" for consumer loans in the name of the Chippewa Cree Tribe. Ex. 6 at 1.

81.     In return, the Chippewa Cree Tribe agreed to commit "its best efforts" to complete certain "critical path items" within 14 days, including forming Plain Green, revising the Tribal Transaction Code to allow for the arrangement's lending products, setting up bank accounts and

ACH processing for Plain Green, and obtaining separate originating and servicing addresses for Plain Green. Ex. 6 at 3.

82. In return for the use of its name, Plain Green received "4.5% of cash revenue received" on the loans, as well as reimbursement for expenses. Ex. 6 at 3.

83. Consistent with the PowerPoints, the Chippewa Cree Tribe was not required to contribute any of its own money to fund the loans or operations. Ex. 6 at 1.

84. Because of Think Finance's control and role, the former chief executive officer of Plain Green, Billi Anne Raining Bird, recently testified that she agreed with the plaintiffs' characterization that Plain Green was a "rent-a-tribe." Ex. 7, Raining Bird Depo. 52:13-55:13.

85. Raining Bird further testified that (1) Plain Green had no meaningful role in the lending program other than pro forma review of recommendations from Think Finance; (2) Think Finance handled every material aspect of the lending program, including marketing, underwriting, origination, servicing, funding, and collection of the loans; and (3) Think Finance intentionally tried to conceal information from Plain Green so that it was dependent on Think Finance, who could then continue to demand the vast majority of the profits from the lending business. Ex. 7, Raining Bird Depo., 85:8-22; 102:3-18, 139:8-141:15

**G. Think Finance creates an additional product with the Tunica-Biloxi Tribe.**

86. Upon information and belief, Think Finance approached the Tunica-Biloxi Tribe in like manner to present its "turnkey" proposal on a take it or leave it basis.

87. Subsequently, Think Finance, the Tunica-Biloxi Tribe, and others entered into an agreement for a rent-a-tribe venture.

88. Upon information and belief, Think Finance agreed to provide the infrastructure to run the lending operations, including the software, risk management, application processing,

underwriting assistance, payment processing, and ongoing service support for consumer loans, while the Tribe agreed to form a tribal entity to serve as a front for the lending operations (MobiLoans) and make revisions to the Tribe's code to facilitate the lending scheme.

89.     In return for the use of its names on the loans, MobiLoans would receive 1% of the revenue from the loans.

90.      The Tribe would have no risk associated with the business and would not be required to contribute any of its own money to fund the loan products or the operations.

91.     Think Finance also reimbursed MobiLoans for the little amount of expenses incurred on its end of the enterprise.

## H.     Defendants' role in the enterprise.

92.     Stinsons, 7HBF, and Sequoia were "Think Finance's Key Investors." *See* Ex. 1 at TF-PA-001677.

93.     Upon information and belief, the Stinsons, 7HBF, and Sequoia collectively owned approximately 80-90% of the shares of Think Finance.

94.     Upon information and belief, SCV and Shaper owned most of the remaining shares of Think Finance.

95.     During the pertinent times, the Stinsons, 7HBF, Sequoia, and SCV were the owners of Think Finance, and they dominated and controlled its business and operations.

96.     At all times relevant hereto, the Stinsons, 7HBF, Sequoia, SCV and Shaper participated and operated Think Finance, including carrying out its key decisions and strategies for developing and implementing the rent-a-tribe scheme.

97.     Upon information and belief, the Stinsons, 7HBF, Sequoia, SCV and Shaper attended regular board of director meetings with the officers and executives of Think Finance

whereby they directed, reviewed, and approved key business decisions of Think Finance, including decisions related to the origination, marketing, underwriting, servicing, and collection of the loans.

98.     In addition, the Stinsons, 7HBF, Sequoia, and SCV provided the capital to Think Finance, which then used it to fund the scheme and make the loans in the name of the tribal enterprises.

99.     The Stinsons, 7HBF, Sequoia, SCV and Shaper were fully aware of and active participants in the practices of the enterprise and knew that the practices violated the law.

100.    Each Defendant either directly or indirectly aided, abetted, counseled and/or commanded Think Finance and the other participants in its enterprise, including aiding and abetting the actions of the executives of Think Finance, including Kenneth Rees.

101.    For example, upon information and belief, the Stinsons, 7HBF, Sequoia, SCV and Shaper had knowledge of and participated in Think Finance's decision to challenge a cease and desist issued to Great Plains warning it to stop offering its illegal credit products to New York consumers. *Otoe-Missouria Tribe v. N.Y. Dep't of Fin. Servs*., 974 F.Supp.2d 353, 356 (S.D.N.Y. 2013), *aff'd*, 769 F.3d 105 (2d Cir. 2014).

102.    Think Finance funded and spearheaded this litigation, including drafting the complaint and deciding when to file but left its name off the pleadings.

103.    On September 30, 2013, the district court denied Great Plains' request for a preliminary injunction, finding that the "undisputed facts demonstrate[d]" that the illegal activity was "taking place in New York, off of the Tribes' lands," and thus, Great Plains was "subject to the State's non-discriminatory anti-usury laws." *Id*. at 361.

104.    The district court further reasoned, "There is simply no basis…that the Tribes are treated differently from any other individuals or entities that enter New York to lend to New York residents." *Id*.

105.    On October 1, 2014, the Second Circuit affirmed the decision and made several damaging observations. Among other things, the Second Circuit noted that "a tribe has no legitimate interest in selling an opportunity to evade state law." 769 F.3d 105, 114 (2d Cir. 2014) (citing *Washington v. Confederated Tribes*, 447 U.S. 134 (1980)).

106.    The Second Circuit further explained that "[m]uch of the commercial activity at issue takes place in New York. That is where the borrower is located; the borrower seeks the loan without ever leaving the state, and certainly without traveling to the reservation" and that "collection clearly takes place in New York." *Id*. at 115.

107.    These damaging findings were not the only problem for Defendants' scheme at the end of 2014—the Pennsylvania Attorney General had filed its enforcement action against Think Finance on December 17, 2014. *See Commonwealth of Pennsylvania v. Think Finance, Inc.*, Case No. 14-7139.

108.    Against this backdrop, Defendants (sometimes personally and sometimes through their employee, director or controlling agents) and Think Finance's executives held a series of meetings in an attempt to enhance the model.

109.    For example, in April 2015, Think Finance held a series of meetings that identified potential revisions to their model to strengthen their business model.

110.    At this time, Think Finance identified a number of possible revisions, including: (1) revising the pricing "for marketing services to reflect reasonable cost plus reasonable profit mark up," (2) replacing "cost plus pricing with risk based pricing," which would then be

"determined from bids from all three tribes prior to each marketing campaign," (3) revising "pricing for underwriting services to reflect cost plus a reasonable profit mark up," and (4) having "[t]ribal lenders own at least 5%, expense reimbursement eliminated" or, alternatively, "[e]liminate the tribal revenue share and replace it with residual profits from the fund."[5]

111. At this time, Think Finance also contemplated "[t]otal wind down of portfolio," including stopping all marketing activities and terminating the websites.

112. By July 2015, after a series of meetings with Think Finance's executives, the Stinsons, 7HBF, Sequoia, SCV and Shaper determined to continue Think Finance's business model with Plain Green, Great Plains, and MobiLoans—with minor revisions to the structure that provided the tribal entities with a larger share of the profits.

113. Further, the Stinsons and 7HBF were investors in Think Finance prior to the adoption of the rent-a-tribe scheme, and the Stinsons and 7HBF played an active role in the management of Think Finance and the development and maintenance of the rent-a-tribe scheme.

114. In particular, Mike Stinson, along with Kenneth Rees, was one of the architects of Think Finance's rent-a-tribe model who consulted with attorney Claudia Calloway in developing Think Finance's payday lending scheme.[6]

---

[5] Think Finance allowed the powerpoint to be publicly quoted in briefing filed by Ms. Edwards in the bankruptcy case. However, the actual document maintains its confidentiality designation, and, thus, Plaintiffs do not attach it to this Complaint.

[6] Calloway's advice to her clients is well-documented in the CashCall litigation. *See Consumer Fin. Prot. Bureau v. CashCall, Inc.,* No. CV157522JFWRAOX, 2016 WL 4820635, at *2 (C.D. Cal. Aug. 31, 2016). As these findings of fact detail, Calloway was "recommending that her clients move to a 'tribal model'" and "that under federal Indian law the tribal lender could make these loans, and they could sell the loans to a non-tribal entity, and the loans could be collected upon at the contract rate, and the loans would not be subject to state regulation." *Id*. Calloway presented herself to her clients as someone who could "'facilitate relationships' and provide opportunities" for payday lenders "to diversify and structure a lending model within requirements of law to 'avoid enforcement actions by state and federal regulators." *Consumer Fin. Prot. Bureau v. CashCall,*

115.    Mike Stinson also reached out to the founders of the Western Sky/CashCall lending scheme (John Templer and Butch Webb) in developing Think Finance's payday lending scheme.

116.    When Mike Stinson no longer served on Think Finance's board of directors, Linda Stinson sat in his position and helped make key business decisions for Think Finance through their interactions with Kenneth Rees.

**H.    Defendants received unlawful interest and principal on the void loans.**

117.    Through their ownership of and control over Think Finance, Defendants participated in the collection of usurious loans in Virginia.

118.    Under the terms of the standard Loan Agreements, the interest rates charged were significantly greater than 12% APR—often between 118% and 448%, if not higher.

119.    For example, Inscho was charged with an APR of 448%—over 37 times the 12% interest cap in Virginia for companies that are not licensed by the Commission. Va. Code § 6.2-303(A).

120.    Similarly, Gibbs was charged with an APR of 277.92%, and Williams was charged with an APR of 247.88%.

121.    Neither Defendants nor any of the other participants in the lending scheme had a consumer finance license permitting them to make loans charging interest in excess of 12% APR nor did they ever attempt to obtain such a license. *See* Va. Code § 6.2-1501.

---

*Inc.*, No. CV1507522JFWRAOX, 2018 WL 485963, at *2 (C.D. Cal. Jan. 19, 2018) (finding of fact and conclusion of law after bench trial). Callaway was further advising her clients that "because the loans made pursuant to the Tribal Lending Model were originated by a tribe or tribal member, the loans would be made under the laws of the tribe and would not have to comply with licensing and usury laws in states where borrowers resided." *Id.* at 3.

122.    Accordingly, the loans are null and void, and it was unlawful for Defendants or any of their affiliated entities to collect or receive any principal, interest, or charges on the loans, including the amounts paid by Plaintiffs. Va. Code § 6.2-1541(A).

123.    Defendants and their co-conspirators received at least $711.02 from Ms. Gibbs as a result of the illegal loans to her—most of which was credited as payment for interest or other fees.

124.    Defendants and their co-conspirators received at least $15,369.15 from Ms. Edwards as a result of the illegal loans to her—most of which was credited as payment for interest or other fees.

125.    Defendants and their co-conspirators received at least $1,858.67 from Ms. Williams as a result of the illegal loans to her—most of which was credited as payment for interest or other fees.

126.    Defendants and their co-conspirators received at least $6,042.19 from Mr. Mwethuku as a result of the illegal loans to him—most of which was credited as payment for interest or other fees.

127.    Defendants and their co-conspirators received at least $16,210.84 from Mr. Inscho as a result of the illegal loans to him—most of which was credited as payment for interest or other fees.

128.    Defendants and their co-conspirators received at least $9,009 from Ms. Price as a result of the illegal loans to her—most of which was credited as payment for interest or other fees.

129.    Defendants and their co-conspirators received at least $12,940 from Mr. Hengle as a result of the illegal loans to him—most of which was credited as payment for interest or other fees.

130.   Defendants and their co-conspirators received at least $2,451 from Ms. Blackburn as a result of the illegal loans to her—most of which was credited as payment for interest or other fees.

131.   Through their ownership interest and participation in the enterprise, Defendants received profits from the illegal loans collected from Plaintiffs and the class members' loans. These profits were then reinvested in the Think Finance enterprise and Elevate, another enterprise engaged in interstate commerce.

132.   Defendants' conduct also violated § 1962(c) of RICO, which prohibits the "collection of unlawful debt." 18 U.S.C. § 1962(c).

133.   RICO defines "unlawful debt" as a debt that was incurred in connection with "the business of lending money or a thing of value at a rate usurious under State or Federal law, where the usurious rate is at least twice the enforceable rate." 18 U.S.C. § 1961(6).

134.   Defendants charged an interest rate far in excess of the enforceable rate established by Virginia law, and thus, Defendants violated RICO's prohibition against the collection of unlawful debt.

135.   As a result of Defendants' participation in the enterprise and violations of RICO, Defendants are jointly and severally liable to Plaintiffs and the putative class members for their actual damages, treble damages, costs, and attorneys' fees pursuant to 18 U.S.C. § 1964(c).

**COUNT ONE:**
**VIOLATIONS OF RICO, 18 U.S.C. § 1962(a)**
**(CLASS CLAIM AGAINST ALL DEFENDANTS)**

136.   Plaintiffs restate each of the allegations in the preceding paragraphs as if set forth at length herein.

137.   Pursuant to Rule 23 of the Federal Rules of Civil Procedure, Plaintiffs bring this claim for themselves and on behalf of a class initially defined as:

All individuals: (1) located in Virginia; (2) who took out a consumer loan product with Plain Green, Great Plains, or MobiLoans; and (3) made a payment on the loan.

Plaintiffs are members of this class.

138. **Numerosity. Fed. R. Civ. P 23(a)(1).** Based on the revenue collected from consumers, numerosity is easily satisfied. Additionally, the names and addresses of the class members are identifiable through the internal business records maintained by Think Finance and GPLS, and the class members may be notified of the pendency of this action by published and/or mailed notice.

139. **Predominance of Common Questions of Law and Fact. Fed. R. Civ. P. 23(a)(2).** Common questions of law and fact exist as to all members of the putative class, and there are no factual or legal issues that differ between the putative class members. These common questions predominate over the questions affecting only individual class members. The common questions include: (1) whether a RICO enterprise existed; (2) whether Defendants received income derived from the unlawful collection of debt; (3) whether Defendants used or invested the part of that income to acquire an interest in, to establish, or to operate the enterprise; and (4) what is the proper recovery for Plaintiffs and the class members against each of the Defendants.

140. **Typicality. Fed. R. Civ. P. 23(a)(3).** Plaintiffs' claims are typical of the claims of each putative class member. Plaintiffs are entitled to relief under the same causes of action as the other members of the putative class. Additionally, Plaintiffs' claims are based on the same facts and legal theories as each of the class members.

141. **Adequacy of Representation. Fed. R. Civ. P. 23(a)(4).** Plaintiffs are adequate representatives of the putative class because their interests coincide with, and are not antagonistic to, the interests of the members of the class that they seek to represent. Plaintiffs have retained counsel competent and experienced in such litigation, and they intend to continue to prosecute the

action vigorously. Plaintiffs and their counsel will fairly and adequately protect the interests of the members of the class. Neither Plaintiffs nor their counsel have any interests that might cause them to not vigorously pursue this action.

142.    **Superiority. Fed. R. Civ. P. 23(b)(3).** Questions of law and fact common to the class members predominate over questions affecting only individual members, and a class action is superior to other available methods for fair and efficient adjudication of the controversy. The damages sought by each member are such that individual prosecution would prove burdensome and expensive. It would be virtually impossible for members of the class individually to effectively redress the wrongs done to them. Even if the members of the class themselves could afford such individual litigation, it would be an unnecessary burden on the Courts. Furthermore, individualized litigation presents a potential for inconsistent or contradictory judgments and increases the delay and expense to all parties and to the court system presented by the legal and factual issues raised by Defendants' conduct. By contrast, the class action device will result in substantial benefits to the litigants and the Court by allowing the Court to resolve numerous individual claims based upon a single set of proof in a case.

143.    **Injunctive Relief Appropriate for the Class.  Fed. R. Civ. P. 23(b)(2).** Class certification is appropriate because Defendants acted on grounds generally applicable to the class, making appropriate injunctive relief with respect to Plaintiffs and the class members. Plaintiffs and the putative class seek an injunction ordering Defendants to divest themselves of any interest in the enterprise, including the receipt of any proceeds arising from the unlawful collection of debt; prohibiting Defendants from continuing to engage in the enterprise or selling the outstanding balances on the loans to any third parties.

144.     All of the loans made to Virginia residents included an interest rate far in excess of twice the enforceable rate in Virginia, and thus, the loans constitute "unlawful debt" under RICO. 18 U.S.C. § 1961(6).

145.     As alleged above, Defendants violated § 1962(a) of RICO through the receipt of profit and income derived, directly and indirectly, through collection of unlawful debt by the tribal lending enterprises managed and operated by Think Finance; and through the use and reinvestment of parts of such income to acquire interests in and to further establish and assist the operations of the enterprise.

146.     Defendants participated in the collection of the unlawful debt as a principal by aiding, abetting, procuring proceeds from the enterprise, and willfully investing money for the purpose of the unlawful scheme.

147.     Plaintiffs and the class members were injured as a result of Defendants' violations of 18 U.S.C. § 1962(a) because the loans would not have been made but for their investment and participation in the enterprise.

148.     These injuries were caused by both the racketeering act itself (the making of the unlawful loans) and by continued reinvestment in the Think Finance enterprise in a way that allowed it to sustain itself and continue collection and the making of more unlawful loans.

149.     Accordingly, Defendants are jointly and severally liable to Plaintiffs and the putative class members for their actual damages, treble damages, costs, and attorney's fees pursuant to 18 U.S.C. § 1964(c).

**COUNT TWO:**
**VIOLATIONS OF RICO, 18 U.S.C. § 1962(b)**
**(CLASS CLAIM AGAINST ALL DEFENDANTS)**

150.     Plaintiffs restate each of the allegations in the preceding paragraphs as if set forth at length herein.

151.    Pursuant to Rule 23 of the Federal Rules of Civil Procedure, Plaintiffs bring this claim for themselves and on behalf of a class initially defined as:

> All individuals: (1) located in Virginia; (2) who took out a consumer loan product with Plain Green, Great Plains, or MobiLoans; and (3) made a payment on the loan.

Plaintiffs are members of this class.

152.    **Numerosity. Fed. R. Civ. P 23(a)(1).** Based on the revenue collected from consumers, numerosity is easily satisfied. Additionally, the names and addresses of the class members are identifiable through the internal business records maintained by Defendants, and the class members may be notified of the pendency of this action by published and/or mailed notice.

153.    **Predominance of Common Questions of Law and Fact. Fed. R. Civ. P. 23(a)(2).** Common questions of law and fact exist as to all members of the putative class, and there are no factual or legal issues that differ between the putative class members. These common questions predominate over the questions affecting only individual class members. The common questions include: (1) whether an enterprise existed; (2) whether Defendants acquired and maintained an interest in the enterprise; and (3) what is the proper recovery for Plaintiffs and the class members against each of the Defendants.

154.    **Typicality. Fed. R. Civ. P. 23(a)(3).** Plaintiffs' claims are typical of the claims of each putative class member. In addition, Plaintiffs are entitled to relief under the same causes of action as the other members of the putative class. All are based on the same facts and legal theories.

155.    **Adequacy of Representation. Fed. R. Civ. P. 23(a)(4).** Plaintiffs are adequate representatives of the putative class because their interests coincide with, and are not antagonistic to, the interests of the members of the class they seek to represent; they have retained counsel competent and experienced in such litigation; and they have and intend to continue to prosecute the action vigorously. Plaintiffs and their counsel will fairly and adequately protect the interests of

the members of the class. Neither Plaintiffs nor their counsel have any interests which might cause them not to vigorously pursue this action.

156.     As alleged above, Defendants violated § 1962(b) of RICO by acquiring and maintaining interests in and control of the enterprise involved in the unlawful collection of debt.

157.     Each Defendant participated in the collection of the unlawful debt as a principal by aiding, abetting, procuring proceeds from the enterprise, and by willfully acquiring and maintaining interests in and control of the enterprise.

158.     Plaintiffs and the class members were injured as a result of Defendants' violations of 18 U.S.C. § 1962(b) because the loans would not have been made but for Defendants' investment and participation in the enterprise.

159.     As a result of Defendants' violations, Defendants are jointly and severally liable to Plaintiffs and the putative class members for their actual damages, treble damages, costs, and attorney's fees pursuant to 18 U.S.C. § 1964(c).

## COUNT THREE:
## VIOLATIONS OF RICO, 18 U.S.C. § 1962(c)
## (CLASS CLAIM AGAINST ALL DEFENDANTS)

160.     Plaintiffs restate each of the allegations in the preceding paragraphs as if set forth at length herein.

161.     Pursuant to Rule 23 of the Federal Rules of Civil Procedure, Plaintiffs bring this claim for themselves and on behalf of a class initially defined as:

> All individuals: (1) located in Virginia; (2) who took out a consumer loan product with Plain Green, Great Plains, or MobiLoans; and (3) made a payment on the loan.

Plaintiffs are members of this class.

162.     **Numerosity. Fed. R. Civ. P 23(a)(1).** Upon information and belief and as reflected by the profits generated by Defendants, Plaintiffs allege that the class members are so numerous

that joinder of all is impractical. The names and addresses of the class members are identifiable through the internal business records maintained by Think Finance and GPLS, and the class members may be notified of the pendency of this action by published and/or mailed notice.

163. **Predominance of Common Questions of Law and Fact. Fed. R. Civ. P. 23(a)(2).** Common questions of law and fact exist as to all members of the putative class, and there are no factual or legal issues that differ between the putative class members. These common questions predominate over the questions affecting only individual class members. The common questions include: (1) whether an enterprise existed; (2) whether Defendants participated in the affairs of the enterprise; (3) whether the loans are "unlawful debt" for purposes of RICO; and (4) what is the proper recovery for Plaintiffs and the class members against Defendants for their role in the enterprise.

164. **Typicality. Fed. R. Civ. P. 23(a)(3).** Plaintiffs' claims are typical of the claims of each putative class member. Plaintiffs are entitled to relief under the same causes of action as the other members of the putative class. Additionally, Plaintiffs' claims are based on the same facts and legal theories as each of the class members.

165. **Adequacy of Representation. Fed. R. Civ. P. 23(a)(4).** Plaintiffs are adequate representatives of the putative class because their interests coincide with, and are not antagonistic to, the interests of the members of the class that they seek to represent. Plaintiffs have retained counsel competent and experienced in such litigation, and they intend to continue to prosecute the action vigorously. Plaintiffs and their counsel will fairly and adequately protect the interests of the members of the class. Neither Plaintiffs nor their counsel have any interests that might cause them to not vigorously pursue this action.

166. **Superiority. Fed. R. Civ. P. 23(b)(3).** Questions of law and fact common to the class members predominate over questions affecting only individual members, and a class action is superior to other available methods for fair and efficient adjudication of the controversy. The damages sought by each member are such that individual prosecution would prove burdensome and expensive. It would be virtually impossible for members of the class individually to effectively redress the wrongs done to them. Even if the members of the class themselves could afford such individual litigation, it would be an unnecessary burden on the Courts. Furthermore, individualized litigation presents a potential for inconsistent or contradictory judgments and increases the delay and expense to all parties and to the court system presented by the legal and factual issues raised by Defendants' conduct. By contrast, the class action device will result in substantial benefits to the litigants and the Court by allowing the Court to resolve numerous individual claims based upon a single set of proof in a case.

167. **Injunctive Relief Appropriate for the Class. Fed. R. Civ. P. 23(b)(2).** Class certification is appropriate because Defendants have acted on grounds generally applicable to the class, making appropriate equitable, injunctive relief with respect to Plaintiffs and the class members. Plaintiffs and the putative class seek an injunction ordering Defendants to divest themselves of any interest in any enterprise pled herein, including the receipt of any proceeds arising from the unlawful collection of debt and prohibiting Defendants from continuing to engage in any enterprise pled herein or selling the outstanding balances on the loans to any third parties.

168. As alleged above, Defendants, along with other participants in the enterprise, violated § 1962(c) of RICO through the "collection of unlawful debt." 18 U.S.C. § 1962(c).

169.     RICO defines "unlawful debt" as a debt which was incurred in connection with "the business of lending money or a thing of value at a rate usurious under State or Federal law, where the usurious rate is at least twice the enforceable rate." 18 U.S.C. § 1961(6).

170.     All of the loans made to Virginia residents included an interest rate far in excess of twice the enforceable rate in Virginia.

171.     This conduct began sometime as early as 2011, continues to date, and will be repeated again and again in the future to the detriment of Virginia consumers.

172.     Plaintiffs and the class members were injured as a result of Defendants' violations of 18 U.S.C. § 1962(c) and are entitled to treble their actual damages, which would include any interest, fees, or other sums collected by Defendants.

<u>**COUNT FOUR**</u>**:**
**VIOLATIONS OF RICO, 18 U.S.C. § 1962(d)**
**(CLASS CLAIM AGAINST ALL DEFENDANTS)**

173.     Plaintiffs restate each of the allegations in the preceding paragraphs as if set forth at length herein.

174.     Pursuant to Rule 23 of the Federal Rules of Civil Procedure, Plaintiffs bring this claim for themselves and on behalf of a class initially defined as:

> All individuals: (1) located in Virginia; (2) who took out a consumer loan product with Plain Green, Great Plains, or MobiLoans; and (3) made a payment on the loan.

Plaintiffs are members of this class.

175.     **Numerosity. Fed. R. Civ. P 23(a)(1).** Based on the revenue collected from consumers, numerosity is easily satisfied. Additionally, the names and addresses of the class members are identifiable through the internal business records maintained by Think Finance and GPLS, and the class members may be notified of the pendency of this action by published and/or mailed notice.

176. **Predominance of Common Questions of Law and Fact**. **Fed. R. Civ. P. 23(a)(2).** As explained above, common questions of law and fact exist as to all members of the putative class, and there are no factual or legal issues that differ between the putative class members. These questions predominate over the questions affecting only individual class members.

177. **Typicality**. **Fed. R. Civ. P. 23(a)(3).** Plaintiffs' claims are typical of the claims of each putative class member. In addition, Plaintiffs are entitled to relief under the same causes of action as the other members of the putative class. All are based on the same facts and legal theories.

178. **Adequacy of Representation**. **Fed. R. Civ. P. 23(a)(4).** Plaintiffs are adequate representatives of the putative class because their interests coincide with, and are not antagonistic to, the interests of the members of the class they seek to represent; they have retained counsel competent and experienced in such litigation; and they have and intend to continue to prosecute the action vigorously. Plaintiffs and their counsel will fairly and adequately protect the interests of the members of the class. Neither Plaintiffs nor their counsel have any interests which might cause them not to vigorously pursue this action.

179. As alleged above, Defendants violated § 1962(d) of RICO by entering into a series of agreements to conspire to violate §§ 1962(a) and (c), as evidenced by their agreement to provide millions of dollars of financing for the loans with the knowledge that the loans would be made in violation of state usury and licensing laws, including Virginia's.

180. Plaintiffs and the class members were injured as a result of Defendants' violations of 18 U.S.C. § 1962(d) and are entitled to treble their actual damages, which would include any interest, fees, or other sums collected by the enterprise.

**COUNT FIVE:**
**VIOLATIONS OF VA CODE § 6.2-305**
**(CLASS CLAIM AGAINST ALL DEFENDANTS)**

181.    Plaintiffs restate each of the allegations in the preceding paragraphs as if set forth at length herein.

182.    Pursuant to Rule 23 of the Federal Rules of Civil Procedure, Plaintiffs bring this action for themselves and on behalf of a class initially defined as follows:

> **Usury Class**: All individuals: (1) located in Virginia; (2) who took out a consumer loan product with Plain Green, Great Plains, or MobiLoans; and (3) paid any amount of principal, interest, fees, or other charges.

> Plaintiffs are members of this class.

183.    **Numerosity. Fed. R. Civ. P 23(a)(1).** Based on the revenue collected from consumers, numerosity is easily satisfied. Additionally, the names and addresses of the class members are identifiable through the internal business records maintained by Defendants, and the class members may be notified of the pendency of this action by published and/or mailed notice.

184.    **Predominance of Common Questions of Law and Fact. Fed. R. Civ. P. 23(a)(2).** Common questions of law and fact exist as to all members of the putative class, and there are no factual or legal issues that differ between the putative class members. These questions predominate over the questions affecting only individual class members. The principal issues include: (1) whether the loans made to consumers charged interest in excess of that permitted by state usury laws; (2) whether Plaintiffs may recover from Defendants the amounts paid on the loans; and (3) what is the proper recovery for Plaintiffs and the class members against each Defendant.

185.    **Typicality. Fed. R. Civ. P. 23(a)(3).** Plaintiffs' claims are typical of the claims of each putative class member. In addition, Plaintiffs are entitled to relief under the same causes of action as the other members of the putative class. All claims are based on the same facts and legal theories.

186.    **Adequacy of Representation. Fed. R. Civ. P. 23(a)(4).** Plaintiffs are adequate representatives of the putative class because their interests coincide with, and are not antagonistic to, the interests of the members of the class they seek to represent. Plaintiffs have retained counsel competent and experienced in such litigation, and they intend to continue to prosecute the action vigorously. Plaintiffs and their counsel will fairly and adequately protect the interests of the members of the class. Neither Plaintiffs nor their counsel have any interests that might cause them to not vigorously pursue this action.

187.    **Superiority. Fed. R. Civ. P. 23(b)(3).** Questions of law and fact common to the class members predominate over questions affecting only individual members, and a class action is superior to other available methods for fair and efficient adjudication of the controversy. The damages sought by each member are such that individual prosecution would prove burdensome and expensive. It would be virtually impossible for members of the class individually to effectively redress the wrongs done to them. Even if the members of the class themselves could afford such individual litigation, it would be an unnecessary burden on the Courts. Furthermore, individualized litigation presents a potential for inconsistent or contradictory judgments and increases the delay and expense to all parties and to the court system because of the legal and factual issues raised by Defendants' conduct. By contrast, the class action device will result in substantial benefits to the litigants and the Court by allowing the Court to resolve numerous individual claims based upon a single set of proof in a case.

188.    All of the Plain Green, Great Plains, and MobiLoans contained interest rates exceeding the amounts permitted by state usury laws, including Virginia's 12% interest rate cap.

189.    As explained above, Defendants each received revenues collected on the loans.

190.    Plaintiffs each paid interest in excess of that permitted by Virginia law.

191.    Accordingly, Plaintiffs and the class members are entitled to recover all amounts repaid on the void loans, and, in certain states like Virginia, Plaintiffs and class members are entitled to twice the amount of such usurious interest that was paid in the two years preceding the filing of this action and their attorney's fees and costs. Va. Code § 6.2-305.

**COUNT SIX:**
**UNJUST ENRICHMENT**
**(CLASS CLAIM AGAINST ALL DEFENDANTS)**

192.    Plaintiffs restate each of the allegations in the preceding paragraphs as if set forth at length herein.

193.    Pursuant to Rule 23 of the Federal Rules of Civil Procedure, Plaintiffs bring this action for themselves and on behalf of a class—the "Unjust Enrichment Class"—initially defined as follows:

> **Unjust Enrichment Class**: All individuals: (1) located in Virginia; (2) who took out a consumer loan product with Plain Green, Great Plains, or MobiLoans; and (3) paid any amount of principal, interest, fees, or other charges.

Plaintiffs are members of the unjust enrichment class.

194.    **Numerosity. Fed. R. Civ. P 23(a)(1).** Based on the revenue collected from Virginia consumers, numerosity is easily satisfied. Additionally, the names and addresses of the class members are identifiable through the internal business records maintained by Defendants, and the class members may be notified of the pendency of this action by published and/or mailed notice.

195.    **Predominance of Common Questions of Law and Fact. Fed. R. Civ. P. 23(a)(2).** Common questions of law and fact exist as to all members of the putative class, and there are no factual or legal issues that differ between the putative class members. These questions predominate over the questions affecting only individual class members. The principal issues include: (1) whether Plaintiffs and the class members conferred a benefit on Defendants; (2) whether Defendants knew or should have known of the benefit; (3) whether Defendants retained an unjust

benefit by accepting the proceeds from the void loans; and (4) what is the proper recovery for Plaintiffs and the class members against each of Defendants.

196.   **Typicality. Fed. R. Civ. P. 23(a)(3).** Plaintiffs' claims are typical of the claims of each putative class member. In addition, Plaintiffs are entitled to relief under the same causes of action as the other members of the putative class. All claims are based on the same facts and legal theories.

197.   **Adequacy of Representation. Fed. R. Civ. P. 23(a)(4).** Plaintiffs are adequate representatives of the putative class because their interests coincide with, and are not antagonistic to, the interests of the members of the class they seek to represent. Plaintiffs have retained counsel competent and experienced in such litigation, and they intend to continue to prosecute the action vigorously. Plaintiffs and their counsel will fairly and adequately protect the interests of the members of the class. Neither Plaintiffs nor their counsel have any interests that might cause them to not vigorously pursue this action.

198.   **Superiority. Fed. R. Civ. P. 23(b)(3).** Questions of law and fact common to the class members predominate over questions affecting only individual members, and a class action is superior to other available methods for fair and efficient adjudication of the controversy. The damages sought by each member are such that individual prosecution would prove burdensome and expensive. It would be virtually impossible for members of the class individually to effectively redress the wrongs done to them. Even if the members of the class themselves could afford such individual litigation, it would be an unnecessary burden on the Courts. Furthermore, individualized litigation presents a potential for inconsistent or contradictory judgments and increases the delay and expense to all parties and to the court system because of the legal and factual issues raised by Defendants' conduct. By contrast, the class action device will result in substantial benefits to the

litigants and the Court by allowing the Court to resolve numerous individual claims based upon a single set of proof in a case.

199.    All of the Plain Green, Great Plains, and MobiLoans loans to consumers in Virginia and other states with similar usury laws were void and unenforceable.

200.    Plaintiffs conferred a benefit on Defendants when they repaid the void loans; Defendants knew or should have known of the benefit; and Defendants have been unjustly enriched through their receipt of any amounts in connection with the unlawful loans.

201.    Accordingly, on behalf of themselves and all other similarly situated, Plaintiffs seek to recover from Defendants, jointly and severally, all amounts repaid on any loans with Plain Green Great Plains, or MobiLoans.

**WHEREFORE,** Plaintiffs request that the Court enter judgment on behalf of themselves and the class they seek to represent against Defendants for:

A.    Certification for this matter to proceed as a class action;

B.    Declaratory, injunctive, actual damages and treble damages relief as pled herein;

C.    Attorney's fees, litigation expenses, and costs of suit; and

D.    Such other or further relief as the Court deems proper.

**TRIAL BY JURY IS DEMANDED**

Respectfully submitted,
**PLAINTIFFS**

By: _____*/s/ Kristi C. Kelly*_____
Kristi C. Kelly, Esq., VSB #72791
Andrew J. Guzzo, Esq., VSB #82170
Casey S. Nash, Esq., VSB #84261
KELLY & CRANDALL, PLC
3925 Chain Bridge Road, Suite 202
Fairfax, VA 22030
(703) 424-7572
(703) 591-0167 Facsimile

Email: kkelly@kellyandcrandall.com
Email: aguzzo@kellyandcrandall.com
Email: casey@kellyandcrandall.com

Leonard A. Bennett, Esq., VSB #37523
Craig C. Marchiando, Esq., VSB #89736
Elizabeth W. Hanes, Esq., VSB #75574
CONSUMER LITIGATION ASSOCIATES, P.C.
763 J. Clyde Morris Blvd., Ste. 1-A
Newport News, VA  23601
Telephone: (757) 930-3660
Facsimile: (757) 930-3662
Email:  lenbennett@clalegal.com
Email: craig@clalegal.com
Email: elizabeth@clalegal.com

*Counsel for Plaintiffs*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 1st day of February 2019, I will electronically file the foregoing with the Clerk of the Court using the CM/ECF system, which will then send a notification of such filing (NEF) to all counsel of record.


_____/s/_____
Kristi Cahoon Kelly, Esq., (No. 07244)
KELLY & CRANDALL, PLC
3925 Chain Bridge Road, Suite 202
Fairfax, Virginia 22030
Telephone: (703) 424-7572
Facsimile:  (703) 591-0167
E-mail:  kkelly@kellyandcrandall.com
*Counsel for Plaintiff*