# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
### Richmond Division

DARLENE GIBBS, *et al.*,
*on behalf of themselves and all*
*individuals similarly situated*,

       Plaintiffs,

v.                                     Civil Action No. 3:18cv676

MICHAEL STINSON, *et al.*,

       Defendants.

## <u>MEMORANDUM OPINION</u>

This matter comes before the Court on ten motions:

(1)      Defendants'[1] Motion to Transfer, (ECF No. 61);[2]

(2)      Sequoia's[3] Motion to Dismiss, (ECF No. 63);[4]

---

[1] The Amended Complaint names the following thirteen defendants: 7HBF NO. 2; Sequoia Capital Franchise Fund, L.P.; Sequoia Capital Franchise Partners, LLC; Sequoia Capital Growth Fund III, L.P.; Sequoia Capital Growth III Principals Fund, LLC; Sequoia Capital Growth Partners III, L.P.; Sequoia Capital IX, L.P.; Sequoia Capital Operations, LLC; Sequoia Entrepreneurs Annex Fund, L.P.; Stephen Shaper; Startup Capital Ventures, L.P.; Linda Stinson; Mike Stinson; and, The Stinson 2009 Grantor Retained Annuity Trust. (*See* Am. Compl., ECF No. 43.) For ease of reference, the Court refers to these defendants collectively as "Defendants."

The Amended Complaint names the following Plaintiffs: Darlene Gibbs, Stephanie Edwards, Lula Williams, Patrick Inscho, Lawrence Mwethuku, George Hengle, Tamara Price, and Sherry Blackburn. For ease of reference, the Court refers to these plaintiffs collectively as "Plaintiffs."

[2] Plaintiffs responded, (ECF No. 106), and Defendants replied, (ECF No. 109).

[3] The Court refers to the following eight defendants collectively as "Sequoia": Sequoia Capital Franchise Fund, L.P.; Sequoia Capital Franchise Partners, LLC; Sequoia Capital Growth Fund III, L.P.; Sequoia Capital Growth III Principals Fund, LLC; Sequoia Capital Growth Partners III, L.P.; Sequoia Capital IX, L.P.; Sequoia Capital Operations, LLC; and, Sequoia Entrepreneurs Annex Fund, L.P.

[4] Plaintiffs responded, (ECF No. 85), and Sequoia replied, (ECF No. 100).

(3)      Sequoia's Motion to Stay Pending Arbitration ("Sequoia's Motion to Compel Arbitration"), (ECF No. 65);[5]

(4)      Defendants Michael C. Stinson;[6] 7HBF NO. 2;[7] Linda Stinson; The Stinson 2009 Grantor Retained Annuity Trust; Startup Capital Ventures, L.P.; and, Stephen Shaper's[8] Motion to Compel Arbitration, (ECF No. 59);[9]

(5)      The 7HBF Defendants' Motion to Dismiss for Lack of Personal Jurisdiction, (ECF No. 53);[10]

(6)      The 7HBF Defendants' Motion to Dismiss for Failure to State a Claim, (ECF No. 54);[11]

(7)      The Shaper Defendants' Motion to Dismiss for Lack of Personal Jurisdiction, (ECF No. 56);[12]

(8)      The Shaper Defendants' Motion to Dismiss for Failure to State a Claim, (ECF No. 57);[13]

---

[5] Plaintiffs responded, (ECF No. 86), and Sequoia replied, (ECF No. 99).

[6] The Amended Complaint identifies Michael C. Stinson as "Mike Stinson." The Court will direct the Clerk of the Court to update the docket with Michael Stinson's full name.

[7] For ease of reference, the Court uses the term "the 7HBF Defendants" to collectively refer to Michael Stinson and 7HBF NO. 2.

[8] For ease of reference, the Court uses the term "the Shaper Defendants" to refer to Linda Stinson; The Stinson 2009 Grantor Retained Annuity Trust; Startup Capital Ventures, L.P.; and, Stephen Shaper.

[9] Plaintiffs responded, (ECF No. 84), and the 7HBF Defendants and Shaper Defendants jointly replied, (ECF No. 94).

[10] Plaintiffs responded, (ECF No. 82), and the 7HBF Defendants replied, (ECF No. 92).

[11] The 7HBF Defendants filed the same memorandum in support for both their Motion to Dismiss for Lack of Personal Jurisdiction and their Motion to Dismiss for Failure to State a Claim. (ECF No. 55.) Plaintiffs responded to both of these motions in a single filing, (ECF No. 82), and the 7HBF Defendants replied in a joint reply, (ECF No. 92).

[12] Plaintiffs responded, (ECF No. 83), and the Shaper Defendants replied, (ECF No. 93).

[13] The Shaper Defendants filed the same memorandum in support for both their Motion to Dismiss for Lack of Personal Jurisdiction and their Motion to Dismiss for Failure to State a

(9)     Plaintiffs' "Motion for Leave to File Supplemental Authority In Support of Their Opposition to Defendants' Motions to Compel A[rb]itration and Stay Proceedings Pending Arbitration," (the "First Motion for Leave to File Supplemental Authority"), (ECF No. 101);[14] and,

(10)    Plaintiffs' "Motion for Leave to File Supplemental Authority Related to Defendants' Motion to Transfer," (the "Second Motion for Leave to File Supplemental Authority"), (ECF No. 110).[15]

The matters are ripe for disposition. The Court dispenses with oral argument because the materials before it adequately present the facts and legal contentions, and argument would not aid the decisional process. The Court exercises jurisdiction pursuant to 28 U.S.C. §§ 1331[16] and 1367(a).[17] For the reasons that follow, the Court will grant Plaintiffs' First Motion for Leave to File Supplemental Authority and Plaintiffs' Second Motion for Leave to File Supplemental Authority. The Court will also grant in part and deny in part Sequoia's Motion to Compel Arbitration. The Court will deny the remaining motions.

---

Claim. Plaintiffs responded to both of these motions in a single filing, (ECF No. 83), and the Shaper Defendants replied in a single reply, (ECF No. 93).

[14] Sequoia responded, (ECF No. 102), and Plaintiffs replied, (ECF No. 103). The 7HBF Defendants and the Shaper Defendants did not respond and the time to do so has expired.

[15] Defendants responded, (ECF No. 112), and Plaintiffs replied, (ECF No. 113).

[16] "The district courts shall have original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States." 28 U.S.C. § 1331. The Amended Complaint alleges violations of 18 U.S.C. § 1962 of the Racketeer Influenced and Corrupt Organizations Act ("RICO"). (*See* Am. Compl., ECF No. 43.)

[17] The Court exercises supplemental jurisdiction over Plaintiffs' state usury claim and unjust enrichment claim pursuant to 28 U.S.C. § 1367(a) ("[I]n any civil action of which the district courts have original jurisdiction, the district courts shall have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy . . . .").

# I.  Factual and Procedural Background

## A.    Summary of Allegations in the Amended Complaint[18]

This controversy arises out of Defendants' involvement in an allegedly unlawful lending operation.  The lending operation, which Plaintiffs describe as a "rent-a-tribe" scheme, allegedly offered loans to Plaintiffs and charged interest rates ranging from 118% to 448%.  (Am. Compl. ¶¶ 1, 118–20, ECF No. 43.)

Under this improper so-called "rent-a-tribe" business model, actors establish entities to originate internet-based high interest loans so as to evade state and federal usury and lending laws.  To effectuate the scheme, a non-tribal entity and a Native American Tribe agree to establish a lending company in the Tribe's name.  According to Plaintiffs, the Native American Tribe nominally establishes the lending company to extend its tribal sovereign immunity to the newly-formed business entity.  The tribal lending company, however, receives capital from a different, non-tribal person or company who seeks to use the tribal lending companies to cloak the unlawful high-interest internet loans with sovereign immunity.  The non-tribal entity retains the vast majority of the profits and controls the tribal lending entity, from major business decisions to day-to-day operations.  In exchange, the Native American Tribe receives only a small percentage of the revenue.

---

[18] For the purpose of the Rule 12(b)(6) Motions to Dismiss, the Court will accept the well-pleaded factual allegations in the Amended Complaint as true, and draw all reasonable inferences in favor of Plaintiffs.  *Kensington Volunteer Fire Dep't, Inc. v. Montgomery Cty., Md.*, 684 F.3d 462, 467 (4th Cir. 2012) ("[A] court 'must accept as true all of the factual allegations contained in the complaint' and 'draw all reasonable inferences in favor of the plaintiff.'" (quoting *E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc.*, 637 F.3d 435, 440 (4th Cir. 2011))).

In this case,[19] Plaintiffs bring claims against individuals and entities that owned and invested in Think Finance and its subsidiaries (collectively, "Think Finance"). According to Plaintiffs, non-party Think Finance[20] spearheaded efforts to establish and control the three Native American-owned lending companies at the heart of the allegedly unlawful lending operation.[21] "For more than seven years, Think Finance . . . operated a rent-a-tribe scheme, which sought to evade the usury laws of certain states by using [the Tribes] as the conduit for their loans." (Am. Compl. ¶ 2.) Plaintiffs aver that Think Finance proposed the formation of the lending operation, asking the Tribes to establish the lending companies in their respective names. In exchange, "Think Finance agreed to provide the infrastructure to run the lending operations, including the software, 'risk management, application processing, underwriting assistance, payment processing, and ongoing service support' for [the] consumer loans." (*Id.* ¶ 80 (quoting Am. Compl. Ex. 6 "Chippewa Cree Term Sheet" 1, ECF No. 43-6).) Through this arrangement, Think Finance maintained control over, and derived "the vast majority of the profits" from, the

---

[19] Plaintiffs have "filed four cases against other participants in the alleged enterprise." (Am. Compl. ¶ 1 (citing *Gibbs, et al. v. Rees, et al.*, No. 3:17-cv-386 (E.D. Va. 2017) (hereafter "*Rees*"); *Gibbs, et al. v. Plain Green, LLC, et al.*, No. 3:17-cv-495 (E.D. Va. 2017) (hereafter "*Plain Green*"); *Gibbs, et al. v. Haynes Investments, LLC, et al.*, No. 3:18-cv-48 (E.D. Va. 2018) (hereafter "*Haynes*"); *Gibbs, et al. v. Curry, et al.*, No. 3:18-cv-654 (E.D. Va. 2018) (hereafter "*Curry*")).)

[20] Plaintiffs, represented by the same Counsel, brought suit against Think Finance in *Rees*, which the Court transferred to the U.S. Bankruptcy Court for the Northern District of Texas on March 23, 2018. (Mar. 23, 2018 Order, ECF No. 132, Case No. 3:17cv386 (E.D. Va. 2017).)

[21] The Chippewa Cree Tribe owns Plain Green, LLC ("Plain Green"). (*See* Am. Compl. ¶¶ 79–85.) The Otoe-Missouria Tribe owns Great Plains Lending, LLC ("Great Plains"). (*See* Am. Compl. ¶¶ 63–78.) The Tunica-Biloxi Tribe owns MobiLoans, LLC ("Mobiloans"). (*See* Am. Compl. ¶¶ 86–91.) The Court refers to the Chippewa Cree Tribe, the Otoe-Missouria Tribe, and the Tunica-Biloxi Tribe collectively as the "Tribes."

lending operation.  (*Id.* ¶ 85.)  Plaintiffs represent consumers who took out online loans with the Tribal lending entities, including Great Plains, Plain Green, and Mobiloans.

Here, Plaintiffs aver that each Defendant represents an owner or investor of Think Finance.  "Through their ownership of Think Finance, Defendants participated in the business's key decisions, strategies, and objectives and, in return, generated large profits from their ownership interest in Think Finance."  (*Id.* ¶ 4.)  Plaintiffs claim that "Defendants personally participated in and oversaw the illegal lending enterprise[,] rendering them personally liable to consumers."  (*Id.*)

###   B.     The Loans

The Gibbs and Mwethuku Contracts purport to be subject to the laws of the Chippewa Cree Tribe of the Rocky Boy's Indian Reservation, as the tribal owner of Plain Green.  The Williams Contract, Edwards Contract, and Inscho Contract purport to be subject to the laws of the Otoe-Missouria Tribe of Indians, as the tribal owner of Great Plains. The Price, Hengle, and Blackburn Contracts[22] purport to be subject to the laws of the Tunica-Biloxi Tribe of Louisiana, as the tribal owner of Mobiloans.

The annual interest rates on these loans ranged from "between 118% and 448%, if not higher."  (Am Compl. ¶ 118.)  Plaintiffs state that Defendants received at least $711.02 from Gibbs "as a result of the illegal loans to her—most of which was credited as payment for interest or other fees."  (Am. Compl. ¶ 123.)  Similarly, Defendants allegedly received at least $15,369.15 from Edwards; $1,858.67 from Williams; $6,042.19 from Mwethuku; $16,210.84

---

[22] While Plaintiffs did not include the original loan contracts with the Amended Complaint, they aver that Price, Hengle, and Blackburn entered into Loan Contracts with Mobiloans.  No Defendant contests this statement.  (Resp. 7HBF Def. and Shaper Def. Mot. Compel Arb. 6, ECF No. 84.)

from Inscho; $9,009.00 from Price; $12,940.00 from Hengle; and $2,451.00 from Blackburn. (Am. Compl. ¶¶ 124–30.)

## C.    Procedural Background

On February 1, 2019, Plaintiffs filed a putative class action Amended Complaint[23] against Defendants, asserting numerous federal and state violations associated with the allegedly unlawful lending operation. Plaintiffs pursue this suit on behalf of Virginia residents who entered into loan agreements with the Tribal lending entities Plain Green, Great Plains, or MobiLoans. They bring six class counts as follows:

**Count I:**    **18 U.S.C. § 1962(a).**[24] Plaintiffs allege that Defendants received "income derived, directly and indirectly, through collection of unlawful debt," and used and reinvested "parts of such income to acquire interests in and to further establish and assist the operations of the enterprise." (Am. Compl. ¶ 145.) (The RICO "Income Derived Claim.")

**Count II:**    **18 U.S.C. § 1962(b).** Plaintiffs allege that Defendants acquired and maintained "interests in and control of the enterprise involved in the unlawful collection of debt." (Am. Compl. ¶ 156.) (The RICO "Enterprise Interest and Control Claim.")

**Count III:**    **18 U.S.C. § 1962(c).** Plaintiffs allege that Defendants violated § 1962(c) through the "collection of unlawful debt." (Am. Compl. ¶ 168.) (The RICO "Collection of Unlawful Debt Claim.")

**Count IV:**    **18 U.S.C. § 1962(d).** Plaintiffs allege Defendants entered into several agreements to violate §§ 1962(a)–(c). (Am. Compl. ¶ 179.) (The RICO "Conspiracy Claim.")

---

[23] Plaintiffs originally filed this suit on October 4, 2018. (ECF No. 1.) On February 1, 2019, Plaintiffs filed this Amended Complaint as a matter of right.

[24] Counts I, II, III, and IV (the "RICO Claims") all arise out of 18 U.S.C. § 1962. *See* 18 U.S.C. §§ 1962(a)–(d). The first three provisions in § 1962 proscribe certain actions related to an enterprise engaged in interstate commerce through the collection of unlawful debt. *See* 18 U.S.C. §§ 1962(a)–(c). The fourth provision makes it unlawful to conspire to violate subsections (a), (b), or (c) of the statute. 18 U.S.C. § 1962(d).

**Count V:** **Virginia Usury Laws.**[25] Plaintiffs allege the loans violate Virginia's usury laws because the interest rates exceed 12%. Plaintiffs allege that Defendants unlawfully "received revenues collected on the loans." (Am. Compl. ¶¶ 188–89.)

**Count VI:** **Unjust Enrichment.**[26] Plaintiffs allege they conferred a benefit on Defendants when they repaid the allegedly unlawful loans; that Defendants knew or should have known about the benefit; and that the Defendants "have been unjustly enriched through their receipt of any amounts in connection with the unlawful loans." (Am. Compl. ¶ 200.)

Plaintiffs seek: (1) class certification; (2) declaratory and injunctive relief and damages; and, (3) attorney's fees, litigation expenses, and costs of suit.

Defendants moved to transfer this case to the United States District Court for the Northern District of Texas. The 7HBF Defendants filed their Motion to Dismiss for Lack of Personal Jurisdiction and their Motion to Dismiss for Failure to State a Claim. The Shaper Defendants filed their Motion to Dismiss for Lack of Personal Jurisdiction and their Motion to Dismiss for Failure to State a Claim. The 7HBF Defendants and the Shaper Defendants also jointly filed a Motion to Compel Arbitration. Sequoia filed its Motion to Compel Arbitration.

---

[25] Subject to certain exceptions, Virginia law proscribes charging more than 12% interest rates on loans. Va. Code Ann. § 6.2-303(A). Virginia law provides that a loan contract which violates Virginia's usury provisions "shall be void" and the lender to that void contract agreement cannot "collect, receive, or retain any principal, interest, or charges whatsoever with respect to the loan." Va. Code Ann. §§ 6.2-1541(A)–(B). A borrower who pays interest on a loan in excess of the applicable statutory maximum may bring an action against "the person taking or receiving such payments." Va. Code Ann. § 6.2-305(A).

[26] To state a claim for unjust enrichment, a plaintiff must allege: "(1) a benefit conferred on the defendant by the plaintiff; (2) knowledge on the part of the defendant of the conferring of the benefit; and (3) acceptance or retention of the benefit by the defendant in circumstances that render it inequitable for the defendant to retain the benefit without paying for its value." *Integrated Direct Mktg., LLC v. May*, 129 F. Supp. 3d 336, 374 (E.D. Va. 2015), *aff'd*, 690 F. App'x 822 (4th Cir. 2017).

Additionally, Sequoia moved to dismiss for lack of jurisdiction pursuant to Rule 12(b)(3)[27] and Rule 12(b)(6).[28]  The motions are ripe.

Plaintiffs later filed the First Motion for Leave to File Supplemental Authority and the Second Motion for Leave to File Supplemental Authority, which the Court will grant.[29]

## II.  Analysis:  Motion to Transfer

The Court first addresses the Motion to Transfer, as the disposition of this motion could affect the other pending motions.  In their Motion to Transfer, Defendants seek transfer to the United States Court for the Northern District of Texas (the "Texas Court") on two separate grounds:  first, pursuant to 28 U.S.C. § 1412; and, alternatively, pursuant to the first-to-file rule. For the reasons below, the Court will deny the Motion to Transfer.

### A.      The Court Declines to Transfer the Case Pursuant to § 1412

In their Motion to Transfer, Defendants argue that this Court should transfer this case to the Texas Court for the same reason the Court transferred *Rees* to the Texas Court in 2018:  this case is related to[30] the bankruptcy proceeding currently underway in Texas.  Assuming, without

---

[27] Rule 12(b)(3) allows dismissal for improper venue.  Fed. R. Civ. P. 12(b)(3).

[28] Rule 12(b)(6) allows dismissal for "failure to state a claim upon which relief can be granted."  Fed. R. Civ. P. 12(b)(6).

[29] The Court will grant Plaintiffs' First Motion for Leave to File Supplemental Authority in which Plaintiffs proffer the Second Circuit's opinion in *Gingras v. Think Finance, Inc.*, 922 F.3d 112 (2d Cir. 2019).  Sequoia's response to the First Motion for Leave to File Supplemental Authority does not oppose Plaintiffs' request, instead providing substantive arguments attacking the weight of the proffered authority.  (*See* Sequoia Resp. First Mot. Leave File Suppl. Auth., ECF No. 102.)  Because the Court finds the *Gingras* decision relevant to this proceeding, and because no party opposes it, the Court will grant Plaintiffs' First Motion for Leave to File Supplemental Authority.

[30] Relying in part on *Dunlap v. Friedman's, Inc.*, 331 B.R. 674 (S.D. W.Va. 2005), this Court previously stated that "the language of § 1412, properly considered in the context of the

deciding, that the cases are related pursuant to § 1412, neither the interests of justice nor party convenience favor transfer. [31]   Accordingly, the Court will deny the Motion to Transfer.

### 1.   Legal Standard:  Transfers Pursuant to § 1412

 "A district court may transfer a case or proceeding under title 11 to a district court for another district, in the interest of justice or for the convenience of the parties."  28 U.S.C. § 1412.  In general,

> [a] civil case filed in a district court is related to a case in bankruptcy if the outcome in the civil case "*could conceivably have any effect on the estate being administered in bankruptcy* . . . if the out-come could alter the debtor's rights, liabilities, options, or freedom of action (positively or negatively) and which in any way impacts upon the handling and administration of the bankrupt estate."

*New Horizon of NY LLC v. Jacobs*, 231 F.3d 143, 151 (4th Cir. 2000) (quoting *Celotex Corp. v. Edwards*, 514 U.S. 300, 308 n.6 (1995)).  Importantly, this test "does not require certain or likely alteration of the debtor's rights, liabilities, options[,] or freedom of action, nor does it require certain or likely impact upon the handling and administration of the bankruptcy estate.  The possibility of such alteration or impact is sufficient" for a case to be "related to" a bankruptcy case.  *In re Celotex Corp.*, 124 F.3d 619, 626 (4th Cir. 1997) (citing *Pacor, Inc. v. Higgins*, 743 F.2d 984, 994 (3d Cir. 1984)).  This broad interpretation of "related to" is consistent with congressional intent in enacting § 1334 "to grant comprehensive jurisdiction to the bankruptcy courts so that they might deal efficiently and expeditiously with all matters connected with the

---

statute as a whole, makes clear that § 1412 must apply to all cases 'related to' bankruptcy proceedings."  *Rees*, No. 3:17cv386, 2018 WL 1460705, at * 7–*10 (E.D. Va. Mar. 23, 2018).

[31] Although this case appears related to the Think Finance Bankruptcy Proceeding in the Texas Court,  Plaintiffs argue that Defendants' Motion to Transfer muddies the applicable legal standard required to evaluate "related to," raising nuanced arguments about the details on the Think Finance Proceeding not before this Court.  Because the Court readily finds that this case should proceed in this Court, the Court declines to engage in a lengthy analysis of the broad "related to" aspect of a § 1412 transfer analysis.

bankruptcy estate." *Celotex*, 514 U.S. at 308 (internal quotation marks and citation omitted); *see also New Horizon*, 231 F.3d at 150.

Under § 1412, transfer is appropriate *either* in the interest of justice *or* for the convenience of the parties—a court need not find that both prongs are met to order a transfer. *See* 28 U.S.C. § 1412; *see also Hilton Worldwide, Inc. v. Glob. Benefits Admin. Comm. V. Caesars Entm't Corp.*, 532 B.R. 259, 274 (E.D. Va. 2015) ("[Section] 1412 is a disjunctive provision, allowing for transfer in the interest of justice *or* for the convenience of the parties . . .").

"The '"interest of justice" component of § 1412 is a broad and flexible standard which must be applied on a case-by-case basis.'" *Id.* (quoting *In re Manville Forest Prods., Corp.*, 896 F.2d 1384, 1391 (2d Cir.1990)). In evaluating whether the interest of justice weighs in favor of transfer under § 1412, courts look to several factors, including: (1) the economic and efficient administration of the bankruptcy estate; (2) the so-called "home court" rule—the presumption that the district hearing the bankruptcy case is the proper venue for related actions; (3) judicial efficiency; (4) the ability to receive a fair trial; (5) the state's interest in having the controversy decided within its borders; (6) the enforceability of any judgment; and, (7) the plaintiff's original choice of forum. *Id.* (citing *Blanton v. IMN Fin. Corp.*, 260 B.R. 257, 266 (M.D.N.C. 2001); *see also Coffey Creek Assocs. Ltd. P'ship v. Guardian Prot. Servs., Inc.*, No. 3:09cv295, 2010 WL 1849023, at *5 (W.D.N.C. May 7, 2010) (citations omitted) (listing the same factors). All factors do not receive equal weight, however, and the most important factor is "the economic and efficient administration of the estate." *Dunlap*, 331 B.R. at 680. "The party seeking transfer has the burden of showing by a preponderance of the evidence that either the interest of justice or the convenience of the parties would be served by the requested transfer." *Yolo Capital, Inc. v.*

*Normand*, No. 1:17cv180, 2018 WL 576316, at *2 (W.D.N.C. Jan. 26, 2018) (citing *Garlock*

*Sealing Techs., LLC v. Waters & Kraus, LLP*, No. 3:14-cv-130, 2015 WL 1022291, at *1

(W.D.N.C. Mar. 9, 2015)).

> ## 2. Neither the Interests of Justice Nor Party Convenience Favor Transfer of this Case

Assuming, without deciding, that the cases are related under the meaning of § 1412, the

Court readily finds that neither the interests of justice nor party convenience favor transfer to the

Texas Court. The Court addresses each component below.

> ### a. The Interests of Justice Do Not Favor Transfer

A court evaluating whether the interests of justice favor transfer weighs seven factors.

*Hilton*, 532 B.R. at 274. The Court discusses each factor in turn. *See id.*; *see also Coffey Creek*,

2010 WL 1849023, at *5 (listing the same factors).

First, as to the economic and efficient administration of the bankruptcy estate, this factor

weighs against transfer because the Texas Court has preliminarily approved a settlement in that

case. This Court has also preliminarily approved a related class action settlement to settle cases

pending before it. In support of the Second Motion for Leave to File Supplemental Authority,[32]

Plaintiffs aver that "the pertinent parties executed the attached 81-page Global Settlement and

Restructuring Term Sheet. . . . [i]n connection with the settlement . . . Plaintiffs filed their

Motion for Preliminary Approval of Class Action Settlement" in the Texas Court. (Mem. Supp.

---

[32] Defendants did "not oppose Plaintiffs' request to file the settlement agreement and the motion for preliminary approval of a class action settlement that have been filed with the Bankruptcy Court." (Resp. Second Mot. Leave File Suppl. Auth. 2, ECF No. 112.) Accordingly, the Court will grant the Second Motion for Leave to File Supplemental Authority. (ECF No. 110.)

Second Mot. Leave File Suppl. Auth. 2, ECF No. 111.)  Since this filing, the Bankruptcy Court has preliminarily approved the class action settlement.

On July 17, 2019, this Court granted a motion to preliminarily approve the intertwined class action settlement in *Plain Green*.  (*See* No. 3:17cv495, ECF No. 123.)  The Court has scheduled a Final Approval Hearing for November 1, 2019, near the date the Bankruptcy Court expects to finalize the settlement pending before that court.  Given the procedural posture of the Think Finance Bankruptcy proceeding and the related settlement before this Court, and given the especially complex negotiations and coordination that have led to these settlements, the Court concludes that transferring this case to the Texas Court, with the expectation but no guarantee that the Texas Court will then transfer the matter to the Bankruptcy Court, will create inefficiencies in the administration of the bankruptcy estate.  As required, the Court weighs this factor more heavily than the others it discusses below.  *See Dunlap*, 331 B.R. at 680.

The second factor, the so-called "home court" rule, favors transfer—assuming, only for purposes of this analysis, that this matter relates to the Think Finance Bankruptcy Proceeding in the Bankruptcy Court.

The third factor, judicial efficiency, weighs in favor of proceeding in this Court.  As stated above, adding these parties and claims to the Think Finance Bankruptcy Proceeding would complicate that proceeding and create judicial inefficiencies at a time when the proceeding is nearing its final resolution.  Defendants point out that the Court previously found, in *Rees*, that this factor weighed in favor of transfer, and that the reasoning in the Court's ruling remains sound.  (*See Rees,* Mar. 23, 2018 Mem. Op. 27–28, No. 3:17cv386, ECF No. 131.)  At the time the Court decided *Rees*, it concluded that the Bankruptcy Court would have to resolve several legal issues and claims, meaning judicial efficiency favored "a single court making

those determinations one time, rather than multiple courts ruling on the issues at different times." (*Id.* 28.)

Because the Bankruptcy proceeding has now settled, the factors which the Court considers are meaningfully different. As all parties recognize, several other actions pending before this Court are closely related to this case. Many of these cases were filed after the Court transferred the *Rees* action.[33] The Court has familiarized itself with the factual allegations, legal claims, and defenses across these cases, many of which overlap with the allegations, claims, and defenses included in this case at bar. Any potential gain in judicial efficiency from transferring this case to the Texas Court seems overborne because this Court will have to consider the same underlying facts and claims to address other cases pending before it. *See, e.g.*, *Wenzel v. Knight*, Case No. 3:14cv432, 2015 WL 222179, at *1, *4, *6 (E.D. Va. Jan. 14, 2015) (refusing to grant transfer pursuant to 28 U.S.C. § 1404(a) where the Court has developed familiarity with "underlying key players and legal doctrines" necessary to resolve the case.) As in *Wenzel*, the interests of justice do not favor transfer where this Court's "familiarity with the facts, claims, and underlying law suggests that the overarching dispute might be more efficiently resolved in Virginia." *Id*. at *4.

The fourth factor, the ability to receive a fair trial, and the sixth factor, the enforceability of any judgment, do not weigh in favor of or against transfer. Both the Texas Court and this Court are equipoised to oversee this matter. Nothing indicates that a judgment from either Court would have less effect or weight than that of the other.

---

[33] *See, Plain Green*, No. 3:17-cv-495 (E.D. Va. 2017); *Haynes*, No. 3:18-cv-48 (E.D. Va. 2018); *Curry*, No. 3:18-cv-654 (E.D. Va. 2018).

Finally, the fifth factor, the state's interest in having the controversy decided within its borders, and the seventh factor, the plaintiff's original choice of forum, both favor proceeding in this Court. As the Court noted in its *Rees* decision, "Plaintiffs chose this forum, and Virginia clearly has an interest in protecting its citizens from conduct like that alleged in the [Amended] Complaint." (*Rees*, Mar. 23, 2018 Mem. Op. 28.)

Having reviewed all seven factors, four weigh in favor of proceeding in this Court, including the most weighty factor, the economic and efficient administration of the bankruptcy estate. *See Dunlap*, 331 B.R. at 680. Only one weighs in favor of transfer; and two are neutral. Accordingly, the Court concludes that the interests of justice do not favor transfer and will deny the Motion to Transfer on that basis under 28 U.S.C. § 1412.

### b. The Convenience of the Parties Does Not Favor Transfer

As to party convenience, Defendants argue that none of the Defendants reside in this venue, and that Plaintiffs already must appear in the Texas Court due to other pending litigation. Plaintiffs, who each reside in Virginia, counter that transfer would inconvenience them and create hardship, attaching affidavits in support. (Resp. Mot. Transfer Exs. 1–8 "Plaintiffs Declarations" ¶ 4, ECF Nos. 106-1–106-8; *see, e.g.*, Resp. Mot. Transfer Ex. 8 "Declaration of Lula Williams" ¶¶ 5–6, ECF 106-8 ("I am on disability and have a limited income, so I would be unable to incur the expense of travel . . . [and] I am 71 years old and have high blood pressure, COPD, and diabetes. . . . [which] make it difficult for me to travel long distances.").) While Defendants underplay the inconvenience of travelling for additional cases, this Court considers these factors meaningful.

Defendants place the Herman Declaration and its attachments[34] before the Court to establish the inconvenience they would experience. (ECF No. 90.) Even considering the documents attached, this declaration does not compel a different finding. The Court finds that Defendants fail to meet their burden of proof to establish by a preponderance of the evidence that the Texas Court is more convenient to parties; because merely shifting the inconvenience from Defendants to Plaintiffs cannot suffice. *Koh v. Microtek Intern., Inc.*, 250 F. Supp. 2d 627, 637 (E.D. Va. 2003) (stating that when "the original forum is convenient for plaintiff's witness, but inconvenient for defendant's witnesses, and the reverse is true for the transferee forum . . . transfer is inappropriate because the result of transfer would serve only to shift the balance of inconvenience" (citation omitted)). The Court will deny the Motion to Transfer based on the party convenience aspect of § 1412 as well.

## B. The Court Declines to Transfer the Case Pursuant to the First-to-File Rule

Having reviewed the matter, the Court concludes that the first-to-file rule likely applies.[35] Assuming, without deciding, that the first-to-file rule applies, the Court concludes that the interests of justice amply justify an exception to applying the first-to-file rule in the instant case. The Court will deny the Motion to Transfer under the first-to-file rule.

---

[34] In support of their Motion to Transfer, Defendants submitted the Declaration of Richard L. Scheff, an attorney of record in this matter. (ECF No. 62-1.) The Court struck this declaration from the record because "[a] declaration by an attorney of record in this matter . . . would plainly raise concerns over the integrity of the judicial system should the Court consider it." (May 7, 2019 Mem. Op. 10, ECF No. 104 (citing *Premium Prods., Inc. v. Pro Performance Sports, LLC*, 997 F. Supp. 2d 433, 436 (E.D. Va. 2014)).)
    Defendants submitted the Herman Declaration and its attachments, (ECF No. 90), in conjunction with their Response to Plaintiffs' Motion to Strike, (ECF No. 89). As the Court recognized in its May 7, 2019 Memorandum Opinion, "Plaintiffs do not challenge the propriety of the Herman Declaration." (May 7, 2019 Mem. Op. 9 n. 20.)

[35] Plaintiffs make some attempt to distinguish this case and the Think Finance Bankruptcy Proceeding, but focus their arguments on exceptions to applying the first-to-file rule. (Resp. Mot. Transfer 25, ECF No. 106.)

1. **Legal Standard:  the First-to-File Rule**

"The first-to-file rule provides that 'when multiple suits are filed in different Federal courts upon the same factual issue, the first or prior action is permitted to proceed to the exclusion of another subsequently filed.'" *Victaulic Co. v. E. Indus. Supplies, Inc.*, No: 6:13-01939, 2013 WL 6388761, at *2 (D.S.C. Dec. 6, 2013) (quoting *Allied-Gen. Nuclear Servs. v. Commonwealth Edison Co.*, 675 F.2d 610, 611 n.* (4th Cir. 1982)).  Courts within the United States Court of Appeals for the Fourth Circuit have observed that the Fourth Circuit "has no unyielding 'first-to-file' rule."  *See, e.g., Victaulic*, 2013 WL 6388761 at *2 (quoting *CACI Int'l Inc. v. Pentagen Techs. Int'l, Ltd.*, 70 F.3d 111 (4th Cir. 1995)).  Generally, "the first suit should have priority, absent the showing of balance of convenience in favor of the second action." *Volvo Const. Equip. N. Am., Inc. v. CLM Equip. Co., Inc.*, 386 F.3d 581, 594–95 (4th Cir. 2004).  But the first-to-file rule "is not absolute and is not to be mechanically applied."  *Victaulic*, 2013 WL 6388761, at *2 (quoting *Harris v. McDonnell*, No. 5:13-cv-00077, 2013 WL 5720355, at *3 (W.D. Va. Oct. 18, 2013)).

In determining whether the two actions come within the scope of the first-to-file rule, courts consider "three factors:  (1) the chronology of the filings, (2) the similarity of the parties involved, and (3) the similarity of the issues at stake." *Victaulic*, 2013 WL 6388761, at *3 (quoting *Harris*, 2013 WL 5720355, at *3).  The parties and issues need not be identical, as the first-to-file rule may apply if the parties and issues "are substantively the same or sufficiently similar."  *Id.* (quoting *Harris*, 2013 WL 5720355, at *3).

If two actions fall within the scope of the first-to-file rule, the decision to apply the rule "is an equitable determination that is made on a case-by-case, discretionary basis." *Elderberry of Weber City, LLC v. Living Ctrs-Se, Inc.*, No. 6:12cv52, 2013 WL 1164835, at *4 (W.D. Va. Mar.

20, 2013) (quoting *Nutrition & Fitness, Inc. v. Blue Stuff, Inc.*, 264 F. Supp. 2d 357, 360

(W.D.N.C. 2003)).  Because the first-to-file rule, as a matter of policy, seeks to avoid duplicative

litigation and to conserve judicial resources, "exceptions to the rule are common 'when justice or

expediency requires.'"  *Id.* (quoting *Samsung Elecs. Co., Ltd. v. Rambus, Inc.*, 386 F. Supp. 2d

708, 724 (E.D. Va. 2005)).

"[A]lthough the Fourth Circuit has not stated explicitly that special circumstances may

warrant an exception to the first-to-file rule, it has implicitly recognized a special circumstance

exception in cases involving procedural fencing or forum shopping."  *Id.* (quoting *Federated

Mut. Ins. Co. v. Pactiv Corp.*, No. 5:09cv00073, 2010 WL 503090, at *3 (W.D. Va. Feb. 9,

2010) (internal citations and quotation marks omitted).  When determining whether "special

circumstances" exist, courts within the Fourth Circuit have considered a variety of factors:  the

existence of forum shopping or a "race to the courthouse," how far each case has progressed, and

the balance of convenience.  *Id.* (collecting cases).  In weighing the balance of convenience,

"courts consider the same factors relevant to transfer of venue or forum non conveniens."[36]  *Id.*

---

[36] Title 28, § 1404(a) governs transfer of venue, stating: "For the convenience of parties
and witnesses, in the interest of justice, a district court may transfer any civil action to any other
district or division where it might have been brought."  28 U.S.C. § 1404(a).  The decision to
transfer a case rests in the district court's sound discretion.  *Koh*, 250 F. Supp. 2d at 630.  A court
determining the propriety of a motion to transfer under § 1404(a) follows a two-step inquiry.
*Bascom Research, LLC v. Facebook, Inc.*, No. 1:12cv1111, 2012 WL 12918407, at *1 (E.D. Va.
Dec. 11, 2012) (quoting *Agilent Tech., Inc. v. Micromuse, Inc.*, 316 F. Supp. 2d 322, 324–25
(E.D. Va. 2004)).  First, the court determines whether the claims could have been brought in the
transferee forum.  *Id.*

Second, the court considers the following four factors:  "(1) plaintiff's choice of forum,
(2) convenience of the parties, (3) witness convenience and access, and (4) the interest of
justice."  *Id.* (quoting *Heniz v. Kettler GMBH & Co. v. Razor USA, LLC*, 750 F. Supp. 2d 660,
667 (E.D. Va. 2010)).  A court's decision to transfer depends on the particular facts of the case
because § 1404(a) "provides no guidance as to the weight" that courts should afford each factor.
*Samsung Elecs. Co., Ltd.*, 386 F. Supp. 2d at 716.

(citation omitted).  Ultimately, "[t]he moving party bears the burden of clearly establishing that these factors favor transfer."  *Victaulic*, 2013 WL 6388761, at *3 (citation omitted).

### 2. The Court Will Decline to Transfer This Case Because Special Circumstances Justify Proceeding In This Court

Even in circumstances where the first-to-file would suggest transfer, the decision to invoke the rule "is an equitable determination that is made on a case-by-case, discretionary basis."  *Elderberry*, 2013 WL 1164835, at *4 (quoting *Nutrition & Fitness*, 264 F. Supp. 2d at 360).  A court may use its broad discretion to determine whether special circumstances exist, such as the existence of forum shopping,[37] the progress of both actions, and the balance of convenience.  *Id.* (collecting cases); *see Koh*, 250 F. Supp. 2d at 630.  Here, even assuming that substantial overlap exists between the parties and claims in the Think Finance Bankruptcy Proceeding and this action (meaning that Defendants could properly invoke the first-to-file rule), special circumstances readily persuade the Court that this action should remain, and proceed, in this Court.

First, the progress of the Think Finance Bankruptcy Proceeding counsels against transfer. As the Court discussed above, adding the parties and claims at this late stage would create judicial inefficiencies.  More importantly, the "balance of convenience" strongly favors remaining in this Court.  *See Volvo*, 386 F.3d at 594–95; *see also Elderberry*, 2013 WL 1164835, at *4; *Victaulic*, 2013 WL 6388761, at *3.  When determining the balance of convenience, the Court considers the same factors that a court weighs when ruling on a motion to transfer venue pursuant to 28 U.S.C. § 1404(a).  In analyzing a motion to transfer under 28 U.S.C. § 1404(a), a court must first consider "whether the plaintiff could have brought the action in the transferee

---

[37] This factor does not weigh in favor of or against transfer in the instant case.

forum." *Wenzel,* 2015 WL 222179, at *1. Plaintiffs, in their opposition to the Motion to

Transfer, raise legitimate concerns about personal jurisdiction over the Defendants in the District

of Texas as it pertains to Plaintiffs' claims, which stem from acts that took place in Virginia,

not Texas.[38]

Even setting aside the issue of personal jurisdiction, given the nature of class action suits,

other § 1404 factors weigh in favor of remaining in this Court. A court considers:

"(1) plaintiffs['] choice of forum, (2) convenience of the parties, (3) witness convenience and

access, and (4) the interest of justice." *Wenzel,* 2015 WL 222179, at *2 (quoting *Pragmatus AV,*

*LLC v. Facebook, Inc.*, 769 F. Supp. 2d 991, 994–95 (E.D. Va. 2011)). "In some cases, the

interest of justice trumps the other factors, even when they suggest a different outcome." *Id.* at

*3 (citing *Byerson v. Equifax Info. Servs., LLC*, 467 F. Supp. 2d 627, 635 (E.D. Va. 2006)).

Under this analysis, Defendants cannot meet their burden to "clearly establish[] that these factors

favor transfer." *Victaulic*, 2013 WL 6388761, at *3 (citations omitted).

Remarkably, none of the factors favor transfer. First, as to the plaintiff's choice of

forum, no question exists that Plaintiffs prefer this forum to the Texas Court, given their

opposition to the transfer and their decision to file in this Court. Second, as to party

convenience, Plaintiffs, all of whom reside in Virginia, each filed declarations giving credible

reasons detailing the inconvenience and expense that transfer to the Texas Court would

---

[38] In analyzing a motion to transfer under 28 U.S.C. § 1404(a), a court must first consider "whether the plaintiff could have brought the action in the transferee forum." *Wenzel*, 2015 WL 222179, at *1. The parties disagree over whether Plaintiffs could have brought suit against Defendants in the transferee forum. While Plaintiffs contend that they may not have personal jurisdiction over Defendants in the Texas Court, Defendants counter that personal jurisdiction is waivable, and their motion to transfer to the Texas Court effectively waives any challenge they might otherwise have.

produce.[39]  (*See* Plaintiffs Decls. ¶ 4, ECF Nos. 106-1–106-8.)  And although Defendants may prefer to litigate claims in one venue, based on their contentions in the Motion to Transfer, they have not sufficiently established that requiring them to proceed in this venue would be inconvenient.[40]  Finally, as to the third factor, Plaintiffs' declarations indicate that all eight Plaintiffs live in Virginia and that none of the Plaintiffs know of any person in Texas who could act as a witness in this case.  (*See* Plaintiffs' Decls.)  For this reason, this factor also weighs in favor of remaining in this Court.

Most importantly, the interest of justice—the fourth consideration under § 1404— justifies proceeding in this venue.  As Defendants recognize, several other actions pending here appear closely related to this case.  Any potential gain in judicial efficiency from transferring this case to the Texas Court seem overborne because this Court will have to consider the same underlying facts and claims to address other cases before it.  *See, e.g.*, *Wenzel*, 2015 WL 222179 at *1, *4, *6 (declining to transfer case where the district court's familiarity with "underlying key players and legal doctrines" would increase judicial efficiency).

In sum, even assuming the first-to-file rule applies to this matter, the Court concludes that ample "special circumstances" commend proceeding in this forum and denying Defendants' Motion to Transfer.  *Elderberry*, 2013 WL 1164835, at *4 (quotation omitted).

---

[39] All eight Plaintiffs filed declarations stating credible reasons why travel to Texas would be too burdensome.  Stephanie Edwards, for example, a single mother of three, avers that she would have to "take unpaid leave in order to attend a lengthy trial in Texas" which she "cannot afford to do," (Edwards Decl. ¶¶ 6–7, ECF No. 106-7.)

[40] According to Plaintiffs, eight of the defendants are from California and six are from Texas, meaning Texas is no more convenient than Virginia to at least some of the Defendants. (Resp. Mot. Transfer 21, ECF No. 106.)  This information is not in the Amended Complaint. Although Defendants do not contradict the assertion in their Reply, the Court does not weigh this in its analysis.

### III. Analysis: Motions to Compel Arbitration

**A.     Applicable Law**

Pursuant to the Federal Arbitration Act ("FAA"), "arbitration is a matter of contract and courts must enforce arbitration contracts according to their terms." *Schein v. Archer & White Sails, Inc.*, 139 S. Ct. 524, 529 (2019). Accordingly, principles of contract law govern the enforceability of arbitration agreements, *id.*, and arbitration agreements "shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." *Id.* (quoting 9 U.S.C. § 2.) A "strong federal policy in favor of enforcing arbitration agreements" exists. *Hayes v. Delbert Servs. Corp.*, 811 F.3d 666, 671 (4th Cir. 2016) (quoting *Dean Witter Reynolds, Inc. v. Byrd*, 470 U.S. 213, 217 (1985)). However, "before referring a dispute to an arbitrator, the court determines whether a *valid* arbitration agreement exists." *Schein*, 139 S. Ct. at 530 (emphasis added).

Under the FAA, "federal law applies to all questions of interpretation, construction, validity, revocability, and enforceability [of arbitration agreements]." *Smith Barney, Inc. v. Critical Health Sys. of N.C.*, 212 F.4d 858, 860–61 (4th Cir. 2000). The FAA also generally "preserves state law contract defenses unless such defenses 'rely on the uniqueness of an agreement to arbitrate' and are applied 'in a fashion that disfavors arbitration.'" *Dillon v. BMO Harris Bank, N.A.*, 856 F.3d 330, 334 (4th Cir. 2017) (quoting *AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 341–42 (2011)).

The Supreme Court of the United States "has recognized that arbitration agreements that operate 'as a prospective waiver of a party's right to pursue statutory remedies' are not enforceable because they are in violation of public policy." *Id.* (quoting *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614, 637 n.19 (1985)). "Under this

'prospective waiver doctrine,' courts will not enforce an arbitration agreement if doing so would prevent a litigant from vindicating federal substantive statutory rights." *Id.* (citations omitted). Arbitration agreements that constitute an "integrated scheme to contravene public policy" are invalid, and "severance should not be used" to save the contract as a whole. *Hayes*, 811 F.3d at 676.

**B.  The Court Finds the Plain Green and Great Plains Arbitration Agreements Unenforceable and the Mobiloans Arbitration Agreement Enforceable**

**1.  *Schein* Does Not Prevent the Court From Determining the Validity of the Delegation Provisions in the Arbitration Agreements**

In their respective motions, Defendants argue that the Court cannot evaluate the validity of the Arbitration Agreements.  In particular, the Defendants contend that the Supreme Court's recent decision in *Schein* requires a district court to "enforce a valid delegation provision and inquire no further into the arbitrability of a dispute that falls within the scope of the agreement to arbitrate . . ." (Sequoia Mot. Comp. Arb. 14, ECF No. 66.)  Because the delegation clauses in the arbitration agreements here reserve to the arbitrator "any dispute" concerning the "validity, enforceability, or scope" of the arbitration agreements, defendants assert that the provisions mandate the dispute reach arbitration without interference from a federal court.  (*Id.* 8.) According to Defendants, "a court may not decide for itself that the Agreements to Arbitrate are not enforceable, period."  (*Id.* at 15)

Defendants misread *Schein*.  In that case, the Supreme Court abrogated the judge-made "wholly groundless" exception to the gateway arbitrability decision.  139 S. Ct. at 524.  The "wholly groundless" exception allowed courts to consider whether the issues in dispute were "subject to arbitration" even where the "contract delegate[d] the arbitrability question to an arbitrator."  *Id*. at 529.  But that doctrine does not apply here.  In this case, Plaintiffs challenge

both the *validity* of the arbitration agreement and the validity of the delegation clause, not the arbitrability or non-arbitrability of issues within the agreement. Indeed, *Schein* directly contravenes Defendants' position when it reaffirms that "[t]o be sure, before referring a dispute to an arbitrator, the court determines whether a *valid arbitration agreement exists*." *Id*. at 530 (emphasis added). The Court's task is not to determine whether certain issues are arbitrable, but whether a valid delegation provision exists.

A delegation provision cannot be "valid" if it resides in a contract that disclaims federal law, as that would place "an arbitrator in the impossible position of deciding the enforceability of the agreement without authority to apply any applicable federal or state law." *Smith v. W. Sky Fin., LLC*, 168 F. Supp. 3d 778, 786 (E.D. Pa. 2016); *see also Dillon*, 856 F.3d at 334–35 (refusing to "defer consideration of the prospective waiver doctrine . . . because that provision effects an unambiguous and categorical waiver of federal statutory rights"); *Ryan v. Delbert Servs. Corp.*, 2016 WL 4702352, at *6 (E.D. Pa. Sept. 8, 2016) (finding delegation invalid since "wholesale waiver of federal and state law" would effectively allowing the defendant "to insulate an unenforceable arbitration clause from attack"); *MacDonald v. CashCall*, 2017 WL 1536427, at *4 (D.N.J. Apr. 28, 2017) ("[e]ven if the question of the enforceability of the arbitration clause were sent to an arbitrator, he or she would be categorically prohibited from applying any federal or state law to arrive at an answer."). Defendants' approach would require an arbitrator to determine whether a valid and enforceable arbitration agreement exists absent the federal or state law tools necessary to do so. As a plethora of Courts have rightly concluded, "[t]he just and efficient system of arbitration intended by Congress when it passed the FAA may not play host to this sort of farce." *Hayes*, 811 F.3d at 674.

Because invalid choice-of-law provisions in an arbitration agreement infect the validity of the delegation clause, the Court turns to a review of the choice-of-law provisions in the Plain Green, Great Plains, and Mobiloans Arbitration Agreements.

## 2. Fourth Circuit Precedent: *Hayes* and *Dillon*

Two recent Fourth Circuit cases control the Motion to Compel Arbitration and warrant thorough summaries: *Hayes v. Delbert Services Corp.*, 811 F.3d 666 (4th Cir. 2016); and, *Dillon v. BMO Harris Bank, N.A.*, 856 F.3d 330 (4th Cir. 2017).

In 2016, the Fourth Circuit considered an arbitration agreement similar to the Arbitration Agreements at issue here.[41]  *See generally Hayes*, 811 F.3d 666.  Plaintiff Hayes entered into a loan contract (the "Hayes Contract") with Western Sky Financial, LLC ("Western Sky"), "an online lender owned by Martin Webb," a member of the Cheyenne River Sioux Tribe.  *Id.* at 668.  The Hayes Contract, like the Plaintiffs' Contracts, included underlying loan provisions, choice-of-law provisions, and an arbitration agreement.  *See id.* at 669.  Western Sky issued Hayes a $2,600 loan (minus a $75 origination fee) with an annual interest rate of 139.12%.  *Id.* Over the four-year life cycle of the loan, "Hayes was set to pay $14,093.12 for his $2,525.00" *Id.* at 668–69.  Hayes brought suit to obtain relief from the allegedly unlawful debt collection, and the defendants sought to compel arbitration pursuant to the terms of the Hayes Contract.  *Id.*

---

[41] Similar to Defendants arguments regarding *Schein*, the defendant in Hayes argued that "the parties in this case clearly and unmistakably delegated arbitrability questions, including questions regarding the validity of the arbitration agreement, to arbitration."  *Hayes*, 811 F.3d at 671 n.1.  The Fourth Circuit rejected this contention, determining that, like here, plaintiffs "challenged the validity of that delegation with sufficient force and specificity to occasion our review."  *Id.*  The Fourth Circuit then proceeded to review the arbitration agreements as a whole, finding that the agreements, and the delegation provision within, were "deploy[ed] . . . to avoid state and federal law and to game the entire system."  *Id.* at 676.

The Hayes Contract purported to be "subject solely to the exclusive laws and jurisdiction of the Cheyenne River Sioux Tribe." *Id.* (quoting the Hayes Contract (bold removed)). It expressly disavowed other law, saying: "no other state or federal law or regulation shall apply to this Loan Agreement." *Id.* (quoting the Hayes Contract).

After discussing the rising trend of challenges to similarly-worded arbitration agreements in trial courts, and closely reviewing other provisions in the Hayes Contract related to applicable law, the *Hayes* court concluded that "[t]his arbitration agreement fails for the fundamental reason that it purports to renounce wholesale the application of any federal law to the plaintiffs' federal claims." *Id.* at 673. The *Hayes* court explained:

> With one hand, the arbitration agreement offers an alternative dispute resolution procedure in which aggrieved persons may bring their claims, and with the other, it proceeds to take those very claims away. The just and efficient system of arbitration intended by Congress when it passed the FAA may not play host to this sort of farce.

*Id.* at 673–74. The Fourth Circuit concluded that "a party may not underhandedly convert a choice-of-law clause into a choice of no law clause—it may not flatly and categorically renounce the authority of the federal statutes to which it is and must remain subject." *Id.* at 675. The Fourth Circuit described the Hayes Contract's attempt to prospectively waive Hayes's federal rights as "plainly forbidden" and held it "invalid and unenforceable." *Id.*

The *Hayes* court considered, without deciding, an important secondary issue: the effect of a recently-added provision of the Hayes Contract which allowed "the borrower to select either AAA [American Arbitration Association] or JAMS—both well respected arbitral organizations—to administer the arbitration." *Id.* at 673. The Fourth Circuit wrestled with this portion of the arbitration agreement, noting

> [that] how one might reconcile the lately added AAA or JAMS provision with the rest of the arbitration agreement presents a "conundrum." It is not immediately

clear, for instance, whether an AAA- or JAMS-appointed arbitrator would still need to be an authorized representative of the Tribe, or when and how the Tribe's law or the various convoluted provisions in the agreement would override the AAA or JAMS default rules. But institutions like AAA and JAMS excel at solving these sorts of conundrums, and once the court finds that the parties agreed to assign their dispute to arbitration, it typically is for the arbitral authority to sort out both the major and minor details of how the arbitration will proceed. It is likely for this reason that the FAA largely leaves judicial review of questions concerning the basic fairness and function of an arbitral mechanism for the award enforcement stage.

*Id.* (citations omitted). The Fourth Circuit declined to resolve this "conundrum," instead concluding that the Hayes Contract's "outright rejection of the application of federal law" plainly rendered the agreement invalid. *Id.*

Finally, the *Hayes* court declined to sever the arbitration agreement's "errant provisions." *Id.* at 675. "It is a basic principle of contract law that an unenforceable provision cannot be severed when it goes [to] the 'essence' of the contract." *Id.* at 675–76 (quoting 8 SAMUEL WILLISTON & RICHARD A. LORD, *A Treatise on the Law of Contracts* § 19:73 (4th ed. 1993)). The *Hayes* court considered the arbitration agreement in the context of the entire Hayes Contract, critiquing the "brazen nature" of provisions attempting to evade federal law. Declaring these attempts "the animating purposes" of the arbitration agreements, *id.* at 676, the Fourth Circuit concluded that "[g]ood authority counsels that severance should not be used when an agreement represents an 'integrated scheme to contravene public policy,'" *id.* (citations omitted).

Just over a year after deciding *Hayes*, the Fourth Circuit again considered the enforceability of an arbitration agreement in the context of an online lending contract. *See generally Dillon*, 856 F.3d 330. Plaintiff Dillon entered into a loan agreement (the "Dillon Contract") with Great Plains through Great Plains's website. *Id.* at 332. The Dillon Contract included choice-of-law provisions and an arbitration agreement similar to those in Plaintiffs' Contracts. Although Dillon resided in North Carolina, which prohibits interest rates in excess of

16%, Great Plains charged an interest rate of 440.18% for Dillon's loan. *Id.* Dillon brought suit, alleging the debt violated North Carolina's usury laws, and violated several RICO provisions through their involvement in the collection of unlawful debt. *Id.* at 332–33. Defendants sought to compel arbitration.

The Fourth Circuit concluded that the arbitration agreement within the Dillon Contract ran afoul of the prospective waiver doctrine. *Id.* at 336. The Dillon arbitration agreement provided, in part, that it "shall be governed by the law of the Otoe-Missouria Tribe of Indians. The arbitrator will apply the law of the Otoe-Missouria Tribe of Indians and the terms of this Agreement . . .". *Id.* at 335 (quoting the Dillon Contract (capitalization altered)). While, unlike the Hayes Contract, the arbitration agreement did not *explicitly* disavow federal law, the *Dillon* court found that the choice-of-law provision "implicitly accomplishes what the [Hayes contract] explicitly stated, namely, that the arbitrator shall not allow for the application of any law other than tribal law." *Id.* Additionally, the *Dillon* Court read other choice-of-law provisions in the contract, such as a waiver requiring the customer to "further agree that no other state or federal law or regulation shall apply to this Agreement, its enforcement or interpretation" as "an explicit attempt to disavow the application of federal . . . law." *Id*. at 336. Because the "effect of the arbitration agreement is unambiguous in the context of the whole contract," the Fourth Circuit concluded that the arbitration agreement functioned "as a prospective waiver of federal statutory rights" and was, therefore, invalid. *Id*.

After finding the choice-of-law provision unenforceable, the *Dillon* court declined to sever the unenforceable provisions from the rest of the arbitration agreement, stating that "such a result is untenable. Unlawful portions of a contract may be severed *only* if: (1) the unlawful provision is not central or essential to the parties' agreement; and (2) the party seeking to enforce

the remainder negotiated the agreement in good faith." *Id.* (citing 9 WILLISTON ON CONTRACTS § 19:70 (4th ed. 1993 & Supp. 2010); Restatement (Second) of Contracts § 184 (1981)).  The *Dillon* court concluded that the arbitration agreement failed to meet either prong of the test for severability, *id.* at 336–37, rendering invalid the entire agreement.

### 3. The Court Will Deny the Motion to Compel Arbitration As to Plain Green and Great Plains

The Arbitration Agreements found within Plaintiffs' Contracts with Plain Green and Great Plains[42] (the "Arbitration Agreements") contravene the prospective waiver doctrine because they "unambiguous[ly] attempt to apply tribal law to the exclusion of federal and state law." *Dillon*, 856 F.3d at 336 (citing *Hayes*, 811 F.3d at 675 (emphasis omitted)).  First, both the Arbitration Agreements purport to apply Tribal law exclusively.  Second, the Plain Green and Great Plains Loan Contracts (the "Loan Contracts"), taken as a whole, reinforce the conclusion that the Loan Contracts disavow the application of federal law.  Third, because the choice-of-law provisions in these Arbitration Agreements cannot be severed from the remainder of the Arbitration Agreements, the Court cannot compel arbitration.

---

[42] Sequoia attaches to their Motion to Dismiss copies of several of the loan agreements at issue.  (*See* ECF No. 64-1.)  Specifically, Sequoia attaches the Loan Agreements that Gibbs, Williams, Edwards, Inscho, and Mwethuku entered into with Plain Green and Great Plains. (ECF No. 64-1.)  The Court considered several of these loan agreements in great detail in *Gibbs et al. v. Haynes et al.*  (*See generally* Mar. 22, 2019 Mem. Op., No. 3:18cv48, ECF No. 51.)

Based on the information available to the Court at this time, the Court considers the language in the proffered Great Plains, Plain Green, and Mobiloans Loan Agreements to analyze the Motions to Compel Arbitration.

Numerous provisions in the Arbitration Agreements demonstrate that these Arbitration Agreements sought to apply Tribal law to the exclusion of federal law.[43] The Arbitration Agreements share strong parallels with the arbitration agreements in *Hayes* and *Dillon*, both of which the Fourth Circuit found unenforceable under the prospective waiver doctrine. *See generally Hayes*, 811 F.3d 666; *Dillon*, 856 F.3d 330.

For example, the arbitration agreement in *Dillon* provided that it "shall be governed by the law of the Otoe-Missouria Tribe of Indians. The arbitrator will apply the law of the Otoe-Missouria Tribe of Indians and the terms of this Agreement . . . ." 856 F.3d at 335 (quoting the Dillon Contract (capitalization altered)); *Hayes*, 811 F.3d at 675 ("The arbitrator will apply the laws of the Cheyenne River Sioux Tribal Nation and the terms of this Agreement." (quoting the Hayes Agreement)). The Fourth Circuit concluded that these choice-of-law provisions, paired with disavowals of federal law, "unambiguous[ly] attempt[ed] to apply tribal law to the exclusion of federal and state law." *Dillon*, 856 F.3d at 336 (citing *Hayes*, 811 F.3d at 675 (emphasis omitted)).

The Arbitration Agreements at bar fare no better. Indeed, all five Plain Green and Great Plains agreements explicitly purport to disavow federal and state law. Just like the arbitration agreements discussed in *Dillon* and *Hayes*, the Williams, Edwards, and Inscho Arbitration

---

[43] This comes as no surprise, as both Hayes and Dillon challenged tribal lending contracts. Further, Dillon challenged a Great Plains contract, and several Great Plains Contracts are at issue here. The Plain Green Contracts appear materially similar to the Great Plains Contracts, so all Arbitration Agreements within the Loan Contracts at bar, excepting Mobiloans, share strong similarities with the arbitration agreements in *Dillon* and *Hayes*.

Agreements state that the arbitrator "shall apply Tribal Law and the terms of this Agreement." (Williams Agr. 9; Edwards Agr. 8; Inscho Agr. 9.) Similarly, the Mwethuku Arbitration Agreement requires the arbitrator to "apply the laws of the Chippewa Cree Tribe and the terms of this Agreement." (Mwethuku Agr. 6.)

The Gibbs Arbitration Agreement, worded slightly differently, states that it "shall be governed by Tribal law. The parties additionally agree to look to the Federal Arbitration Act and judicial interpretations thereof for guidance."[44] (Gibbs Agr. 9.) In another section, the Great Plains and Plain Green Arbitration Agreements authorize the arbitrator to "award all remedies available under [Tribal law], whether at law or in equity." (Gibbs Agr. 8; Williams Agr. 9; Edwards Agr. 8; Inscho Agr. 9; Mwethuku Agr. 6.) The absence of any reference to awarding remedies under state or federal law supports the inference that the Arbitration Agreements sought to exclude any state or federal remedy, unless separately authorized by Tribal law. *See Dillon*, 856 F.3d at 335–36.

A different section of the Arbitration Agreements allow borrowers a limited choice of venue to pursue any dispute under the Contracts, "provided that this accommodation . . . shall not be construed . . . to allow for the application of any law other than [Tribal law]." (Gibbs Agr. 7; Williams Agr. 9; Edwards Agr. 8; Inscho Agr. 9; Mwethuku Agr. 6.) These provisions plainly disavow the application of federal law, clearly violating the prospective waiver doctrine. *Hayes*, 811 F.3d at 675.[45]

_____

[44] In contrast to Defendants' assertions otherwise, the fact that this agreement merely "look[s]" to the FAA for "guidance" supports the conclusion that the Gibbs Arbitration Agreement attempts to make the FAA optional, rather than mandatory. (Gibbs Agr. 9.)

[45] In *Hayes*, the Fourth Circuit discussed a provision in the Hayes Contract stating that the "no matter where the arbitration occurs, the arbitrator will not apply 'any law other than the law of the Cheyenne River Sioux Tribe of Indians to this Agreement.'" 811 F.3d at 675 (quoting

These provisions within the Arbitration Agreements plainly support a finding that these

Arbitration Agreements sought to prospectively exclude the application of federal law. Because

any such attempt contravenes the prospective waiver doctrine,[46] the Court finds the choice-of-

---

the Hayes Contract). The *Hayes* court concluded this provision evinced the Hayes Contract's
intent to disavow federal or state law. *Id.*

[46] As to choice-of-law, the 7HBF Defendants and Shaper Defendants reiterate their
request for the Court to follow the Supreme Court's guidance in the *M/S Bremen v. Zapata Off-
Shore Co.*, 407 U.S. 1 (1970). They contend that this Court's analysis of *The Bremen* decision in
*Haynes* "is troubling for several reasons." (7HBF Reply Mot. Compel Arb. Page 2, n.1, ECF
No. 94.) Having read their concerns, the Court stands by its previous analysis of *The Bremen*.
    In *The Bremen*, an admiralty case about a choice-of-forum provision, the Supreme Court
considered a contract between an American corporation and a German corporation to tow a
drilling rig from the state of Louisiana to Italy. 407 U.S. at 2. The contract provided that the
"London Court of Justice" would hear any dispute arising under the contract and, accordingly,
apply English law. *Id.*
    In *Haynes*, this Court distinguished *The Bremen* largely on the grounds that the Supreme
Court couched its decision in admiralty law. 407 U.S. at 10. Defendants assert that the
admiralty distinction has "not been embraced by the Supreme Court." In support of this
proposition, Defendants cite Justice Kennedy's concurrence in *Stewart Organization, Inc. v.
Ricoh Corporation*, arguing that *The Bremen*'s "reasoning applies with much force to federal
courts sitting in diversity." 487 U.S. 22, 33 (1988) (Kennedy, J. concurring). Only one other
Justice joined Justice Kennedy's concurrence. The majority's holding did not stretch that far.
    Justice Marshall's majority opinion in *Stewart*, joined by five other members of the
Supreme Court, found *The Bremen* "instructive" but determined that the proper standard of
review was whether the District Court abused its discretion under 1404(a). *Id.* at 28. At no point
does the *Stewart* majority indicate that differing factual scenarios would not affect the choice-of-
forum analysis, or that *The Bremen* mandated the enforcement of a choice-of-forum clause in
every case. The *Stewart* majority did not say that the Bremen *could not* extend to federal courts,
but they turned to the 1404(a) a choice-of-forum clause, saying it "should receive neither
dispositive consideration . . . nor no consideration . . . but rather the consideration for which
Congress provided in 1404(a)." *Stewart*, 487 U.S. at 31. No hard-line rule exists mandating the
application of a foreign forum selection clause, regardless of factual distinctions.
    And the factual record here diverges from that in *The Bremen* in important ways. This
case does not involve admiralty law, nor are the Plaintiffs "experienced and sophisticated
businessmen." Bremen, 407 U.S. at 12. The loan contracts at hand, and the conduct alleged by
Plaintiffs, occurred either within the continental United States or on land over which "Congress
possess plenary authority." *Michigan v. Bay Mills Indian Cmty.*, 572 U.S. 782, 790 (2014). This
does not necessarily implicate the type of international factors and bargaining experience *The
Bremen* Court weighed.
    More fundamentally, Defendants fail to square their reliance on *The Bremen* with the
Supreme Court's subsequent decision in *Mitsubishi v. Solar*, where the Court noted that in the

law provisions unenforceable.  Not even the strong federal policy in favor of enforcing arbitration agreements compels a different result.

### b. The Full Context of the Plain Green and Great Plains Loan Contracts Fortifies the Court's Conclusion that the Arbitration Agreements Violate the Prospective Waiver Doctrine

As in *Dillon* and *Hayes*, the Court next considers the overall context of the Loan Contracts to determine the enforceability of the Arbitration Agreements within them.[47]  After reviewing all five contracts as a whole, the Court concludes that the Great Plains and Plain Green Loan Contracts attempt to disavow the application of any state and federal law, thereby contravening the prospective waiver doctrine.

As in *Dillon*, the Loan Contracts elsewhere expressly disavow and sometimes contain purported waivers of the application of any state law.  (Gibbs Agr. 1–2; Williams Agr. 1–2, 10; Edwards Agr. 1, 9; Inscho Agr. 1–2, 10; Mwethuku Agr. 1, 7.)  As to federal law, several provisions in the Loan Contracts appear to disavow its application.  Like the Dillon Contract, the Great Plains and Plain Green Loan Contracts include a "Truth in Lending Disclosure," but caution that the disclosure does not constitute "consent[]" to any "application of state or federal law."  (Gibbs Agr. 2; Williams Agr. 2; Edwards Agr. 2; Inscho Agr. 2; Mwethuku Agr. 1.)

---

"event the choice-of-forum and choice-of-law clauses operated in tandem as a prospective waiver of a party's right to pursue statutory remedies . . . we would have little hesitation in condemning the agreement as against public policy."  473 U.S. 614, 637 n.19 (1985) (upholding arbitration agreement where a litigant could "effectively . . . vindicate [his or her] statutory cause of action in the [foreign] arbitral forum.")  *Mitsubishi*, decided after *The Bremen*, cautions that a choice-of-forum and choice-of-law provision cannot be employed to deprive plaintiffs of their statutory rights.  Because the loan agreements in this case would deprive plaintiffs of federal protections, the Court finds them invalid.

[47] Also, as in *Dillon* and *Hayes*, the Court—for now—limits its findings to the relevant contract provisions, evaluating only the enforceability of the Arbitration Agreements within Plaintiffs' Loan Contracts, and not the Loan Contracts as a whole.

The Mwethuku Contract expressly requires Mwethuku to "agree that no other state or federal law or regulation shall apply to this Agreement, its enforcement or interpretation." (Mwethuku Agr. 1.)  Similarly, the other Plain Green and Great Plains Agreements warn the borrower that the loan "is subject to and governed by Tribal law and not the law of the borrower's resident state."  (Gibbs Agr. 1 (capitalization altered); *see* Williams Agr. 1 (capitalization altered); Edwards Agr. 1 (capitalization altered); Inscho Agr. 1 (capitalization altered).)

The "Governing Law" provisions contained in each contract similarly attempt to render federal law optional.  The Mwethuku Agreement states that the Loan Contract is "governed by the Indian Commerce Clause of the Constitution of the United States of America and the laws of the Chippewa Cree Tribe," implicitly disavowing any other aspects of the Constitution or federal or state law.[48]  (Mwethuku Agr. 6.)  Four Contracts state that Tribal law governs each Contract, and that the lender "may choose to voluntarily use certain federal laws as guidelines for the provision of services.  Such voluntary use does not represent acquiescence of the [Tribe] to any federal law."  (Gibbs Agr. 6; Williams Agr. 7; Edwards Agr. 6–7; Inscho Agr. 7.)

Other aspects of the Loan Contracts evince an attempt to disavow the application of federal law.  While all of the Arbitration Agreements within the Loan Contracts provide an

---

[48] The Indian Commerce Clause of the U.S. Constitution, Art. I, § 8, Cl 3, makes "Indian relations . . . the exclusive province of federal law."  *Cty. of Oneida v. Oneida Indian Nation of N.Y.*, 470 U.S. 226, 234 (1985).  It "does not provide a basis for tribal jurisdiction over non-Indians.  *FTC v. Payday Financial, LLC,* 935 F. Supp. 2d 926, 931 n.3 (D.S.D. 2013).  Nor has the Indian Commerce Clause ever been found to serve as a font of substantive rights for Indians or non-Indians.  This Court readily joins other courts that have considered this matter in finding "inclusion of the Indian Commerce Clause amounts to 'invocation of an irrelevant constitutional provision.'"  *See Brice v. Plain Green*, LLC, 372 F. Supp. 3d 955, 970 (N.D. Ca. 2019) (denying a motion to compel arbitration filed by Plain Green on similar arbitration clause because agreement violated the prospective waiver doctrine) (quoting *Jackson v. Payday Fin*., LLC, 764 F.3d 765, 778 (7th Cir. 2014)).

opportunity to opt out of the Arbitration Agreement, a borrower who opts out may only bring

claims within the Tribal court system and under Tribal law.  (Gibbs Agr. 6–7; Williams Agr. 7–

8; Edwards Agr. 7; Inscho Agr. 7–8; Mwethuku Agr. 5)  And though arbitrators would apply the

standard policies and procedures of the selected arbitration firm, the Arbitration Agreements

state that, should any conflict arise between federal rules and Tribal law, Tribal law controls.

(Gibbs Agr. 7; Williams Agr. 8; Edwards Agr. 8; Inscho Agr. 9; Mwethuku Agr. 6.)

Finally, four Contracts provide that any challenge to the arbitration decision must be

brought within the Tribal court system, and would be evaluated pursuant to Tribal law, not

federal or state law, or even standard arbitration rules.  (Gibbs Agr. 8; Williams Agr. 9; Edwards

Agr. 8; Inscho Agr. 9–10.)  The Mwethuku Arbitration does not outline any procedure for

judicial review of the arbitrator's decision.  (*See* Mwethuku Agr.)

Considering the Arbitration Agreements, the full context of the corresponding Loan

Contracts, and highly relevant, controlling Fourth Circuit precedent, the Court finds the

Arbitration Agreements unenforceable and nonseverable.[49]  The Court will deny Sequoia's

---

[49] All five of the Plain Green and Great Plains Contracts proclaim that the other provisions of the Contracts would remain in full force and effect even if a court found some aspect, such as the arbitration agreement, unenforceable.  (Gibbs Agr. 7, Williams Agr. 6; Edwards Agr. 6; Inscho Agr. 7; Mwethuku Agr. 6.)

*Dillon* strongly suggests that such arbitration agreements—even with this purported workaround—would not be severable.  *See Dillon*, 856 F.3d at 336–37.  "Unlawful portions of a contract may be severed *only* if:  (1) the unlawful provision is not central or essential to the parties' agreement; and (2) the party seeking to enforce the remainder negotiated the agreement in good faith."  *Id.* at 336 (citing 8 WILLISTON ON CONTRACTS § 19:70 (4th ed. 1993 & Supp. 2010); Restatement (Second) of Contracts § 184 (1981)).

The Arbitration Agreements fail to meet either prong of the test for severability.  For example, four of these Arbitration Agreements include the following provision:  "As an *integral* component of accepting this [Contract], you irrevocably consent to the exclusive jurisdiction of the Tribal courts for purposes of this [Contract]."  (Gibbs Agr. 9 (emphasis added); Williams Agr. 10 (emphasis added); Edwards Agr. 9 (emphasis added); Inscho Agr. 10 (emphasis added).)  As in *Dillon*, the Court finds the unlawful choice-of-law provisions integral to the Arbitration Agreements, and declines to sever them from the Loan Contracts.

Motion to Compel Arbitration and the 7HBF Defendants and Shaper Defendants' Motion to Compel Arbitration as to the Plain Green and Great Plains loan contracts.

### 4. The Court Will Grant the Motion to Compel Arbitration As to the Mobiloans Contracts

Because the Arbitration Agreement contained within the Mobiloans Agreement does not disavow federal law, wholesale, the Court will grant Sequoia's Motion to Compel Arbitration as to the Mobiloans Contract. As a threshold matter, the Court first determines which Mobiloans contract governs the dispute at bar, and then looks to the substance of the Plaintiffs agreement with Mobiloans.

### a. Mobiloans Contract At-Issue

Neither party attaches a copy of the Mobiloans contract entered into by Plaintiffs Hengle, Price, and Blackburn. Instead, Sequoia and Plaintiffs proffer significantly different Mobiloans contracts. For the reasons stated below, the Court finds that the agreement submitted by Sequoia governs the case at bar.

Sequoia attaches the Mobiloans Terms and Conditions from September 28, 2018. (*See* Ex-1, ECF No. 64-1.) In the accompanying declaration, Kim Palermo, the Chief Compliance Officer of Mobiloans, avers that these were the terms and conditions "in effect when the Plaintiffs filed this lawsuit." (Palermo Decl. ¶¶ 2, 9, ECF No. 64-1.) She explains that "Mobiloans T&C are updated periodically and have been updated since each of the four

---

Furthermore, the *Dillon* court identified that Great Plains "obtained the terms in the arbitration agreement through its 'dominant bargaining power' in a calculated attempt to avoid the application of state and federal law." *Dillon*, 856 F.3d at 337 (quoting Restatement (Second) of Contracts § 184 cmt.b). Based on this, the Fourth Circuit concluded that Great Plains did not negotiate the Dillon Contract in good faith, failing the second prong of the severability analysis. *Id.* Here, the same factors counsel against finding that Plain Green or Great Plains negotiated in good faith.

plaintiffs filled out their online applications." (*Id.* ¶ 9.)  Palermo declares that "[c]onsumers, including the [P]laintiffs, are notified when Mobiloans makes material changes to its T&C." (*Id.*)  If a consumer does not agree to the modified conditions, they "may contact customer service and close his or her account." (*Id.*)  None of the Plaintiffs did so.

In response, Plaintiffs submit a markedly different version of the loan agreement through the declaration of plaintiff George Hengle.  Between April 25, 2014 and August 30, 2016, Hengle took out a number of loans with Mobiloans.  (*See* Hengle Decl. ¶ 3, ECF No. 84-1.)  Hengle avers that he does not "recall receiving a loan agreement" during any of those transactions.  (*Id.* ¶ 5.)  However, in "late 2016," Hengle states that he logged onto the Mobiloans website and "was able to copy and paste the terms and conditions from the Mobiloans website into a Microsoft Word document." (*Id.* ¶ 6.)  Plaintiffs submitted that document (the "Hengle T&C") to the Court.  (Hengle Decl. Ex. A, ECF No. 84-1.)  Because the Court concludes that the Sequoia documentation controls Defendants' Motion to Compel Arbitration, a more in depth explication of the standards governing evidentiary burdens in a motion compel arbitration is necessary here.

### i.     Standard Of Review For Motion to Compel Arbitration

The FAA requires federal courts to "rigorously enforce arbitration agreements according to their terms." *Am. Exp. Co. v. Italian Colors Rest.*, 570 U.S. 228, 233 (2013) (internal quotation marks and citations omitted).  "Agreements to arbitrate are construed according to the ordinary rules of contract interpretation, as augmented by a federal policy requiring that all ambiguities be resolved in favor of arbitration." *Choice Hotels Int'l, Inc. v. BSR Tropicana Resort, Inc.*, 252 F.3d 707, 710 (4th Cir. 2001) (citation omitted).  Courts must compel arbitration if the moving party proves "(1) the existence of a dispute between the parties, (2) a

written agreement that includes an arbitration provision which purports to cover the dispute, (3) the relationship of the transaction, which is evidenced by the agreement, to interstate or foreign commerce, and (4) the failure . . . to arbitrate the dispute." *Adkins v. Labor Ready, Inc.*, 303 F.3d 496, 500–01 (4th Cir. 2002) (quoting *Whiteside v. Teltech Corp.*, 940 F. 2d 99, 102 (4th Cir. 1991)).

Although courts must compel arbitration when a party satisfies these four factors, the standard of review and procedural mechanisms to be applied in resolving these four factors are less clear. "Motions to compel arbitration exist in the netherworld between a motion to dismiss and a motion for summary judgment." *Shaffer v. ACS Gov't Servs., Inc.*, 321 F. Supp. 2d 682, 683 (D. Md. 2004). Recently, a number of district courts in the Fourth Circuit have determined the burden of proof is "akin to the burden on summary judgment" because motions to compel arbitration often require courts to consider evidence outside of the pleadings.[50] *Novic v. Midland Funding, LLC*, 271 F. Supp. 3d 778, 782 (D. Md. 2017) (quoting *Galloway v. Santander Consumer USA, Inc.*, 819 F.3d 79, 85 (4th Cir. 2016)).

Under this modified summary judgment approach,[51] the district court views the facts in a light most favorable to the nonmovant, drawing all justifiable inferences in that party's favor.

---

[50] When a party brings a motion to dismiss for improper venue on the basis of a forum-selection clause, the Fourth Circuit considers it under Federal Rule of Civil Procedure 12(b)(3). *Sucampo Pharms., Inc. v. Astellas Pharma, Inc.*, 471 F.3d 544, 550 (4th Cir. 2006). A Rule 12(b)(3) motion allows the court to consider evidence outside the pleadings. *Id.* (citations omitted). Because an arbitration clause functions as a specialized forum-selection clause, *see Aggarao v. MOL Ship Mgmt. Co., Ltd.*, 675 F.3d 355, 365 n.9 (4th Cir. 2012), the Court will consider evidence outside the pleadings.

[51] Another approach under which courts evaluate a motion to compel arbitration links to the text of § 4 of the FAA, which states in relevant part, that the district court will compel arbitration "upon being satisfied that the making of the agreement for arbitration or the failure to comply therewith is not in issue." 9 U.S.C. § 4. Under this standard, there must be a "judicial conclusion" that there is a validly formed, express agreement to arbitrate. *Granite Rock Co. v. Int'l Bhd. of Teamsters*, 561 U.S. 287, 303 (2010). If a dispute about the agreement to arbitrate

*Ricci v. DeStefano*, 557 U.S. 557, 586 (2009). Summary judgment is appropriate if the moving party demonstrates that there is "no genuine issue as to any material fact" and that it is "entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Defendants, as the "moving parties," have the burden to show that the "[a]rbitration [c]lauses apply to Plaintiffs." *Hancock v. Am. Tel. & Tel., Co., Inc.*, 701 F.3d 1248, 1261 (10th Cir. 2012). If defendants meet that burden, plaintiffs may "rebut that showing with evidence establishing a genuine dispute as to whether the provisions apply." *Id*. The Arbitration Act "establishes that, as a matter of federal law, any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration, whether the problem at hand is the construction of the contract language itself or an allegation of waiver, delay, or a like defense to arbitrability." *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24–25 (1983); *see also Bensadoun v. Jobe-Riat*, 316 F.3d 171, 175 (2d Cir. 2003) (stating that "[t]he presence of undisputed facts in the record require [] the issue of arbitrability to be resolved against the Plaintiff as a matter of law.")

---

exists, the district court should "engage[] in a limited review to ensure that the dispute is arbitrable—i.e., that a valid agreement to arbitrate exists between the parties and that the specific dispute falls within the substantive scope of that agreement." *Glass v. Kidder Peabody & Co., Inc.*, 114 F.3d 446, 454 (4th Cir. 1997). Where a "proponent of an arbitration agreement offers credible, admissible evidence to support a finding of an agreement to arbitrate, the opponent cannot rely on mere unawareness of whether it had made an arbitration agreement." *Dillon v. BMO Harris Bank, N.A.*, 173 F. Supp. 3d 258, 263 (M.D. N.C. 2016) (citing *Almacenes Fernandez, S.A. v. Golodetz*, 148 F.2d 625, 628 (2d Cir. 1945)).

It is unclear what daylight exists, if any, between the two approaches. Both require the party seeking arbitration to offer evidence to satisfy the court that an arbitration agreement actually exists, and both allow the non-moving party to rebut that evidence. Under either standard, the Court must grant the Sequoia Motion to Compel Arbitration as to the Mobiloans Agreements.

## ii.     The 2018 Mobiloans Agreement Controls

The 2018 Mobiloans T&C controls the issue at bar.[52]  Unlike the Plain Green and Great Plains loan agreements discussed above, Plaintiffs did not submit the actual loan contracts Price, Hengle, and Blackburn entered into, leaving the Court without the necessary terms and conditions by which to evaluate the Motion to Compel Arbitration as to the Mobiloans Contracts. Sequoia proffers the 2018 Mobiloans T&C through the Palermo Declaration.  But the Parties offered no further evidence about whether the 2016 or 2018 terms and conditions should apply.

Kim Palermo, the Chief Compliance Officer of Mobiloans, in a document sworn under penalty of perjury, avers that Mobiloans periodically updates its terms and conditions and those terms and conditions "have been updated since each of the four plaintiffs filled out their online applications."[53]  (Palermo Decl. ¶ 9.)  Customers can opt out of the updated terms and conditions by "contact[ing] customer service" or "clos[ing] his or her account."  (*Id*.)  She further declares that:  (1) the attached terms and conditions were those "in effect when the plaintiffs filed this

---

[52] The terms and conditions in the 2016 Mobiloans T&C and the 2018 Mobiloans T&C vary substantially from one another, to the extent that the choice of document applicable here outcome determinative on the prospective waiver doctrine issue.

[53] Although a notary did not sign the Declaration, Sequoia properly brings its contention that Plaintiffs agreed to the updated terms and conditions with this declaration made under penalty of perjury because 28 U.S.C. § 1746 states:

> Wherever . . . any matter is required or permitted to be supported, evidenced, established, or proved by the sworn declaration, verification, certificate, statement, oath, or affidavit, in writing of the person making the same . . . such matter may, with like force and effect, be supported, evidenced, established, or proved by the unsworn declaration. . .

> (2) If executed within the United States, its territories, possessions, or commonwealths: "*I declare (or certify, verify, or state) under penalty of perjury that the foregoing is true and correct. Executed on (date). (Signature)*".

28 U.S.C. § 1746(2) (emphasis added).

lawsuit**;**" (2) "[n]one of the plaintiffs ever objected to any material changes of the Mobiloans T&C or sought to terminate their lines of credit**;**" and**,** (3) "none of the four plaintiffs in this case opted out of the arbitration agreement." (*Id.* ¶¶ 9–10)

The Palermo Declaration offers two forms of evidence. First, it describes the routine business practices of Mobiloans. Under Rule 406 of the Federal Rules of Evidence, "[e]vidence of . . . an organization's routine practice may be admitted to prove that on a particular occasion the . . . organization acted in accordance with the . . . routine practice." Fed. R. Evid. 406. The Palermo Declaration states that these updates were sent as a matter of course, and that updates were sent during the operative period where Plaintiffs held accounts with Mobiloans. In a procedurally analogous case, the Tenth Circuit found that a company's routine practice of sending out terms and conditions constituted admissible evidence that customers had in fact accepted those terms and conditions. *Hancock*, 701 F.3d at 1262 ("Defendants can use Rule 406 routine-practice evidence to show that Plaintiffs were presented with and accepted the [updated terms of service]. In other words, there is no dispute that Defendants may use such evidence to meet their initial burden on their motions."). Palermo's presentation of this routine business practice supports a finding that Plaintiffs received, and accepted, the updated conditions.

Second, the Palermo Declaration reflects "personal knowledge" of the Plaintiffs action—or inaction—to the updated terms and conditions. Fed. R. Civ. P. 56(c)(4) ("An affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated."). In particular, Palermo avers that "[n]one of the plaintiffs ever objected to any material changes of the Mobiloans T&C or sought to terminate their lines of credit." (Palmero Decl. ¶ 9.) As required by Rule 56, Palermo's declaration reflects her personal

knowledge of the Plaintiffs loan contracts. *See* Fed. R. Civ. P. 56(c)(4). Such testimony, based on personal knowledge, is admissible evidence that the Plaintiffs did not opt-out of the updated terms and conditions, and therefore assented to the new terms and choice-of-law provisions. Plaintiffs do not challenge the Palermo Declaration as not evincing personal knowledge.

Together, the routine business practices of Mobiloans and Palermo's declaration amounts to "credible, admissible evidence to support a finding of an agreement to arbitrate" under the law. *BMO Harris*, 173 F. Supp. 3d at 264. This triggers Plaintiffs' burden to "rebut that showing with evidence establishing a genuine dispute as to whether the provisions apply." *Hancock*, 701 F.3d at 1261.

Plaintiffs fail to raise any "genuine dispute as to any material fact"—or any dispute at all—in response to the Palermo Declaration. Fed. R. Civ. P. 56(a). Plaintiffs do not actively deny that the 2018 Mobiloans T&C control, nor do they—even reading their argument favorably—aver, allege, or even suggest that they did not accept the updated terms and conditions.[54] They do not claim that the Palermo Declaration failed to assert personal knowledge of how their accounts operated, including notification of updated terms and conditions. Neither Hengle nor any of the Plaintiffs deny they received the updated terms. Instead, Plaintiffs argue that Sequoia's decision to submit the 2018 Mobiloans T&C, and not the actual language that Plaintiffs entered into, shows that the "Defendants view those documents as less-favorable than the ones they included here." (Resp. Mot. Compel. Arb. 7 n.4, ECF No. 84.) However, the issue

---

[54] Plaintiffs submit the Hengle Declaration wherein Hengle declares he applied for an internet loan from Mobiloans twenty-four times. (*See* Hengle Decl. ¶ 3.) Hengle does not attach a copy of any loan agreement he saw when he filled out his applications because he "do[es] not recall receiving a loan agreement." (*Id*. ¶ 5.) He proffers a 2016 version of the terms and conditions from the Mobiloans website that he copied in "late 2016" after he took out his last loan. (*Id*. ¶ 6.) The Hengle Declaration does not address any factual or legal argument proffered by Sequoia about the effect of the updated terms.

here concerns which loan documents control the present proceedings, not which documents are more or less-favorable to either party. Sequoia offers admissible evidence that Plaintiffs received emails allowing them to opt-out of the updated terms and conditions, and that none of the Plaintiffs did so. On that issue, Plaintiffs fail to dispute that the 2018 Mobiloans Terms and Conditions apply.

The presence of "undisputed facts in the record require [] the issue of arbitrability to be resolved against the Plaintiff as a matter of law." *Bensadoun*, 316 F.3d at 175. Even read in a light most favorable to the Plaintiffs, the Palermo Declaration and Plaintiffs failure to respond to the contentions contained in that Declaration, require the Court to conclude that the 2018 Mobiloans T&C are valid and, therefore, binding on Plaintiffs. *See, e.g.*, *Sacchi v. Verizon Online LLC*, No. 14 Cv. 423 (RA), 2015 WL 765940, at *7 (S.D.N.Y. Feb. 23, 2015) (compelling arbitration where plaintiff received notice of amended terms and conditions); *In re Facebook Biometric Info. Privacy Litig.*, 185 F. Supp. 3d 1155, 1167 (N.D. Cal. 2016) (finding users assented to amended terms by their continued use of website after being provided with email notice that terms were changing with a link to the new terms).[55] Accordingly, the Court directs its analysis towards the 2018 Mobiloans T&C, hereafter the "Mobiloans Agreement."

---

[55] In both the *Sacchi* and *Facebook* courts weighed substantially more evidence that those plaintiffs had accepted the updated terms and conditions. In *Sacchi*, the defendant presented the court with evidence that the Plaintiff had "received affirmative notice of the amendments" and the plaintiff did not deny that he had received that notice. 2015 WL 765940, at *7. In *Facebook*, the district court rendered its decision only after an "evidentiary hearing on disputed fact issues." 185 F. Supp. 3d at 1158. Here, the evidence before the Court is the Palermo Declaration which, while made under penalty of perjury, does not show the specific emails sent to Plaintiffs, nor does it identify any records that the Plaintiffs did not close their accounts. Nonetheless, because Plaintiffs do not dispute the Palermo Declaration's validity or proffer evidence showing they did not receive or accept the 2018 Mobiloans T&C, the Court concludes that those conditions apply.

### b.    <u>Text of the Mobiloans Agreement</u>

To confirm that the Court has before it a valid arbitration agreement, the Court undertakes a review of the language of the Arbitration Agreement. The Mobiloans Agreement contains multiple choice-of-law and governing law provisions, at least six of which are relevant here. First, the actual text of the Arbitration Agreement states that the consumer must "agree that any Dispute (defined below) will be resolved by arbitration in accordance with Tribal Law and *applicable federal law*." (Mobiloans Agr. 21 (emphasis added).) Second, it declares that a "Dispute" encompasses "any clam arising from . . . Tribal, *federal* or state constitution, statute, ordinance regulation, or common law, and including any issue concerning the validity, enforceability, or scope of this Account or the Arbitration Agreement." (*Id*. (emphasis added).)

Third, the Arbitration Agreement further specifies that "the chosen arbitrator will utilize the rules and procedures applicable to consumer disputes of the chosen arbitration organization, but only to the extent that those rules and procedures are consistent with the terms of this Agreement, Tribal Law and *applicable federal law*." (*Id*. (emphasis added).) Fourth, under the section labeled "Judicial Review," the Arbitration Agreement states that the arbitrator "will apply the terms of this Agreement, including the Arbitration Agreement, Tribal Law, and *federal law as appropriate*." (*Id*. 22 (emphasis added).)

Fifth, the Arbitration Agreement permits the arbitrator to "award statutory damages and/or reasonable attorney's fees and expenses . . . [if] allowed by Tribal or *federal statute* or *applicable* law." (*Id*. (emphases added).) And, finally, sixth, the Arbitration Agreement specifies that any arbitration award must be "consistent with this Agreement and *applicable law* or may be set aside by the Tribal court upon judicial review." (*Id*. (emphasis added).)

The Mobiloans Agreement as a whole contains similar language. In the provision labeled "Governing Law," the Agreement states

> This Agreement and the Arbitration Agreement are governed by the laws of the Tunica- Biloxi Tribe of Louisiana, the Indian Commerce Clause of the United States Constitution, the Federal Arbitration Act ("FAA"), and any *applicable federal law* necessary to *uphold federal substantive statutory rights* or. [sic]

(*Id*. 23.) (emphases added.) Altogether, the Agreement employs the term "applicable federal law" eight times. The Mobiloans Agreement also indicates that the Federal Arbitration Act and federal law "as appropriate" will govern the terms. (*Id*. 22–23.)

### c. The Mobiloans Agreement Contemplates the Application of Federal Law to the Arbitration Proceedings

Because the Mobiloans Contract as a whole contemplates the application of federal law to the arbitration proceedings, the Court will grant the Motion to Compel Arbitration as to Mobiloans. The Court does so for two reasons.

First, the "prospective waiver doctrine" does not preclude this result because the Mobiloans Agreement, read as a whole, does not "operate 'as a prospective waiver of a party's right to pursue statutory remedies.'" *Am. Ex.*, 563 U.S. at 242. Rather, the Mobiloans Agreement expressly contemplates the application of federal law to any and all arbitration proceedings. Second, while there are disquieting inconsistencies in the arbitration agreement, the "strong federal policy in favor of enforcing arbitration agreements" necessitates enforcement of the arbitration clause. *Dean Witter,* 470 U.S. at 217.

### i. The Prospective Waiver Doctrine Does Not Apply to the Mobiloans Contract

The "prospective waiver doctrine" does not apply here because the Mobiloans Agreement does not expressly disavow the application of federal law. The Mobiloans Agreement utilizes the phrase "applicable federal law" at least eight times within the Arbitration and Governing Law

sections.  (*See* Mobiloans Agr. 21–23.)  That phrase meaningfully differentiates the Mobiloans

Agreement from the loan contracts considered in *Hayes* and *Dillon*, and the other Arbitration

Agreements in this case.

In the legal context, Black's Law Dictionary defines the term "applicable" as "affecting

or relating to a particular person, group, or situation; having direct relevance."  Black's Law

Dictionary (11th ed. 2019).  Therefore, "applicable federal law" simply refers to federal law

having direct relevance to the issue at hand.  Indeed, the phrase "applicable federal law" is

redundant:  the addition of the term "applicable" does not alter which federal laws apply.  A

court, by definition, would never rely on "inapplicable federal law."  If a federal statutory or

constitutional provision is on point or "relevant," it will apply to the dispute by virtue of the

Supremacy Clause.[56]  The phrase "applicable federal law" renders the Mobiloans Contract

subject to federal law, seemingly without qualification.

Provisions in the Mobiloans Contract beyond the Arbitration Agreement itself bolster the

Court's conclusion.  The Governing Law section—which purports to also govern the Arbitration

Agreement—states that "any applicable federal law necessary to uphold federal substantive

statutory rights or" governs the Mobiloans Agreement.  (Mobiloans Agr. 23.)  Typographical

error aside, the plain language of this section expressly contemplates the presiding professional

arbitrators considering and applying federal law to any dispute.

---

[56] Federal courts' usage of the term "applicable federal law" bolsters this conclusion.
Courts employ the phrase as a modifier to narrow the annals of the U.S. Code to the federal law
"having direct relevance" on the situation at hand, but the phrase does not substantively alter
which laws apply.  Black's Law Dictionary (11th ed. 2019).  The Court could unearth no support
for the proposition that the phrase has a specialized meaning that might limit or otherwise
preclude federal statutory remedies, nor do Plaintiffs offer any.

These provisions meaningfully differentiate the Mobiloans Agreement from those the Fourth Circuit considered in *Hayes* and *Dillon*. In *Hayes*, the contract required the consumer to agree that "no United States state or federal law applies to this Agreement." *Hayes*, 811 F.3d at 676. Here, the language of the agreement forms the opposite result. The Mobiloans Agreement states, albeit awkwardly, that federal law does apply. Similarly, the Dillon Contract required a consumer to "agree that no other state or federal law or regulation shall apply to this Agreement, its enforcement or interpretation." *Dillon*, 856 F.3d at 335. No such waiver, or disavowal of federal law, exists in the Mobiloans Agreement.

The Mobiloans Agreement also differs substantively from the Plain Green and Great Plains Loan Contracts. The Plain Green and Great Plains agreements lack any language suggesting arbitration proceedings would be subject to any law but that of the various Tribes. Furthermore, when the Plain Green and Great Plains Contracts discuss the application of federal law, they do so in language implying that the directives of Congress are optional. (*See, e.g.*, Gibbs Agr. 9) ("[t]he parties additionally agree to look to the Federal Arbitration Act and judicial interpretations thereof for *guidance*." ).) In contrast, the Mobiloans Agreement declares in no uncertain terms that any arbitration proceeding will be subject to federal law, including those laws necessary to "uphold federal substantive statutory rights." (Mobiloans Agr. 21–23.)

The Fourth Circuit in *Hayes* determined that a contract may "not flatly and categorically renounce the authority of the federal statutes to which it is and must remain subject." *Hayes*, 811 F.3d at 675. By repeatedly stating that the Arbitration Agreement will be interpreted "in accordance with . . . applicable federal law," the Mobiloans Agreement acknowledges it is subject to the laws of the United States. (Mobiloans Agr. 21–23.) As such, the prospective waiver doctrine does not apply to the Mobiloans Contract.

The Mobiloans Contract contains several inconsistent or meaningless provisions, and is riddled with typographical errors.[57]   Nonetheless, the "strong federal policy in favor of enforcing arbitration agreements," paired with the ability of the arbitrator to resolve any inconsistencies in the first instance, require this Court to compel arbitration.  *Dean Witter,* 470 U.S. at 217.

The FAA "establishes that, as a matter of federal law, any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration."  *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24–25 (1983).  Once the Court finds that a valid arbitration agreement exists, "it typically is for the arbitral authority to sort out both the major and minor details of how the arbitration will proceed."  *Hayes*, 811 F.3d at 673.  At that point, the district court "has 'exhausted its function' and may not intervene again until a party objects to the arbitration award or seeks enforcement thereof."  *Glass v. Kidder Peabody & Co., Inc.*, 114 F.3d 446, 454 (4th Cir. 1997) (quoting *Steelworkers v. American Mfg. Co.*, 363 U.S. 564, 571 (1960) (Brennan, J. concurring).  This holds true "even if the court thinks that a party's claim on the merits is frivolous."  *Schein*, 139 S. Ct. at 530.  Restraint on this matter extends even to a "choice-of-law question" which must be determined in the "first instance by the arbitrator."  *Mitsubishi,* 473 U.S. at 637 n.19.

---

[57] The Mobiloans Agreement contains a key typographical error, stating that it is subject to "any applicable federal law necessary to uphold federal substantive statutory rights **or**." (Mobiloans Agr. 23 emphasis added).)  While the addition of another provision after "applicable federal law" would be a redundancy on top of a redundancy, the Court finds the questionable draftsmanship of the Mobiloans Agreement disquieting.  Nonetheless, the strong federal policy of enforcing arbitration agreements requires that inconsistencies raised by the Mobiloans Agreement should be resolved in the first instance by the Parties' agreed arbitrator.  *Schein*, 139 S. Ct. at 530.

Plaintiffs contend that, despite the text of the Mobiloans Contract, the arbitrator will be unable to apply federal law because the "Tunica-Biloxi Code requires enforcement of the Agreements, which mandate Tribal Law." (Resp. Mot. Compel Arb. 26, ECF No. 84.) Because tribal law must apply, there "is therefore no hope that any law but the Tribe's would apply in arbitration or judicial review of an arbitration outcome," meaning that consumers federal rights would be "extinguished." (*Id.*) According to Plaintiffs, the Court should not leave procedural and choice-of-law issues to the arbitrator because it will result in the denial of guaranteed federal rights. Plaintiffs' argument, however, does not align with the text of the Tunica-Biloxi Arbitration Code.[58]

The Tunica-Biloxi Arbitration Code expressly allows the "parties [to] agree upon the jurisdiction whose substantive law governs the interpretation and enforcement of the agreement or claim." Tunica-Biloxi Arb. Code § 12. Here, the Mobiloans Contract contemplates the application of both Tribal Law and federal law. Nothing within the Tunica-Biloxi Arbitration Code requires the chosen arbiter to apply laws outside of those the Parties have chosen.

Importantly, the Tunica-Biloxi Arbitration Code also expressly contemplates the application of federal law. *See* Tunica-Biloxi Arb. Code § 11.2 ("consistent with *federal law* and the purpose of this Code, any ambiguities regarding the validity, scope, or enforceability of an agreement to arbitrate . . . arbitration, shall be resolved by the arbitrator" (emphasis added).) And should the arbitrator find that the choice-of-law provisions as stated in the Agreement

---

[58] Plaintiffs point out that it "cannot be determined when or if [the Tunica-Biloxi Arbitration Code] was duly enacted" and therefore question whether it would even apply to the arbitration proceedings. (Resp. Mot. Compel Arb. 26.) However, the existence of the Tunica-Biloxi Arbitration Code is not essential to the Arbitration Agreement or the Court's decision to compel arbitration as to Mobiloans. If the arbitrator found that the Code, and thus Tribal Law, did not apply, the arbitrator would be well-within his or her power to use other law made applicable by the Arbitration Agreement: namely, the FAA and other federal laws.

unenforceable or unworkable, the Tunica-Biloxi Arbitration Code then contains a default choice-of-law section, which once again, contemplates the application of federal law to the arbitration proceedings. *See* Tunica-Biloxi Arb. Code § 12.3 ("whenever the Agreement does not set forth a choice-of-law provision, the Tribal Court shall apply the substantive law of the Tribe, including any applicable choice-of-law principles, and then applicable federal law and then the substantive law of the State of Louisiana.")

Arbitration of Plaintiffs' claims might very well prove difficult. The Parties' chosen arbitrator will have to determine how Tribal and federal law interact in arbitration agreements, and employ procedural rules that protect the substantive rights of both tribal and federal law while remaining true to the text of the Arbitration Agreement. But, as Judge Wilkinson opined in *Hayes*, professional arbitration "institutions like AAA and JAMS excel at solving these sorts of conundrums." *Hayes*, 811 F.3d at 673. And district courts are not permitted to determine arbitral issues because the exact form and nature of that arbitration seems unclear, or even problematic. "Once it is determined . . . that the parties are obligated to submit the subject matter of a dispute to arbitration, 'procedural' questions which grow out of the dispute and bear on its final disposition should be left to the arbitrator." *Kidder Peabody,* 114 F.3d at 453 (quoting *John Wiley & Sons, Inc. v. Livingston*, 376 U.S. 543, 84 (1964)).

As to the Mobiloans Contracts, the Court has "'exhausted its function'" by concluding that the Plaintiffs must submit their disputes with Mobiloans to arbitration. *Id.* The Court may not intervene again until a party objects to the arbitration award or seeks enforcement thereof." *Id.* at 454. The Court will grant Sequoia's Motion to Compel Arbitration as to Mobiloans.

## IV.  Analysis:  Rule 12(b)(6) Motions to Dismiss

Next, the Court considers three Motions to Dismiss pursuant to Rule 12(b)(6):  the

7HBF Defendants' Motion to Dismiss;[59] the Shaper Defendants' Motion to Dismiss;[60] and

Sequoia's Motion to Dismiss.[61]  Defendants challenge each of the six class claims that Plaintiffs

---

[59] The 7HBF Defendants also challenge personal jurisdiction, suggesting that the Court decline to follow binding Fourth Circuit precedent.  (7HBF Defendants Mem. Supp. Mot. Dismiss 6–9, ECF No. 55.)  Plaintiffs served Defendants in accordance with the Fourth Circuit's interpretation of 18 U.S.C. § 1965(d).  *See ESAB Grp., Inc. v. Centricut, Inc.*, 126 F.3d 617, 626–27 (4th Cir. 1997).  In *ESAB*, the Fourth Circuit ruled that § 1965(d) allows a plaintiff to establish personal jurisdiction over a defendant by effectuating service over the defendant in any district in which the defendant resides.  *Id.*

As another court in the Eastern District of Virginia recently noted, "[t]his conclusion puts the Fourth Circuit in the clear minority."  *George Hengle, et al. v. Mark Curry, et al.,* No, 3:18cv100, 2018 WL 3016289, (E.D. Va. 2018) (discussing cases).  Defendants ask the Court to "decline to apply the Fourth Circuit's decision in *ESAB* given the weight of contrary authority."  (7HBF Defendants Mem. Supp. Mot. Dismiss 7.)  The Fourth Circuit has not overruled *ESAB* and the Court declines to stray from binding precedent.

[60] In their Motion to Dismiss, the Shaper Defendants adopt all of the arguments that the 7HBF Defendants outline in their Motion to Dismiss.  In response, Plaintiffs reference and incorporate their response to the 7HBF Defendants' Motion to Dismiss.  Despite this, because the 7HBF Defendants and Shaper Defendants proffer the same arguments, the Court's analysis and discussion of the 7HBF Defendants' Motion to Dismiss, including that in footnote 59, applies with equal force to the Shaper Defendants.

[61] Sequoia raises two other arguments for dismissal, both of which are unavailing.  First, Sequoia moves to dismiss the Amended Complaint for improper venue pursuant to Federal Rule of Civil Procedure 12(b)(3).  Under the general venue statute, venue is proper where a "substantial part of the events . . . giving rise to the claim occurred."  28 U.S.C. § 1391(b).  Plaintiffs may establish venue to pursue their RICO claims under either RICO or the general venue statutes.  *ESAB,* 126 F.3d at 626.

Here, Plaintiffs allege that Sequoia violated RICO by collecting on usurious loans.  As one Court in this Division has found, this collection "necessarily occurred wherever the class member was located when the payment was made."  *Hengle*, 2018 WL 3016289, at *6.  Because a "substantial part of the events" that form the basis of Plaintiffs' claims occurred in Virginia, the Court will deny Sequoia's Motion to Dismiss based on improper venue.

Second, Sequoia moves to dismiss based on the "claim splitting doctrine," which proscribes a plaintiff from filing separate suits against the same defendants for the same alleged harms.  *See, e.g.*, *Sensormatic Sec. Corp. v. Sensormatic Elec. Corp.*, 273 Fed. App'x 256, 265 (4th Cir. 2008).  Sequoia does not argue that Plaintiffs have previously sued it for these harms

assert against them as failing to state a claim under Federal Rule of Civil Procedure 12(b)(6).
For the reasons articulated below, the Court finds that Plaintiffs meet their burden.
Accordingly, the Court will deny the Motions to Dismiss.

### A.  Legal Standard:  Rule 12(b)(6) Motion to Dismiss

"A motion to dismiss under Rule 12(b)(6) tests the sufficiency of a complaint; importantly, it does not resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses." *Republican Party of N.C. v. Martin*, 980 F.2d 943, 952 (4th Cir. 1992) (citing 5A Charles A. Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1356 (1990)).  To survive Rule 12(b)(6) scrutiny, a complaint must contain sufficient factual information to "state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007); *see also* Fed. R. Civ. P. 8(a)(2) ("A pleading that states a claim for relief must contain . . . a short and plain statement of the claim showing that the pleader is entitled to relief.").  Mere labels and conclusions declaring that the plaintiff is entitled to relief are not enough. *Twombly*, 550 U.S. at 555.  Thus, "naked assertions of wrongdoing necessitate some factual enhancement within the complaint to cross the line between possibility and plausibility of entitlement to relief." *Francis v. Giacomelli*, 588 F.3d 186, 193 (4th Cir. 2009) (internal quotation marks omitted).

A complaint achieves facial plausibility when the facts contained therein support a reasonable inference that the defendant is liable for the misconduct alleged. *Twombly*, 550 U.S.

---

before.  Instead, Sequoia contends that it is somehow in privity with other defendants *only* for the purposes of its claim splitting argument.

In doing so, Sequoia contradicts its own arguments.  Sequoia asks the Court to find on the one hand that it is not in privity for the purposes of liability, but on the other, that it should be considered in privity for the purposes of claim splitting.  The Court cannot embrace such an approach.  Accordingly, the Court will deny Sequoia's Motion to Dismiss on the grounds of the claim splitting doctrine.

at 556; *see also Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). This analysis is context-specific and requires "the reviewing court to draw on its judicial experience and common sense." *Francis*, 588 F.3d at 193. The Court must assume all well-pleaded factual allegations to be true and determine whether, viewed in the light most favorable to the plaintiff, they "plausibly give rise to an entitlement to relief." *Iqbal*, 556 U.S. at 676–79; *see also Kensington*, 684 F.3d at 467 (finding that the court in deciding a Rule 12(b)(6) motion to dismiss "must accept as true all of the factual allegations contained in the complaint' and 'draw all reasonable inferences in favor of the plaintiff'" (quoting *Kolon Indus., Inc.*, 637 F.3d at 440)). This principle applies only to factual allegations, however, and "a court considering a motion to dismiss can choose to begin by identifying the pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth." *Iqbal*, 556 U.S. at 679.

**B.  All Six Counts Survive the Motions to Dismiss**

Plaintiffs allege that Defendants violated RICO by engaging in a series of acts to establish and expand on an unlawful lending operation. Specifically, Plaintiffs allege Defendants played an instrumental role in designing the improper Tribal lending business structure, provided necessary funding for such ventures, and reaped profits from the collection of repayments on the unlawful Loan Contracts. The Loan Contracts, according to Plaintiffs, violate Virginia usury laws because they charge more than 12% annual interest, the statutory limit. For the reasons stated below, the Court concludes that each claim survives Defendants' Rule 12(b)(6) challenge.

**1.  Count V:  Virginia Usury Claim**

The Court first addresses Count V (the Virginia Usury Claim) because it undergirds all the RICO counts. Plaintiffs allege that the Loan Contracts charge rates unlawful under Virginia law. The resulting debt constitutes the relevant "unlawful debt" in Counts I – IV, forming the

basis of the RICO claims. The RICO claims all involve the "collection of unlawful debt" under state law. 18 U.S.C. § 1964. RICO defines "unlawful debt," in relevant part, as:

> a debt . . . which is unenforceable under State or Federal law in whole or in part as to principal or interest because of the laws relating to usury, and . . . which was incurred in connection with . . . the business of lending money . . . at a rate usurious under State or Federal law, where the usurious rate is at least twice the enforceable rate.

18 U.S.C. § 1961(6). Plaintiffs allege that the Loan Contracts charge rates unlawful under Virginia law, meaning that Defendants collect "unlawful debt" as identified in Counts I – IV, the RICO claims.

Virginia law provides that, in general, "no contract shall be made for the payment of interest on a loan at a rate that exceeds 12 percent per year." Va. Code. Ann. § 6.2-303(A). A lender may not charge interest more than this 12% annual interest rate unless she or he obtains a consumer finance license. *See* Va. Code Ann. § 6.2-1501. A loan contract that violates these Virginia provisions "shall be void" and the lender to that void contract agreement cannot "collect, receive, or retain any principal, interest, or charges whatsoever with respect to the loan." Va. Code Ann. § 6.2-1541(A)–(B). A borrower who pays more than 12% annual interest on a loan may bring an action against "the person taking or receiving such payments."[62] Va. Code Ann. § 6.2-305(A).

Plaintiffs' detailed allegations, sometimes including documentary attachments, amply support their Virginia usury claim. First, Plaintiffs plainly allege that they paid more than an

---

[62] Section 6.2-305(A) of the Virginia Code states, in relevant part:

> If interest in excess of that permitted by an applicable statute is paid upon any loan, the person paying may bring an action within two years from [certain preconditions]:

54

annual interest rate of 12% on their loans, citing interest rates starting at 118% and ranging as

high as 448% annually.  For example, the Inscho Agreement contains an annual interest rate of

"448%—over 37 times the 12% interest cap in Virginia."  (Am. Compl. ¶ 119.)  Plaintiffs add

that Defendants lacked a "consumer finance license permitting them to make loans charging

interest in excess of 12% APR nor did they ever attempted [sic] to obtain such a license."

(*Id*. ¶ 121.)

The Amended Complaint also includes sufficient allegations supporting  Plaintiffs'

contention that Defendants collected or received payments on the loans, including interest

payments.  The Amended Complaint details the exact amount paid on each usurious loan by each

named Plaintiff.  (*See* Am. Compl. ¶¶ 123–130) ("co-conspirators received at least $711.02 from

Ms. Gibbs . . . co-conspirators received at least $15,369.15 from Ms. Edwards . . . Defendants

and their co-conspirators received at least $1,858.67 from Ms. Williams." )

Next, for the reasons articulated above, *supra* Section III.B.2, Defendants' choice-of-law

arguments cannot prevail.  According to Defendants, the Loan Agreements' express adoption of

Tribal law constitutes a valid choice-of-law provision that prevents the Court from applying

Virginia law.[63]  But just as the Arbitration Agreements cannot prospectively waive federal law in

---

1. The total amount of the interest paid to such person in excess of that permitted by the applicable statute;

2. Twice the total amount of interest paid to such person during the two years immediately preceding the date of the filing of the action; and

3. Court costs and reasonable attorney fees.

Va. Code. Ann. § 6.2-305(A).

[63] Defendants contend that the Supreme Court of Virginia's decision in *Settlement Funding v. Von Neumann-Lillie*, 645 S.E. 2d 436 Va. (2007), is dispositive here.  (Sequoia Mem. Supp. Mot. Dismiss 12–13; 7HBF Mem. Supp. Mot. Dismiss 16.)  Defendants' reliance on

these circumstances, the Loan Contracts as a whole cannot prospectively waive federal law. *See generally Hayes*, 811 F.3d 666; *Dillon*, 856 F.3d 330. The choice-of-law provisions in the Plain Green and Great Plains Loan Contracts contravene public policy and disclaim the application of federal law. Those same invalid choice-of-law provisions cannot rationally be used to dictate that Virginia Law does not apply. *See Senture, LLC v. Dietrich*, 575 F. Supp. 2d 724, 727 (E.D. Va. 2008) (stating that "unfair or unreasonable" choice-of-law provisions constitute grounds to void a forum selection clause.) Because the choice-of-law provisions throughout the Loan Contracts are unenforceable, Defendants cannot rely on them for their state-law related arguments, either.

Plaintiffs plausibly allege that Defendants collected or received payments on loans that violated Virginia's statutory limits as part of their involvement with the alleged RICO enterprise. As such, Plaintiffs' Virginia usury claim, Count V, survives these Rule 12(b)(6) challenges.

---

*Settlement Funding* is misplaced. In *Settlement Funding*, the Supreme Court of Virginia found that the trial court erred in *assuming* that no distinction existed between Utah usury laws and Virginia usury laws, because Settlement Funding had placed information on the record concerning Utah's lack of usury law. 645 S.E. 2d at 437–39. The Supreme Court of Virginia reversed the trial court and remanded the case for further proceedings. *Id.* at 439.

But the *Settlement Funding* court never substantively addressed the enforceability of the loan contract at issue or the merits of any possible contract defenses. *See generally id.* Existing Fourth Circuit precedent, and ample federal case law more on point, obliges this Court to give *Settlement Funding* far less weight than Defendants urge. The Court cannot find that Settlement Funding requires application of Tribal choice-of law provisions.

### 2. Count I:  RICO § 1962(a) – Prohibiting Investment of Income Derived from a Pattern of Racketeering Activity[64]

Plaintiffs allege sufficient facts to state a claim under 18 U.S.C. § 1962(a), the Income

Derived Claim.[65] To state a claim under § 1962(a),  Plaintiffs must allege that:  "(1) the

Defendants derived income [through the collection of an unlawful debt]; [and],  (2) the income

was used or invested, directly or indirectly, in the establishment or operation; (3) of an

enterprise; (4) which is engaged in or the activities of which affect interstate or foreign

commerce." *Smithfield Foods, Inc. v. United Food & Commercial Workers Int'l Union, et al.*,

---

[64] Courts have held that the collection of an unlawful debt, as an act native to the RICO statute, is itself a RICO violation even without a "pattern of racketeering activity." *See Goldenstein v. Repossessors, Inc.*, 815 F.3d 142, 148 n.5 (3d. Cir. 2016) (citations and quotations omitted); *Day v. DB Capital Grp., LLC*, 2011 WL 887554, at *12 (D. Md. Mar. 11, 2011)("For RICO claims based on the collection of unlawful debt, the prevailing view is that the plaintiff need not show a pattern of such activity—one act of collection is sufficient.")  Although "the Fourth Circuit has not expressly adopted this interpretation, [] district courts within the circuit have embraced the view." *Day*, 2011 WL 887554, at *12 n.10 (citations and quotations omitted); *see also, Proctor v. Metro. Money Store Co.*, 645 F. Supp. 2d 464, 481 (D. Md. 2009).

[65] Section 1962(a) provides:

It shall be unlawful for any person who has received any income derived, directly or indirectly, from a pattern of racketeering activity or through collection of an unlawful debt in which such person has participated as a principal within the meaning of section 2, title 18, United States Code, to use or invest, directly or indirectly, any part of such income, or the proceeds of such income, in acquisition of any interest in, or the establishment or operation of, any enterprise which is engaged in, or the activities of which affect, interstate or foreign commerce. A purchase of securities on the open market for purposes of investment, and without the intention of controlling or participating in the control of the issuer, or of assisting another to do so, shall not be unlawful under this subsection if the securities of the issuer held by the purchaser, the members of his immediate family, and his or their accomplices in any pattern or racketeering activity or the collection of an unlawful debt after such purchase do not amount in the aggregate to one percent of the outstanding securities of any one class, and do not confer, either in law or in fact, the power to elect one or more directors of the issuer.

18 U.S.C. § 1962(a).

633 F. Supp. 2d 214, 222 (E.D. Va. 2008) (citing *United States v. Vogt*, 910 F.2d 1184, 1193 (4th Cir. 1990)).

Reading their allegations favorably, Plaintiffs readily meet their burden under Rule 12(b)(6). First, Plaintiffs allege that Defendants derived income through the collection of revenue on the allegedly unlawful debt. Specifically, Plaintiffs aver that it "it was unlawful for Defendants or any of their affiliated entities to collect or receive any principal, interest, or charges on the loans, including the amounts paid by Plaintiffs." (Am. Compl. ¶ 122.)

Second, Plaintiffs plausibly allege facts that Defendants used the unlawfully obtained income to further invest in and support their operation. Plaintiffs assert that "[t]hrough their ownership interest and participation in the enterprise, Defendants received profits from the illegal loans collected from Plaintiffs and the class members' loans. These profits were then reinvested in the Think Finance enterprise and Elevate." (Am. Compl. ¶ 131.) Plaintiffs further allege that "continued reinvestment in the Think Finance enterprise . . . allowed it to sustain itself and continue collection and the making of more unlawful loans." (*Id.* ¶ 148.)

Finally, as alleged, Think Finance, Great Plains, and Plain Green constitute a so-called enterprise engaged in interstate commerce.[66] Plaintiffs allege that these companies shared common ownership through "Think Finance and Elevate" both of which engaged in "interstate commerce." (*Id.* ¶ 131.) As such, Plaintiffs plausibly allege facts supporting their contention that Defendants derived income through the collection of unlawful debt.[67]

---

[66] Defendants do not challenge the "interstate commerce" element of the RICO provisions. Indeed, four of the five Contracts expressly avow that "the transaction represented by this [Loan Contract] involves interstate commerce for all purposes." (Gibbs Agr. 6; Williams 7; Edwards 7; Inscho 7.)

[67] Sequoia argues that Plaintiffs fail to meet this element because the Amended Complaint contains no allegation that Sequoia *collected* the allegedly unlawful debt. According

Because Plaintiffs' allegations satisfy all prongs required to state a § 1962(a) Income Derived Claim, they meet their burden to state this RICO claim. They plausibly maintain that Defendants derived income from an unlawful Tribal lending operation engaged in interstate commerce through the collection of unlawful debt. They also plausibly contend that Defendants reinvested these proceeds into the so-called enterprise. As such, Count I, Plaintiffs' § 1962(a) Income Derived Claim, survives the Motions to Dismiss.

### 3. Count II: RICO § 1962(b) – Prohibiting the Use of a Pattern of Racketeering to Acquire or Maintain Control Over an Enterprise

Plaintiffs amply state factual allegations in support of their § 1962(b) Maintain Control Over Enterprise Claim. To establish a violation of § 1962(b),[68] Plaintiffs must allege that:

---

to Sequoia, "Virginia's usury statute only permits a consumer to file an action to recover excess payments 'from the *person* taking or receiving such payments.'" (Sequoia Mem. Supp. Mot. Dismiss 38, ECF No. 64 (quoting Va. Code § 6.2-305(A)) (emphasis altered).) Because the "Amended Complaint does not allege that Sequoia directly took or received any payments on Plaintiffs' loans, . . . . Sequoia . . . cannot be held liable under Section 6.2-305(A)." *Id.* Existing case law suggests otherwise.

A plaintiff suing under RICO need not argue that each defendant individually collected the debt. For example, in *Proctor v. Metropolitan Money Store Corp.*, a plaintiff brought RICO claims against multiple defendants involved in an alleged "mortgage foreclosure rescue scam." 645 F. Supp. 2d at 471. Some of the named defendants argued the Complaint did not allege any acts by them related to the collection of unlawful debts. *Id.* at 482. Instead, the *Proctor* plaintiffs alleged that these defendants acted for a common purpose and with knowledge of each other, receiving "a large volume of referrals" and commissions in exchange for their activities related to the enterprise: the collection of an unlawful debt. *Id.* at 483 (quoting the Second Am. Compl.) When denying the motion to dismiss before it, the United States District Court for the District of Maryland concluded these allegations sufficed to show that these defendants derived income from the enterprise for the purpose of § 1962 liability. *Id.*

[68] Section 1962(b) provides:

It shall be unlawful for any person through a pattern of racketeering activity or through collection of an unlawful debt to acquire or maintain, directly or indirectly, any interest in or control of any enterprise which is engaged in, or the activities of which affect, interstate or foreign commerce.

18 U.S.C. § 1962(b).

"(1) the Defendants engaged in [collection of an unlawful debt];[69] (2) in order to acquire or maintain, directly or indirectly; (3) any interest or control over an enterprise; (4) which is engaged in, or the activities of which affect interstate or foreign commerce."[70] *Smithfield Foods*, 633 F. Supp. 2d at 222 (citing 18 U.S.C. § 1962(b); *Davis v. Hudgins*, 896 F. Supp 561, 567 (E.D. Va. 1995)).

First, Plaintiffs' plausible, non-speculative, factual allegations related to the collection of unlawful debt plainly support their claim that Defendants exerted substantial control over the alleged enterprise described above. First, Plaintiffs allege that Michael Stinson and his spouse Linda Stinson owned 15-25% of the interest in Think Finance at the times relevant to the Amended Complaint. (Am. Compl. ¶¶ 18–19.) Second, 7HBF allegedly owned "at least 20% of the interest in Think Finance at all times relevant hereto." (*Id.* ¶ 21.) Third, Sequoia purportedly owned a 25% interest. (*Id.* ¶ 22.) Similarly, Plaintiffs allege the other Defendants acted as holding companies or pass-through entities to hide the illicit activity. (*See, e.g.*, Am. Compl. ¶ 20) (alleging that Elevate existed to "launder the profits of [the] unlawful enterprise.")

Plaintiffs plausibly contend that, through these ownership interests, "regular board of director meetings," and continued participation in the "business's key decisions, strategies, and objectives," the Defendants jointly exerted considerable control over how Think Finance carried out the allegedly unlawful Tribal lending operation as a whole. (*Id.* ¶¶ 97, 4.) These allegations support a finding at the Motion to Dismiss stage, that Defendants exercised substantial control over the enterprise.

---

[69] As discussed above, Plaintiffs plausibly state facts to satisfy this element, *supra* Section IV.B.3.

[70] As discussed above, the parties do not dispute the "interstate commerce" element of any RICO claim at this procedural juncture, *supra* note 66.

Finally, the Amended Complaint plausibly alleges that Defendants continued to collect revenue, and increase their investment, *in order to* maintain their interest and control over the enterprise. *See* 18 U.S.C. § 1962(b); *see also Constellation Bank, N.A. v. C.L.A. Mgmt. Co.*, No. 94 Civ. 0989, 1995 WL 42285, *4 (S.D.N.Y. Feb. 1, 1995) ("Allegations that the acquisition or maintenance of an interest in an enterprise was obtained by arranging financing satisfied the requirements of section 1962(b).") Specifically, Plaintiffs allege that Defendants collected revenue from the allegedly unlawful loans. Defendants then reinvested these funds, showing their interest by Defendants in increasing their control and involvement in the enterprise. (Am. Compl. ¶¶ 131, 145, 148.)

The Court concludes that Plaintiffs' allegations, read favorably, suffice to show that Defendants engaged in the collection of the unlawful debt "in order to . . . maintain" its interest in and control over the a purportedly unlawful lending operation in violation of RICO. 18 U.S.C. § 1962(b). As a result, Count II, the Maintain Control Over Enterprise Claim, survives the Motion to Dismiss.

### 4.      Count III:  RICO § 1962(c) – Prohibiting Conduct of an Enterprise through the Collection of Unlawful Debt

The Court readily concludes that Plaintiffs make substantial allegations demonstrating that Defendants conducted the affairs of the unlawful lending operation which engages in interstate commerce, thereby stating a violation of § 1962(a). 18 U.S.C. § 1962(c).[71] To

---

[71] Section 1962(c) provides:

It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt.

18 U.S.C. § 1962(c).

establish a violation of § 1962(c), Plaintiffs must allege that Defendants (1) conducted the affairs of an enterprise (2) through the collection of unlawful debt (3) while employed by or associated with (4) the "enterprise engaged in, or the activities of which affect, interstate or foreign commerce."[72] 18 U.S.C. § 1962(c); *see Smithfield Foods*, 633 F. Supp. 2d at 222 (providing the elements for satisfying § 1962(c) claims founded on allegations of racketeering).

As discussed in detail above, Plaintiffs contend that Defendants helped design and implement the Tribal lending business through their ownership and control of Think Finance, which developed the Tribal lending business model at the heart of this allegedly unlawful RICO enterprise. Plaintiffs allege that "during the pertinent times, the Stinsons, 7HBF, Sequoia, and SCV were the owners of Think Finance, and they dominated and controlled its business and operations." (Am. Compl. ¶ 95.) Put plainly, the enterprise would not exist but for Think Finance's instrumental role, which Plaintiffs plausibly attribute to Defendants. Furthermore, Defendants conducted the affairs of the enterprise by altering its business model in response to growing legal pressures. Specifically, Plaintiffs allege that following legal action against Think Finance in New York, the Defendants and Think Finance "held a series of meetings that identified potential revisions . . . to strengthen their business model." (*Id.* ¶ 109.) After deliberation, Defendants "determined to continue Think Finance's business model with Plain Green, Great Plains, and MobiLoans—with minor revisions to the structure that provided the tribal entities with a larger share of the profits." (*Id.* ¶ 112.) Finally, Plaintiffs aver that "the Stinsons, 7HBF, Sequoia, SCV[,] and Shaper attended regular board of director meetings with the officers and executives of Think Finance whereby they directed, reviewed, and approved key

---

[72] Plaintiffs plausibly allege facts in support of the first element, the second element (*supra* Section IV.B.3.), the third element, and the fourth element (*supra* note 66).

business decisions of Think Finance, including decisions related to the origination, marketing, underwriting, servicing, and collection of the loans." (*Id.* ¶ 97.)  These ample allegations, combined with allegations throughout the Amended Complaint elaborating on this scheme, demonstrate that Defendants conducted the affairs of the enterprise.  18 U.S.C. § 1962(c).

Further, no question exists that Plaintiffs sufficiently allege that Defendants "associated with" the lending operation as a whole when they committed the above acts.  18 U.S.C. § 1962(c).  Defendants engaged in the above mentioned acts as part of their association with the allegedly unlawful lending operation.  The Court finds unavailing Defendants' argument that mere ownership interest in Think Finance cannot subject them to liability unavailing because Plaintiffs allege more than a passive ownership interest.  Combined, these allegations amply support Plaintiffs' claim that Defendants conducted the affairs of the unlawful Tribal lending business.  Accordingly, Count III survives the Motion to Dismiss.

### 5. Count IV:  RICO§ 1962(d) – Conspiracy to Violate RICO Sections 1962(a), (b) or (c)

The Court finds that the Plaintiffs allege a conspiracy to violate the RICO statutes in Count IV.  *See* 18 U.S.C. § 1962(d).  Section 1962(d) makes it unlawful "for any person to conspire to violate any of the provisions of subsection (a), (b), or (c) of this section."  18 U.S.C. § 1962(d).  The Amended Complaint puts forth detailed and thorough allegations related to Defendants' role in the unlawful Tribal lending operation at the heart of the RICO claims.  The Amended Complaint describes the formation of the so-called enterprise, detailed negotiations between co-conspirators, and the development and growth of the Tribal lending businesses over time, including efforts to launder the unlawful proceeds.  Because Counts I, II, and III, alleging violations of §§ 1962(a)–(c), survive the Motion to Dismiss, Count IV, which derives from those counts, survives the Motion to Dismiss as well.

### 6.     <u>Count VI:  Unjust Enrichment</u>

In Count VI, Plaintiffs plausibly allege facts sufficient to state a claim for unjust enrichment under Virginia law.  To state a claim for unjust enrichment, a plaintiff must allege: "(1) a benefit conferred on the defendant by the plaintiff; (2) knowledge on the part of the defendant of the conferring of the benefit; and (3) acceptance or retention of the benefit by the defendant in circumstances that render it inequitable for the defendant to retain the benefit without paying for its value." *Integrated Direct*, 129 F. Supp. 3d at 374.

First, Defendants benefitted from Plaintiffs' payments on their loans because, as discussed above, Defendants derived income from the enterprise based on borrowers entering into Loan Contracts with Plain Green and Great Plains.  Second, no dispute exists that Defendants knew of the benefit—income generated from the substantive interest rates on these loans.  Defendants merely claim that the income was lawful.

Finally, Plaintiffs' plausible factual allegations, also delineated above, regarding the illegality of the loans under Virginia law support a finding, at this procedural stage, that "circumstances . . . render it inequitable for the defendant to retain the benefit without paying for its value." *Id*.  Virginia law limits lenders' ability to charge more than 12% annual interest on loans to Virginia consumers.  *See* Va Code. § 6.2-303.  The interest rates at issue range from 118% to 448% annually.  It appears, certainly at this early stage, that Plaintiffs amply and plausibly demonstrate that these circumstances render it inequitable for Defendants to retain the benefit they have received from the collection on loans from Virginia consumers.  For these reasons, the Court will deny the motions to Dismiss Count VI, the Unjust Enrichment claim.

## V.  Conclusion

The Court considers ten motions before it.  For the reasons stated above, the Court will:

(1)      DENY Defendants' Motion to Transfer, (ECF No. 61);

(2)      DENY Sequoia's Motion to Dismiss, (ECF No. 63);

(3)      GRANT in part and DENY in part Sequoia's Motion to Compel Arbitration, (ECF No. 65)[73];

(4)      DENY the 7HBF and Shaper Defendants' Motion to Compel Arbitration, (ECF No. 59);

(5)      DENY the 7HBF Defendants' Motion to Dismiss for Lack of Personal Jurisdiction, (ECF No. 53);

(6)      DENY the 7HBF Defendants' Motion to Dismiss for Failure to State a Claim, (ECF No. 54);

(7)      DENY the Shaper Defendants' Motion to Dismiss for Lack of Personal Jurisdiction, (ECF No. 56);

(8)      DENY the Shaper Defendants' Motion to Dismiss for Failure to State a Claim, (ECF No. 57);

---

[73] "A court may dismiss or stay a suit that is governed by the FAA."  *Chronister v. Marks & Harrison, P.C.*, No. 3:11cv688, 2012 WL 966916, at *2 (E.D. Va. Mar. 21, 2012).  "The law remains unsettled as to whether a court should stay or dismiss a case when all claims are subject to arbitration, but no question exists that the Court has the discretion to take either option." *Quality Plus Servs., Inc. v. AGY Aiken LLC*, No. 3:16cv727, 2017 WL 2468792, at *6 (E.D. Va. June 7, 2017).  Because Plaintiffs Price, Hengle, and Blackburn's claims are subject to arbitration under the terms of the Mobiloans Agreement, the Court will exercise its discretion to compel arbitration and dismiss these claims as to those Plaintiffs *only*, without prejudice.

(9)     GRANT Plaintiffs' First Motion for Leave to File Supplemental Authority, (ECF No. 101); and,

(10)    GRANT Plaintiffs' Second Motion for Leave to File Supplemental Authority, (ECF No. 110).

An appropriate Order shall issue.

_____/s/_____
M. Hannah Lauck
United States District Judg

Date: September 30, 2019
Richmond, Virginia