IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division

**DARLENE GIBBS,** *et al.,*
*on behalf of themselves and all*
*individuals similarly situated,*

       **Plaintiffs,**

v.

**MICHAEL STINSON,** *et al.,*

       **Defendants.**

Civil Action No. 3:18cv676

## MEMORANDUM OPINION

This matter comes before the Court on the Motion for Class Certification filed by

Plaintiffs Sherry Blackburn, Stephanie Edwards, Darlene Gibbs, George Hengle, Patrick Inscho,

Lawrence Mwethuku, Tamara Price, and Lula Williams (collectively, "Plaintiffs" or "Named

Plaintiffs"). (ECF No. 187.)  Defendants 7HBF NO. 2, Stephen Sharper, Startup Capital

Ventures, L.P., Linda Stinson, Michael Stinson, Haynes Investments, LLC, L. Stephen Haynes,

and Sovereign Business Solutions, LLC (collectively, "Defendants") responded, (ECF No. 210),

and Plaintiffs replied, (ECF No. 215).

This matter is ripe for disposition.  The Court dispenses with oral argument because the

materials before it adequately present the facts and legal contentions, and argument would not

aid the decisional process. The Court exercises jurisdiction pursuant to 28 U.S.C. §§ 1331[1] and 1367(a).[2] For the reasons that follow, the Court will grant the Motion for Class Certification.

## I. Factual and Procedural Background

The Court assumes familiarity with the facts and procedural background of this case as set forth in its September 30, 2019 Memorandum Opinion. *See Gibbs v. Stinson*, 421 F. Supp. 3d 267 (E.D. Va. 2019), *aff'd sub nom. Gibbs v. Sequoia Cap. Operations, LLC*, 966 F.3d 286 (4th Cir. 2020) ("September 2019 Memorandum Opinion" or "*Gibbs I*"). Accordingly, the Court presents only those facts and allegations relevant to the issues concerning class certification.

### A.    Factual Background

As described in the September 2019 Memorandum Opinion, this controversy arises out of Defendants' involvement in an allegedly unlawful lending operation. The lending operation allegedly involved loans made through tribal entities to Plaintiffs at exorbitant interest rates.[3] (Am. Compl. ¶¶ 1, 118–20, ECF No. 43.) According to Plaintiffs, Defendants participated in this scheme as "founders, funders, [or] closely held owners of Think Finance, LLC," a company

---

[1] "The district courts shall have original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States." 28 U.S.C. § 1331. The Amended Complaint alleges violations of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1962. (*See* Am. Compl., ECF No. 43.)

[2] The Court exercises supplemental jurisdiction over Plaintiffs' state usury claim and unjust enrichment claim pursuant to 28 U.S.C. § 1367(a) ("[I]n any civil action of which the district courts have original jurisdiction, the district courts shall have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy . . . .").

[3] Plaintiffs employ the rent-a-tribe moniker when describing these lending schemes. They do so in part because Billi Anne Raining Bird, the CEO and COO of Plain Green who is a member of the Chippewa Cree Tribe, testified in a deposition that she agreed with that characterization because the tribes solely served as figureheads in the scheme. (Am. Compl. ¶ 84.) Despite that testimony, the Court will minimize the utilization of that moniker.

that serviced the high-interest loans made by certain tribal lending entities. (Mem. Supp. 2–3,[4] ECF No. 188.) Those tribal entities include Great Plains Lending LLC ("Great Plains"), Plain Green LLC, and Mobiloans LLC. (Am. Compl. ¶ 3.)

### 1.    The Nature and Composition of the Proposed Class

In the Motion for Class Certification, Plaintiffs seek to certify the following class (the "Virginia Class"):

> All individuals who resided in Virginia at the time he or she obtained any loan: (i) from Great Plains Lending, (ii) from Plain Green prior to June 1, 2016, or (iii) from MobiLoans prior to May 6, 2017, who made any payment on the loan (the "Virginia Class").

(Mem. Supp. 17.) According to RSM US LLP ("RSM"), a company appointed to serve as settlement administrator in three related nationwide class action lawsuits involving Think Finance, 43,598 consumers belong to the Virginia Class. (Mem. Supp. Ex. 4 "RSM Declaration" ¶¶ 2, 10, ECF No. 188-4.) These 43,598 Virginia borrowers paid a total of $172,639,754.45 to Great Plains, Plain Green, or Mobiloans. (*Id.* ¶ 10.) Of this total amount, $68,494,967.09 represents interest payments exceeding the annual 12% statutory maximum allowable under Virginia law. (*Id.* ¶ 11; *see also* Va. Code § 6.2-303(A).[5]) Indeed, the record suggests that all the loans Great Plains, Plain Green, and Mobiloans originated assigned annual interest rates exceeding 24%.[6] (Resp. Ex. 6 "Mobiloans Terms and Conditions" 3, ECF No. 210-6 (disclosing

---

[4] The Court employs the pagination assigned by the CM/ECF docketing system to the parties' submissions.

[5] That statute provides: "Except as otherwise permitted by law, no contract shall be made for the payment of interest on a loan at a rate that exceeds 12 percent per year." Va. Code § 6.2-303(A).

[6] The RICO statute defines an "unlawful debt," in part, as a debt carrying a "usurious rate [that] is at least twice the enforceable rate" "under State or Federal law." 18 U.S.C. § 1961(6).

interest rates on Mobiloans loans as ranging from 206.14% to 442.31% per annum); Mem. Supp.

Ex. 54 "Think Finance Discovery Responses" 3, ECF No. 188-54 (admitting that all Great Plains

and Plain Green loans carried an interest rate greater than 24% per annum).)

RSM bases its estimates related to the nature and composition of the Virginia Class on

consumer-level account information that the company received from Think Finance. (RSM

Decl. ¶ 3, ECF No. 188-4.) The dataset Think Finance provided RSM pertains to loans made to

consumers in the names of Great Plains, Plain Green, Mobiloans, or the First Bank of Delaware.[7]

(*Id.*) The dataset contains nationwide information on 1,877,050 loans for 1,045,248

consumers. (*Id.*)

Each Named Plaintiff—except for Sherry Blackburn—belongs to the Virginia Class.[8]

(*Id.* ¶¶ 12–18; Resp. Ex. 9 "Sue Mouck December 22, 2020 Email" 18, ECF No. 210-9.)

Although all Named Plaintiffs used a Virginia address to obtain a loan from Great Plains, Plain

Green, or Mobiloans, Sherry Blackburn's loans fell outside the specified class period. (Sue

Mouck Dec. 22, 2020 Email 18.)

Notwithstanding this error concerning Blackburn, each Named Plaintiff has remained

active throughout this litigation. They have regularly communicated with Counsel, reviewed

copies of the pleadings, responded to written discovery, produced documents, and attended

depositions. (Mem. Supp. Ex. 56 "Andrew Guzzo Declaration" ¶ 10, ECF No. 188-56; *id.* Ex.

---

Because the enforceable rate under Virginia law amounts to 12%, Va. Code § 6.2-303(A), a debt
carrying a usurious rate of 24% constitutes an "unlawful debt" under RICO, 18 U.S.C. § 1961(6).

[7] Think Finance provided RSM data on nonparty First Bank of Delaware because Think
Finance developed the alleged tribal lending scheme from what Plaintiffs dubbed a "rent-a-bank"
scheme it implemented in partnership with the First Bank of Delaware. (*See* Am. Compl. ¶¶ 45–
47.)

[8] The Named Plaintiffs pertinent here are: Darlene Gibbs, Stephanie Edwards, Lula
Williams, Patrick Inscho, Lawrence Mwethuku, George Hengle, and Tamara Price.

58 "Anna Haac Declaration" ¶ 8, ECF No. 188-58.) They have also sustained this level of

involvement not only in the present lawsuit, but also in two other related nationwide class actions

involving Think Finance. (Guzzo Decl. ¶ 10, ECF No. 188-56; Haac Decl. ¶ 8, ECF No. 188-

58.) And as with the remaining members of the Virginia Class, the Named Plaintiffs have an

interest in obtaining the relief sought from Defendants. (Haac Decl. ¶ 9, ECF No. 188-58.)

### 2.    The Six Class Claims at Issue

The Named Plaintiffs seek declaratory and injunctive relief, damages, and attorney's fees

and costs from Defendants arising from the following six class counts:

**Count I:**     **18 U.S.C. § 1962(a).**[9]  Plaintiffs allege that Defendants received "income derived, directly and indirectly, through collection of unlawful debt," and used and reinvested "parts of such income to acquire interests in and to further establish and assist the operations of the enterprise." (Am. Compl. ¶ 145.)

**Count II:**    **18 U.S.C. § 1962(b).** Plaintiffs allege that Defendants acquired and maintained "interests in and control of the enterprise involved in the unlawful collection of debt." (Am. Compl. ¶ 156.)

**Count III:**   **18 U.S.C. § 1962(c).** Plaintiffs allege that Defendants violated § 1962(c) through the "collection of unlawful debt." (Am. Compl. ¶ 168.)

**Count IV:**    **18 U.S.C. § 1962(d).** Plaintiffs allege Defendants entered into several agreements to violate §§ 1962(a)–(c). (Am. Compl. ¶ 179.)

**Count V:**     **Virginia Usury Laws.**[10]  Plaintiffs allege the loans violate Virginia's usury laws because the interest rates exceed 12%.

---

[9] Counts I, II, III, and IV (the "RICO Claims") all arise out of 18 U.S.C. § 1962. *See* 18 U.S.C. §§ 1962(a)–(d). The first three provisions in § 1962 proscribe certain actions related to an enterprise engaged in interstate commerce through the collection of unlawful debt. *See* 18 U.S.C. §§ 1962(a)–(c). The fourth provision makes it unlawful to conspire to violate subsections (a), (b), or (c) of the statute. 18 U.S.C. § 1962(d).

[10] Subject to certain exceptions, Virginia law proscribes charging more than 12% interest rates on loans. Va. Code § 6.2-303(A). Virginia law provides that a loan contract which violates Virginia's usury provisions "shall be void" and the lender to that void contract agreement cannot "collect, receive, or retain any principal, interest, or charges whatsoever with respect to the loan." Va. Code §§ 6.2-1541(A)–(B). A borrower who pays interest on a loan in excess of the

Plaintiffs allege that Defendants unlawfully "received revenues collected on the loans." (Am. Compl. ¶¶ 188–89.)

**Count VI:**     **Unjust Enrichment.** Plaintiffs allege they conferred a benefit on Defendants when they repaid the allegedly unlawful loans; that Defendants knew or should have known about the benefit; and that the Defendants "have been unjustly enriched through their receipt of any amounts in connection with the unlawful loans." (Am. Compl. ¶ 200.)

## B.     Procedural Background

On February 12, 2021, Plaintiffs filed the Motion for Class Certification. Defendants timely filed their response, (ECF No. 210), and Plaintiffs timely filed their reply, (ECF No. 215). During the pendency of the Motion for Class Certification, Plaintiffs, (ECF Nos. 218, 248), and Defendants, (ECF No. 223), filed three Motions to File Supplemental Authority, which the Court granted, (ECF Nos. 227, 252). Neither Party requested a hearing on the Motion for Class Certification. For the reasons articulated below, the Court will grant the motion.

## II.  Standard of Review

Plaintiffs bear the burden of proving all requirements of Rule 23. *Lienhart v. Dryvit Sys., Inc.*, 255 F.3d 138, 146 (4th Cir. 2001). First, the proposed class must satisfy the four requirements of Federal Rule of Civil Procedure 23(a).[11] Those requirements are that:

(1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the [class representative's] claims or defenses are typical of those of the class; and, (4) the [class representative] will fairly and adequately [represent] the interests of the class.

Fed. R. Civ. P. 23(a); *see Broussard v. Meineke Disc. Muffler Shops, Inc.*, 155 F.3d 331, 337

---

applicable statutory maximum may bring an action against "the person taking or receiving such payments." Va. Code § 6.2-305(A).

[11] Rule 23(a) lists four requirements that a class representative must meet in order to sue on behalf of a class. Fed. R. Civ. P. 23(a).

(4th Cir. 1998).  Although not explicitly stated in Rule 23(a), the class also must be
ascertainable:

> In order to certify a class under Rule 23, a court must be able to readily identify the
> class members in reference to objective criteria.  Although the plaintiff need not be
> able to identify every class member at the time of certification, the plaintiff must
> demonstrate that class members will be identifiable without extensive and
> individualized fact-finding or mini-trials.

*Souter v. Equifax Info. Servs., LLC*, 307 F.R.D. 183, 196 (E.D. Va. 2015) (internal quotation

marks and citations omitted); *see also EQT Prod. Co. v. Adair*, 764 F.3d 347, 358 (4th Cir. 2014)

(similarly suggesting that a court cannot certify a class unless it "can readily identify the class

members in reference to objective criteria" and that although "plaintiffs need not be able to

identify every class member at the time of certification," class action is inappropriate if class

members are not identifiable "without extensive and individualized fact-finding or mini-trials"

(internal quotation marks and citation omitted)).[12]

Second, Plaintiffs' proposed class must align with at least one of the types of class

actions delineated in Federal Rule of Civil Procedure 23(b),[13] and meet the corresponding

prerequisites for certification.  Here, Plaintiffs move for certification under Rule 23(b)(3).  A

court may certify a class under Rule 23(b)(3) when it finds that:  (1) "questions of law or fact

common to the members of the class predominate over any questions affecting only individual

---

[12] Courts have concluded otherwise.  For instance, "the Ninth Circuit has rejected an
ascertainability requirement for class certification."  *Brice v. Haynes Invs., LLC.*, No. 18cv1200,
2021 WL 1916466, at *4 (N.D. Cal. Apr. 23, 2021), *appeal filed sub nom.*, *Brice v. 7HBF No. 2,
Ltd.*, No. 21-80047 (9th Cir. May 11, 2021) ("*Brice I*") (citing *Briseno v. ConAgra Foods, Inc.*,
844 F.3d 1121, 1133 (9th Cir. 2017)).

[13] Rule 23(b) outlines three types of class actions, including the type proposed here:  one
involving "questions of law or fact common to class members [that] predominate over any
questions affecting only individual members." Fed. R. Civ. P. 23(b)(3).

members;" and, (2) "a class action is superior to other available methods for [the] fair[] and efficient[] adjudication of the controversy." Fed. R. Civ. P. 23(b)(3).

As the United States Court of Appeals for the Fourth Circuit has explained, courts need not "accept plaintiffs' pleadings when assessing whether a class should be certified." *Gariety v. Grant Thornton, LLP*, 368 F.3d 356, 365 (4th Cir. 2004). Rather, "the district court must take a 'close look' at the facts relevant to the certification question and, if necessary, make specific findings on the propriety of certification." *Thorn v. Jefferson-Pilot Life Ins. Co.*, 445 F.3d 311, 319 (4th Cir. 2006) (quoting *Gariety*, 368 F.3d at 365). "Such findings can be necessary even if the issues tend to overlap into the merits of the underlying case," but "[t]he likelihood of the plaintiffs' success on the merits . . . is not relevant to the issue of whether certification is proper." *Id.* (internal citations omitted).

The Supreme Court of the United States elaborated on a district court's ability to make factual determinations at the class certification stage in *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338 (2011). In *Dukes*, the Supreme Court explained:

> Rule 23 does not set forth a mere pleading standard. A party seeking class certification must affirmatively demonstrate his compliance with the Rule—that is, he must be prepared to prove that there are *in fact* sufficiently numerous parties, common questions of law or fact, etc. We recognized in *Falcon* that "sometimes it may be necessary for the court to probe behind the pleadings before coming to rest on the certification question," and that certification is proper only if "the trial court is satisfied, after a rigorous analysis, that the prerequisites of Rule 23(a) have been satisfied."

*Id.* at 350–51 (quoting *Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 160–61 (1982) (emphasis in original)). "Frequently that 'rigorous analysis' will entail some overlap with the merits of the plaintiff's underlying claim. That cannot be helped."[14] *Id.* at 351.

---

[14] After *Dukes*, in *Amgen Inc. v. Connecticut Retirement Plans & Trust Funds*, 568 U.S. 455 (2013), and *Comcast Corp. v. Behrend*, 569 U.S. 27 (2013), the Supreme Court expounded upon the extent to which a court may address merits issues at the class certification stage. In

### III.  Analysis

Upon consideration of the applicable requirements under Federal Rule of Civil Procedure 23, the Court will grant the Motion for Class Certification.  Before providing its "close look" at each class certification requirement, *Thorn*, 445 F.3d at 319 (quoting *Gariety*, 368 F.3d at 365), the Court must address two preliminary issues:  (1) whether, following this Court's September 2019 Memorandum Opinion, the Virginia Class can include Virginia consumers who obtained a loan from Mobiloans; and, (2) whether Plaintiffs waived their right to pursue a class action based on the arbitration agreements they entered into with the tribal lenders. Defendants maintain that both issues present "insurmountable hurdles" to certifying the proposed class.  (Resp. 13.)  However, the Court concludes that these issues do not impede class certification.

**A.      Defendants Fail to Demonstrate That Two Preliminary Issues Preclude Certification of the Proposed Class**

Defendants argue that two so-called preliminary issues dispose "of some or all of the issues" at bar.  (Resp. 13.)  First, Defendants assert that the Court's September 2019 Memorandum Opinion forecloses Mobiloans consumers from participating in this class action. (*Id.* at 13–14.)  Second, Defendants contend that the class action waivers in Plaintiffs' loan agreements preclude class certification.  (*Id.* at 14–18.)  For the reasons articulated below, neither issue defeats Plaintiffs' Motion for Class Certification.

---

*Amgen*, the Court explained that, "[a]lthough we have cautioned that a court's class[ ]certification analysis must be rigorous and may entail some overlap with the merits of the plaintiff's underlying claim, Rule 23 grants courts no license to engage in free-ranging merits inquiries at the certification stage." 568 U.S. at 465–66 (quoting *Dukes*, 564 U.S. at 351).  The *Amgen* Court continued:  "Merits questions may be considered to the extent—but only to the extent—that they are relevant to determining whether the Rule 23 prerequisites for class certification are satisfied." *Id.* at 466 (citing *Dukes*, 564 U.S. at 351 n.6).  In *Comcast*, the Supreme Court elucidated that the "rigorous analysis" required for class certification also reaches damages and causation. *See* 569 U.S. at 35–37.

1. **The Court's September 2019 Memorandum Opinion Does Not Prevent the Proposed Class from Including Consumers Who Obtained Loans from Mobiloans**

First, the Court's September 2019 Memorandum Opinion does not foreclose consumers who obtained Mobiloans loans from participating in this class action. Defendants appear to suggest that the Court's opinion compels Plaintiffs Price, Hengle, and Blackburn, the Named Plaintiffs who borrowed from Mobiloans, to arbitrate their claims against *all Defendants*. (*Id.* at 13–14.) But only a selective reading of the September 2019 Memorandum Opinion supports that understanding.

In that Opinion, the Court granted then-defendant Sequoia's[15] Motion to Compel Arbitration as to Price, Hengle, and Blackburn. *Gibbs I*, 421 F. Supp. 3d at 314. In doing so, the Court reasoned,

> Because Plaintiffs Price, Hengle, and Blackburn's claims are subject to arbitration under the terms of the Mobiloans Agreement, the Court will exercise its discretion to compel arbitration and dismiss these claims as to those Plaintiffs *only*, without prejudice.

*Id.* at 314 n.73. This cleverly selective citation might support Defendants' contention that Mobiloans consumers cannot participate in this class action because they must arbitrate their claims. But read in the context of the entire Memorandum Opinion, the Court's reasoning applied only to Sequoia, not to all Defendants, because the Court expressly denied the non-

---

[15] The Court refers to the following eight entities collectively as "Sequoia:" Sequoia Capital Franchise Fund, L.P.; Sequoia Capital Franchise Partners, LLC; Sequoia Capital Growth Fund III, L.P.; Sequoia Capital Growth III Principals Fund, LLC; Sequoia Capital Growth Partners III, L.P.; Sequoia Capital IX, L.P.; Sequoia Capital Operations, LLC; and, Sequoia Entrepreneurs Annex Fund, L.P.

Plaintiffs initially included Sequoia as a defendant in this case. However, following the Court's September 2019 Memorandum Opinion, Sequoia agreed to settle Plaintiffs' claims. *See Gibbs v. TCV V, L.P.*, No. 3:19cv789 (E.D. Va.) (Notice of Amended Documents Ex. 1 "Amended Settlement Agreement" § 4.1a, ECF No. 29-1). Accordingly, Sequoia is no longer a party to this lawsuit.

Sequoia Defendants' Motion to Compel Arbitration, which included Plaintiffs' claims against

Mobiloans.[16] *Id.* at 314.  (*See* Sept. 30, 2019 Order 1, ECF No. 115.)

Because the September 2019 Memorandum Opinion denied the non-Sequoia Defendants'

Motion to Compel Arbitration, the Court's prior opinion does not preclude Price, Hengle, or

Blackburn (or any Mobiloans consumer, for that matter, who obtained a loan prior to May 6,

2017) from participating in the present class action.  As to the current Defendants, resolution of

the Motions to Compel Arbitration as to Mobiloans consumers in the September 2019

Memorandum Opinion does not impede class certification.

### 2.     **The Class Action Waivers Are Unenforceable**

Defendants' second preliminary argument, the existence of class action waivers in

Plaintiffs' loan agreements, similarly does not bar class certification.

---

[16] In response to the present motion, Defendants note their awareness of the Court's denial of their Motion to Compel Arbitration.  (*See* Resp. 14 n.5.)  In their response brief, Defendants question the distinction the Court drew in the September 2019 Memorandum Opinion between their Motion to Compel Arbitration and Sequoia's "for purposes of enforcing Mobiloans arbitration agreements."  (*Id.*)  To the extent Defendants seek reconsideration of the Court's denial of their Motion to Compel Arbitration in their response brief, the time to do so has expired. *See* Fed. R. Civ. P. 59(e) (providing a twenty-eight-day deadline for a motion to alter or amend a judgment); Fed. R. Civ. P. 60(c)(1) (providing a one-year deadline for a motion for relief from a judgment or order).  And to the extent Defendants seek to compel Price, Hengle, and Blackburn to arbitrate their claims, no motion to compel arbitration pends before the Court.

The Court admonishes defense counsel against raising arguments here "already considered and rejected" in this and other courts. *Brice v. Haynes Investments, LLC*, ---- F. Supp. 3d ----, 2021 WL 2936733, at *6 (N.D. Cal. July 13, 2021) ("*Brice II*").  As already noted by the *Brice* court in California, this pattern of "rehash[ing]" previously rebuffed arguments improperly wastes judicial resources and must cease. *Id.* at *12.

Each tribal lending entity included a class action waiver in its loan agreements.  The

Great Plains and Plain Green[17] loans contained the following waiver as part of their Waiver of

Jury Trial and Arbitration Agreement (the "Arbitration Agreement"):

> **WAIVER OF RIGHTS:  BY ENTERING INTO THIS AGREEMENT, YOU ACKNOWLEDGE AND AGREE THAT YOU ARE WAIVING YOUR RIGHT TO (A) HAVE A JURY TRIAL TO RESOLVE DISPUTES, (B) HAVE A COURT RESOLVE DISPUTES, (C) PARTICIPATE IN A CLASS ACTION LAWSUIT, AND (D) HAVE ACCESS TO DISCOVERY AND OTHER PROCEDURES THAT ARE AVAILABLE IN A LAWSUIT.**

(*See, e.g.*, Mem. Supp. Ex. 3 "Edwards Agreement" 9, ECF No. 188-3; Resp. Ex. 5 "Inscho

Agreement" 11, ECF No. 210-5; Resp. 14–15.)  Borrowers likewise waived their right to

participate in a class action lawsuit in the Arbitration Agreement included under Mobiloans'

terms and conditions:

> *Waiver of Jury Trial and Waiver of Ability to Participate in a Class Action.*  YOU HEREBY AGREE THAT YOU ARE WAIVING YOUR RIGHT TO A JURY TRIAL, TO HAVE A COURT DECIDE YOUR DISPUTE, AND YOU ARE WAIVING YOUR ABILITY TO SERVE AS REPRESENTATIVE, AS A PRIVATE ATTORNEY GENERAL, TO PARTICIPATE IN A CLASS ACTION LAWSUIT, OR IN ANY OTHER REPRESENTATIVE CAPACITY FOR OTHERS IN THE ARBITRATION, AND TO CERTAIN DISCOVERY AND OTHER PROCEDURES THAT WOULD BE AVAILABLE IN A LAWSUIT.

(Resp. Ex. 6 "Mobiloans Terms & Conditions" 23, ECF No. 210-6.)[18]

---

[17] This record does not include a loan agreement from Plain Green.  Defendants represent that Plain Green's class action waiver is identical to that of Great Plains, (Resp. 14), a representation Plaintiffs do not dispute, (*cf.* Reply, ECF No. 215).  As a result, the Court assumes that loan agreements from Plain Green contain the same class action waiver as loan agreements from Great Plains.

[18] Although Mobiloans changed its terms and conditions over time, it never altered the language of the class action waiver in the Arbitration Agreement during the class period. (*Compare* Mobiloans Terms & Conditions 22, ECF No. 210-6 *with id.* at 50 and *id.* at 72.)  For clarity, the Court notes that Exhibit 6 to Defendants' Response to Plaintiffs' Motion for Class Certification is also marked as Palermo Declaration Exhibit 1.  *Id.* at 2.

a.   **Prior Decisions in This and Other Cases Render the Great
Plains and Pain Green Class Action Waivers Unenforceable**

As the Fourth Circuit recently decided, the class action waivers in loan agreements from

Great Plains and Plain Green are unenforceable. *See Gibbs v. Sequoia Cap. Operations, LLC*,

966 F.3d 286 (4th Cir. 2020) ("*Gibbs II*"). In affirming this Court's September 2019

Memorandum Opinion, the Fourth Circuit held that "the *entire* arbitration agreement is

unenforceable" for both Great Plains and Plain Green loans because they prospectively waived

federal rights and remedies.[19] *Id.* at 294 (emphasis added) (internal quotation marks and citation

omitted). "Under this 'prospective waiver doctrine,' courts will not enforce an arbitration

agreement if doing so would prevent a litigant from vindicating federal substantive statutory

rights." *Dillon v. BMO Harris Bank, N.A.*, 856 F.3d 330, 334 (4th Cir. 2017). The prospective

waiver doctrine constitutes an exception to the "strong federal policy in favor of enforcing

arbitration agreements." *Hayes v. Delbert Servs. Corp.*, 811 F.3d 666, 671 (4th Cir. 2016)

(quoting *Dean Witter Reynolds, Inc. v. Byrd*, 470 U.S. 213, 217 (1985)).

The Fourth Circuit's holding in *Gibbs II* extends to the Great Plains and Plain Green class

action waivers because both tribal lending entities' Arbitration Agreements, which the Fourth

Circuit found unenforceable, *Gibbs II*, 966 F.3d at 294, include these waivers, (*see, e.g.*,

Edwards Agreement 9, ECF No. 188-3; Inscho Agreement 11, ECF No. 210-5). Because the

Fourth Circuit ruled that the entire Arbitration Agreement in these loan agreements is

---

[19] This Court acknowledges that in a very recent case concerning underlying loan
agreements nearly identical to those in the action before this Court, the United States Court of
Appeals for the Ninth Circuit reached a different conclusion, remanding that case "with
instructions to compel the parties to proceed to arbitration." *Brice v. Haynes Invs., LLC*, No. 19-
15707, 2021 WL 4203337, at *2, *8 (9th Cir. Sept. 16, 2021). However, as this Court sits within
the Fourth Circuit, it will follow its own finding and current Fourth Circuit precedent, which
dictate that the arbitration agreements in the case at bar are unenforceable. *See Gibbs II*, 966
F.3d at 294.

unenforceable, that ruling embraces the class action waivers contained within those agreements. Under the law of the case, Defendants cannot enforce these waivers. *Gibbs II*, 966 F.3d at 294; *TFWS, Inc. v. Franchot*, 572 F.3d 186, 191 (4th Cir. 2009) ("The law of the case doctrine posits that when a court decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages in the same case." (internal quotation marks and citations omitted)); *see also Brice I*, 2021 WL 1916466, at *2 (finding unenforceable the same class action waivers at issue here given that court's prior ruling that the entire Great Plains and Plain Green Arbitration Agreements were unenforceable).

Despite the Fourth Circuit's holding in *Gibbs II*, Defendants submit that the prospective waiver doctrine does not apply to the class action waivers contained within the unenforceable Arbitration Agreements. (Resp. 16.) According to Defendants, the prospective waiver doctrine renders unenforceable choice-of-forum or choice-of-law provisions that operate in tandem to foreclose a party's right to pursue a statutory remedy. (*Id.*) Because a class action waiver concerns neither the forum nor the applicable law, Defendants posit it "does not—and, indeed, cannot—foreclose a plaintiff's substantive right to pursue statutory remedies." (*Id.*)

Defendants' argument takes too narrow a view of the prospective waiver doctrine. "Although the prospective waiver doctrine has most commonly been associated with arbitration agreements, the rationale behind the doctrine supports its application in contexts beyond mandatory arbitration agreements." *Williams v. Big Picture Loans, LLC*, No. 3:17cv461, 2021 WL 2930976, at *5 (E.D. Va. July 12, 2021) ("*Big Picture I*").

As with the present case, *Big Picture I* concerned high-interest loans originated by tribal entities. *Id.* at *2. In finding unenforceable the class action waivers in those loan agreements, the court in *Big Picture I* reviewed the prospective waiver doctrine from its origins, noting that

14

the doctrine "has focused on whether a party has waived, in advance, its right to pursue federal statutory remedies." *Id.* at \*5 (citing *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614, 637 n.19 (1985)). The court further explained that the prospective waiver doctrine does not merely concern mandatory arbitration of claims; rather, the doctrine's core concern relates to "the waiver of important federal rights." *Id.* "[W]here a provision of a contract mandates an alternative dispute resolution procedure that amounts to a substantive waiver of federally protected rights, the provision is unenforceable." *Id.* (citation omitted); *see also Gibbs II*, 966 F.3d at 294 (applying prospective waiver doctrine to the choice-of-law provisions of the loans at issue here because those provisions "stymie the vindication of the federal statutory claims that the borrowers seek to enforce"); *Gibbs v. Haynes Invs., LLC*, 967 F.3d 332, 344 (4th Cir. 2020) ("*Gibbs III*") (applying the prospective waiver doctrine to the arbitration provisions within the loans at issue here because "the effect of such provisions is to . . . make unavailable to the borrowers the effective vindication of federal statutory protections and remedies").

When viewed in the context of the entire loan agreement, the class action waivers at issue here "clearly amount[] to a substantive waiver of federally protected rights." *Big Picture I*, 2021 WL 2930976, at \*6. In addition to waiving the right to participate in class action lawsuits, consumers who obtained loans from Great Plains and Plain Green:

1. waived the right to have a jury trial to resolve disputes, (Edwards Agreement 9, ECF No. 188-3);

2. waived the right to have a court resolve disputes (*id.*);

3. waived the right to have access to discovery and other procedures available in a lawsuit (*id.*);

4. signed the agreement despite the consumer protections afforded under the law of the state in which they reside (*id.* at 2);

5. agreed that including truth-in-lending disclosures did not mean that the tribal lending entity or the tribe itself consented "to application of state or federal law," (*id.* at 3);

6. agreed that tribal law governed any dispute concerning the loan agreement, and that the tribal lending entity "may choose to voluntarily use certain federal laws as guidelines," (*id.* at 8); and,

7. agreed to arbitrate their claims either on tribal land or within thirty miles of their current residence, "provided that this accommodation . . . shall not be construed in any way (a) as a relinquishment or waiver of the sovereign status or immunity of the [t]ribe, (b) to allow for the application of any law other than [t]ribal law, or (c) to constitute a transaction of business in any place other than Indian country of the [t]ribe," (*id.* at 9).

"In conjunction, these provisions operate to functionally waive a consumer's right to vindicate federally protected statutory rights." *Big Picture I*, 2021 WL 2930976, at *7. Specific to the class action waivers, the rights being relinquished are the protections afforded under Federal Rule of Civil Procedure 23, protections that allow litigants with small claims to pursue those claims together when doing so individually would be infeasible. *Gunnells v. Healthplan Servs., Inc.*, 348 F.3d 417, 424 (4th Cir. 2003) (stating class actions "afford aggrieved persons a remedy if it is not economically feasible to obtain relief through the traditional framework of multiple individual damage actions" (citation omitted)). Because the class action waivers exist to "make unavailable to the borrowers the effective vindication of federal statutory protections and remedies," the prospective waiver doctrine applies. *Gibbs III*, 967 F.3d at 344; *see also Big Picture I*, 2021 WL 2930976, at *7 ("[T]he system set up here prevents borrowers from effectively vindicating any federal statutory claim . . . [and] violate[s] the prospective waiver rule."). Thus, even if the Fourth Circuit in this case had not found the entire Arbitration Agreements unenforceable, the prospective waiver doctrine would render unenforceable the class action waivers contained within these agreements.[20]

---

[20] For a similar reason, the Court declines to sever the class action waivers from the Arbitration Agreements. Because the Arbitration Agreements, which contain the class action waivers, "constitute an 'integrated scheme to contravene public policy,'" they "are invalid," rendering severance improper. *Gibbs I*, 421 F. Supp. 3d at 290 (quoting *Hayes*, 811 F.3d at 676).

16

In short, the whole Great Plains and Plain Green Arbitration Agreements, including the class action waivers, are unenforceable. *See Brice I*, 2021 WL 1916466, at *2. The waivers therefore do not preclude class certification.

> b. **The Prospective Waiver Doctrine Renders the Class Action Waiver in the Mobiloans Agreements Unenforceable**

Despite finding the Mobiloans Arbitration Agreements enforceable in the September 2019 Memorandum Opinion, the Court concludes that the prospective waiver doctrine renders unenforceable the class action waiver provisions within those agreements.[21]

As with the Great Plains and Plain Green loan agreements, the function of the Mobiloans class action waivers become apparent when viewed in context. In addition to waiving the right to participate in a class action, Mobiloans consumers:

1. waived the right to have a jury trial to resolve disputes, (Mobiloans Terms & Conditions 23, ECF No. 210-6);

2. waived the right to have a court resolve disputes, (*id.*);

3. waived the right to have access to discovery and other procedures available in a lawsuit, (*id.*); and,

4. agreed that tribal law, the Indian Commerce Clause of the United States Constitution, the Federal Arbitration Act, and "any applicable federal law" governed the loan agreement and the Arbitration Agreement contained therein (the "Choice-of-Law Provision"), (*id.* at 24; *accord id.* at 51, 73).

As explained in this Court's September 2019 Memorandum Opinion, the Choice-of-Law Provision distinguishes the Mobiloans contracts from those of Great Plains and Plain Green because the Mobiloans contracts permit the application of federal law whereas the latter do not. Despite this difference, the Choice-of-Law Provision in the Mobiloans agreements implies that

---

[21] The Court found the Mobiloans Arbitration Agreement enforceable because it contemplated application of federal law to arbitration proceedings for disputes arising under the Mobiloans loan agreement. *Gibbs I*, 421 F. Supp. 3d at 303. As a result, the Court concluded the prospective waiver doctrine did not apply. *Id.* at 304.

state law does not apply.  In fact, the first paragraph of the Mobiloans Terms and Conditions

reinforces the implication that protections under state law do not apply:

> **MOBILOANS, LLC IS AN ENTITY OWNED AND OPERATED BY THE
> TUNICA-BILOXI TRIBE OF LOUISIANA.  THE CREDIT ISSUED TO
> YOU AND INFORMATION PROVIDED UNDER THIS AGREEMENT BY
> MOBILOANS IS DONE SO *SOLELY* UNDER THE PROVISIONS OF
> LAWS OF THE TUNICA-BILOXI TRIBE OF LOUISIANA AND CERTAIN
> FEDERAL LAWS AS SPECIFIED IN [THE CHOICE-OF-LAW
> PROVISION].**

(Mobiloans Terms & Conditions 2, ECF No. 210-6 (emphasis added; bold in original);

*accord id.* at 29, 56.)

Taken together, the Arbitration Agreement, Choice-of-Law Provision, and class action

waiver run afoul of the prospective waiver doctrine.  These provisions prevent a consumer from

joining with others pursuant to Federal Rule of Civil Procedure 23 to vindicate consumer-

protection rights afforded under state law, regardless of the arbitral forum.  One such Virginia

law provides that a loan contract issued in violation of the state's usury provisions "shall be

void," and the lender to that void contract cannot "collect, receive, or retain any principal,

interest, or charges whatsoever with respect to the loan."  Va. Code §§ 6.2-1541(A)–(B).  The

class-action-waiver provision in the Mobiloans agreements prevents consumers from feasibly

obtaining relief under this Virginia law by foreclosing use of the class action device, a federal

statutory right provided under Federal Rule of Civil Procedure 23.  *See Gunnells*, 348 F.3d at

424.  Thus, the class action waiver, when viewed in combination with the other provisions of the

Mobiloans Arbitration Agreement, "prospectively waives Plaintiffs' federal and *state* statutory

rights."  *Hengle v. Asner*, 433 F. Supp. 3d 825, 857 (E.D. Va. 2020) (emphasis added), *motion to

certify appeal granted*, No. 3:19cv250, 2020 WL 855970 (E.D. Va. Feb. 20, 2020); *see also

Gingras v. Think Fin., Inc.*, 922 F.3d 112, 127 (2d Cir. 2019), *cert. denied sub nom. Sequoia

Cap. Operations, LLC v. Gingras*, 140 S. Ct. 856 (2020) ("The arbitration mechanism in these

agreements purports to offer neutral dispute resolution but appears to disallow claims brought under federal and *state* law." (emphasis added)).

Because the prospective waiver doctrine applies, the Court finds unenforceable the class action waiver within the Mobiloans agreements. As a result, these waivers do not bar class certification for Mobiloans consumers.

**B.      The Court Will Certify the Virginia Class Because Plaintiffs Satisfy the Requirements of Rule 23**

Having concluded that neither of the two preliminary issues raised by Defendants prohibit class certification, the Court turns to the Rule 23 requirements. Plaintiffs satisfy the requirements under Rule 23(a) and Rule 23(b)(3), so the Court will grant the Motion for Class Certification and certify the Virginia Class.

**1.      Plaintiffs Satisfy the Requirements of Rule 23(a)**

The Virginia Class satisfies the four explicit requirements under Rule 23(a): (1) numerosity of the class makes joinder of all members impracticable; (2) common questions of law or fact exist; (3) Plaintiffs' claims typify those of the class; and, (4) Plaintiffs will fairly and adequately represent the interests of the class. Fed. R. Civ. P. 23(a); *see Broussard*, 155 F.3d at 337. In addition, the Virginia Class satisfies the implicit ascertainability requirement. *See Soutter*, 307 F.R.D. at 196. In this case, most of the dispute regarding the Rule 23(a) requirements concerns ascertainability. Accordingly, the Court addresses ascertainability before considering the four explicit requirements to allow a class action under Rule 23(a).

a.    **The Virginia Class Satisfies the Ascertainability Requirement**

Plaintiffs have shown that the Virginia Class is ascertainable.  To meet this requirement, a plaintiff "need not be able to identify every class member at the time of certification;" rather, he or she must only "demonstrate that class members will be identifiable without extensive and individualized fact-finding or mini-trials." *Soutter*, 307 F.R.D. at 196 (internal quotation marks and citation omitted); *see also EQT Prod. Co.*, 764 F.3d at 358 (stating same).

Here, Plaintiffs posit that class membership turns entirely on three objective criteria:

> (1) determining whether a consumer had a loan with Plain Green, Great Plains, or Mobiloans; (2) for all such consumers, determining whether they had a Virginia address when they executed the loan; (3) identifying any payments made by those consumers during the class period.

(Mem. Supp. 20.)  To determine whether a class member meets these criteria, Plaintiffs intend to rely on nationwide consumer-level account data that Think Finance provided to RSM in three related class action settlements.  (*See* RSM Decl. ¶¶ 2, 3, ECF No. 188-4.)  In fact, Plaintiffs have already determined putative class membership.  Using the Think Finance data, RSM has identified 43,598 unique consumers as belonging to the Virginia Class.  (*Id.* ¶ 10.)

Plaintiffs therefore present objective criteria to determine class membership and apply those criteria to Think Finance data to reach an estimate for the size of the Virginia Class.  In doing so, Plaintiffs have "demonstrate[d] that class members will be identifiable without extensive and individualized fact-finding or mini-trials." *Soutter*, 307 F.R.D. at 196 (internal quotation marks and citation omitted).

Defendants assert that Plaintiffs' showing fails because the dataset on which they base their estimates contains errors and is not reliable.  Specifically, Defendants discovered that Earl Browne, a named plaintiff in *Brice v. Haynes Investments, LLC* and alleged member of the California class, executed his loan while residing in Alabama.  (Sue Mouck December 22, 2020

20

Email 18, ECF No. 210-9.)  *Brice* is a class action pending before the United States District Court for the Northern District of California against many of the same defendants, with nearly the same issues presented as those raised here.  Indeed, many of the same attorneys for the plaintiffs and defendants in *Brice* also represent the Plaintiffs and Defendants in the case at bar.

Browne is not a Named Plaintiff here.  Defendants suggest that the error involving Browne, a single data point in a case pending before a different court, means that "[o]ne of two things must be true:"  "[e]ither Plaintiffs' counsel is misrepresenting [Browne's] state of residency when his loans were originated . . . , or the consumer-level account data . . . is materially incomplete and inaccurate."  (Resp. 21 (emphasis removed).)  While Defendants do not rule out the possibility of misrepresentation, they argue that the inaccuracy raises concerns because RSM itself acknowledged that it could not verify the accuracy of the data received. (Resp. Ex. 12 "Ritesh Patel Deposition" 3–4, ECF No. 210-12.)[22]

"The attack on Browne and defendants' other attacks on the RSM data . . . do not preclude class certification."  *See Brice I*, 2021 WL 1916466, at *4.  While a "significant error in the aggregate data" used to ascertain class membership could defeat class certification, a minor error does not.  *Krakauer v. Dish Network, L.L.C.*, 925 F.3d 643, 658 (4th Cir. 2019), *cert. denied*, 140 S. Ct. 676 (2019).  Indeed, Defendants do not identify even a single error pertaining to this class action.  They have not identified the wrongful inclusion of any one of the 43,598 consumers who RSM identifies as belonging to the *Virginia* Class.

_____

[22] Defendants also challenge RSM's analysis of the data, arguing that is it misleading to assume that the difference between the total amount borrowed and the total amount paid constituted interest as of an arbitrary end date. (Resp. 24–25; *see also* Patel Dep. 5–12.)  While this assumption may "impact the aggregate damages award," it "does not create an ascertainability issue or otherwise create a barrier to class certification."  *Brice I*, 2021 WL 1916466, at *4.

Although the mistaken inclusion of Browne in the California class[23] may seem a minor error as to that class, it bears essentially no relevance on the Virginia Class before this Court because Browne is not a Named Plaintiff here.[24] The manager of class action claims administration at RSM stated under oath that if Browne did not take out his loans while residing in California, RSM would not have included Browne among the 224,007 putative members of the California class. (Patel Dep. 23–24.) Although Plaintiffs' Counsel may have mistakenly included Browne as a named plaintiff in the *Brice* class action, that mistake does not taint the RSM data used to ascertain class membership here where Browne is not a Named Plaintiff.

Finally, the Court finds that Defendants' argument regarding RSM's inability to verify the accuracy of the data lacks merit. These data have been used to administer three class action settlements, settlements that Defendants' Counsel did not oppose despite representing the defendants in those cases. RSM also obtained custody of the data at issue directly from Think Finance, (RSM Decl. ¶ 3, ECF No. 188-4), a company that touted its "turn-key" technological capabilities when pitching itself as loan-servicing partner to tribal lenders, (Mem. Supp. Ex. 2 "Think Finance February 2011 Presentation" 4, ECF No. 188-2). "[C]ourts do not look favorably upon the argument that records a defendant treats as accurate for business purposes are not accurate enough to define a class." *Soutter*, 307 F.R.D. at 197–98 (citation omitted). Any

---

[23] Browne executed his loan while residing in Alabama (Sue Mouck December 22, 2020 Email 2, ECF No. 210-9), and therefore he could not be part of the California class.

[24] The Court observes that Defendants recycled language from their brief in opposition to class certification in *Brice I* in their brief in opposition to class certification here. In fact, Defendants copy almost verbatim their arguments attacking the RSM data from *Brice I* in this case (and they also extensively discuss a named plaintiff from *Brice I* who is not a Named Plaintiff in the case before this Court). (*Compare* Resp. 20–25 *with* Opp'n Pls.' Mot. Class Cert. 25–29, ECF No. 145, *Brice v. Stinson*, 3:19cv1481 (N.D. Cal.).) The *Brice I* court found those arguments unpersuasive, *see* 2021 WL 1916466, at *4, and after an independent review, this Court finds those identical arguments unpersuasive as well.

speculation as to the veracity of the data at issue—Think Finance's own data—does not overcome Plaintiffs' presentation of ascertainability.

Because Plaintiffs have proposed three objective criteria to determine class membership and possess nationwide data to inform that determination, members of the Virginia Class are readily identifiable. Plaintiffs have satisfied the ascertainability requirement. *See Soutter*, 307 F.R.D. at 196; *EQT Prod. Co.*, 764 F.3d at 358.

> **b.    The Virginia Class Is So Numerous That Joinder of All Members Is Impracticable**

Plaintiffs also satisfy the numerosity requirement. Although there is no minimum number of potential class members needed to fulfill the numerosity requirement, *see Holsey v. Armour & Co.*, 743 F.2d 199, 217 (4th Cir. 1984), joinder usually becomes impracticable where the class exceeds forty members, *see Kennedy v. Va. Polytechnic Inst. & State Univ.*, No. 7:08cv579, 2010 WL 3743642, at *3 (W.D. Va. Sept. 23, 2010).[25] Here, the record identifies that 43,598 consumers belong to the Virginia Class. (RSM Decl. ¶ 10, ECF No. 188-4.) This far exceeds the forty-member threshold for numerosity. *See Kennedy*, 2010 WL 3743642, at *3. Because it would be impracticable to join 43,598 individual actions, the Plaintiffs have established numerosity.

> **c.    Questions of Law or Fact Are Common to the Class**

Plaintiffs likewise establish commonality. Rule 23(a)(2) requires that class members' claims involve common questions of law or fact. Fed. R. Civ. P. 23(a)(2). "The commonality requirement focuses on the claims of the class as a whole, and whether they 'turn on questions of law applicable in the same manner to each member of the class.'" *Soutter*, 307 F.R.D. at 199

---

[25] In *Kennedy*, the court explained that, although courts are reluctant to certify classes with fewer than twenty-five members, they are "much more willing to certify a class if it has more than [forty] members." *Kennedy*, 2010 WL 3743642, at *3 (citing cases).

(quoting *Califano v. Yamasaki*, 442 U.S. 682, 701 (1979)). "To satisfy this requirement, there need be only a single issue common to the class." *Id.* (citing *Cent. Wesleyan Coll. v. W.R. Grace & Co.*, 143 F.R.D. 628, 636 (D.S.C. 1992), *aff'd* 6 F.3d 177 (4th Cir. 1993)). A plaintiff, however, cannot merely allege that the class members "have all suffered a violation of the same provision of law." *Dukes*, 564 U.S. at 350. "Commonality requires the plaintiff to demonstrate that the class members have suffered the same injury." *Id.* at 349-50 (internal quotation marks and citation omitted). That is, the "common contention . . . must be of such a nature that it is capable of classwide resolution—which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Id.* at 350.

Plaintiffs submit that each class member's claims—whether brought under the Virginia usury laws or RICO or as a common law tort of unjust enrichment—arise from the same conduct: Defendants' ownership and involvement in developing a lending scheme designed to evade Virginia usury laws. (Mem. Supp. 21.) This conduct raises at least eight common questions of law that can be evaluated with common proof:

> (1) whether [the tribal lending entities'] interest rates violate Virginia's usury laws; (2) whether the choice-of-law provision in their loan agreements bar[s] enforcement of Virginia's usury laws; (3) whether the relationship between the various participants constitutes an enterprise as defined under RICO; (4) whether Defendants acquired or maintained any interest or control over the enterprise in violation of § 1962(b); (5) whether Defendants participated [in] or managed the affairs of the enterprise in violation of § 1962(c); (6) whether Defendants conspired to violate RICO in violation of § 1962(d); (7) whether Defendants have been unjustly enriched at the expense of Plaintiffs' and the class; (8) whether the amounts paid by each consumer are recoverable against defendants.

(*Id.* at 21–22.) Based on these eight common questions, the class members "share a common set of legal and factual questions" regarding all their claims.[26] *Williams v. Big Picture Loans, LLC*,

---

[26] The Court addresses in detail the common questions to each specific claim during its discussion of predominance.

3:17cv461, 2021 WL 3072462, at *7 (E.D. Va. July 21, 2021) ("*Big Picture II*"). Further, while not binding on this Court, several other district courts have found commonality "in comparable cases where class members brought suits challenging various tribal lending schemes." *Id.*; *see Brice I*, 2021 WL 1916466, at *4–5; *MacDonald v. Cashcall, Inc.*, 333 F.R.D. 331, 342–43 (D.N.J. 2019). "The same is true here." *Big Picture II*, 2021 WL 3072462, at *7.

Even though Plaintiffs identify far more than "a single issue common to the class," *Soutter*, 307 F.R.D. at 199, Defendants argue that commonality does not exist, (Resp. 35–36). According to Defendants, the common issues Plaintiffs identify are "*typically* preliminary issues, which if decided in Defendants' favor would resolve broad swathes of the case, if not the entire action" but if "decided in Plaintiffs' favor, the result would quickly give way to additional, individual, fact-specific questions." (*Id.* at 35 (emphasis added).)

Assuming without deciding that some of the eight common questions Plaintiffs identify involve "preliminary issues," others do not. For example, the third common question identified—"whether the relationship between the various participants constitutes an enterprise as defined under RICO," (Mem. Supp. 22)—will *not* devolve into individual inquiries if the Court resolves this question in Plaintiffs' favor. If Plaintiffs establish as to one class member that the various participants here constitute a RICO enterprise, the same evidence will establish the same conclusion as to every other class member. *See Dukes*, 564 U.S. at 350 (explaining an issue qualifies as common if "it is capable of classwide resolution"). Likewise, evidence establishing "whether Defendants acquired or maintained any interest or control over the enterprise in violation of § 1962(b)"—the fourth common question identified, (Mem. Supp. 22)—would establish the same conclusion for all class members. Because at least one issue is susceptible to classwide proof, Plaintiffs have established commonality. *Soutter*, 307

F.R.D. at 199; *see also Dukes*, 564 U.S. at 359 ("[E]ven a single common question will do." (cleaned up)).  Defendants' argument to the contrary does not persuade.

### d.   Named Plaintiffs' Claims Are Typical of Those of the Class

Named Plaintiffs also satisfy the typicality requirement.[27]  For a class representative to satisfy typicality, he or she "must be part of the class and possess the same interest and suffer the same injury as the class members."  *Deiter v. Microsoft Corp.*, 436 F.3d 461, 466 (4th Cir. 2006); *see also Soutter*, 307 F.R.D. at 208 ("[T]he typicality prerequisite focuses on the general similarity of the named representative's legal and remedial theories to those of the proposed class.").  As explained by the Fourth Circuit in *Deiter*:

> The typicality requirement goes to the heart of a representative parties' ability to represent a class, particularly as it tends to merge with the commonality and adequacy-of-representation requirements.  The representative party's interest in prosecuting his own case must simultaneously tend to advance the interests of the absent class members.  For that essential reason, plaintiff's claim cannot be so different from the claims of absent class members that their claims will not be advanced by plaintiff's proof of his own individual claim.  That is not to say that typicality requires that the plaintiff's claim and the claims of class members be perfectly identical or perfectly aligned.  But when the variation in claims strikes at the heart of the respective causes of actions, we have readily denied class certification.

436 F.3d at 466–67 (internal citations omitted).  In short, "[t]he essence of the typicality requirement is captured by the notion that 'as goes the claim of the named plaintiff, so go the claims of the class.'"  *Id.* at 466 (quoting *Broussard*, 155 F.3d at 340).

Here, the interests of each Named Plaintiff align with those of the class.  All Named Plaintiffs allege to have suffered the same injury:  payment of principal and usurious interest on unlawful debt.  Further, as with all members of the Virginia Class, Named Plaintiffs' claims—

---

[27] Because Blackburn's loans fall outside the class period (Sue Mouck December 22, 2020 Email 18), she does not belong to the Virginia Class.  The Court will not appoint her as a class representative.  *See Deiter*, 436 F.3d at 466.

whether brought under Virginia usury laws, the federal RICO statute, or the common law tort of unjust enrichment—all arise from Defendants' alleged use of a tribal lending scheme to uniformly charge interest rates above the statutory maximum in Virginia. (*See* Mobiloans Terms & Conditions 3, ECF No. 210-6 (disclosing interest rates on Mobiloans loans ranging from 206.14% to 442.31%); Think Finance Disc. Resp. 3, ECF No. 188-54 (admitting that all Great Plains and Plain Green loans carried an interest rate greater than 24%)); *see also* Va. Code § 6.2-303(A) (setting the statutory cap on interest rates in Virginia at 12%). Finally, each Named Plaintiff belongs to the Virginia Class. (RSM Decl. ¶¶ 12–18, ECF No. 188-4.) Named Plaintiffs' claims typify those of absent class members, "both in terms of the legal theory and factual circumstances underlying that theory." *MacDonald*, 333 F.R.D. at 343. "The only difference across class members would be the actual damages they are asserting which will not preclude a finding of typicality." *Big Picture II*, 2021 WL 3072462, at *8.

Defendants contend that typicality does not exist because Plaintiffs overlook distinctions among the different types of products and services offered by the three tribal lending entities affiliated with Think Finance. (Resp. 38.) According to Defendants, the loan agreements from each tribal lending entity specify "different interest rates, loan terms, marketing, collection practices, amount of payments, familiarity and understanding of the loans, and benefits realized by each class member." (*Id.* at 29.)

Even if these differences exist, "defendants identify no differences that are *material* between the loan documents that would create atypicality given the claims asserted." *Brice I*, 2021 WL 1916466, at *6. The only loan term that matters with respect to the claims of each class member, including those of each Named Plaintiff, is whether the interest rate exceeds the relevant thresholds: 12% interest per year for claims under Virginia usury laws and 24% interest

per year for claims under RICO. Because the loan agreements originated by all three tribal lending entities exceeded those thresholds, (Think Finance Disc. Resp. 3, ECF No. 188-54; Mobiloans Terms & Conditions 3, ECF No. 210-6), any differences in the terms of these agreements would be immaterial and, as a result, would not destroy typicality, *see Brice I*, 2021 WL 1916466, at *6; *see also Soutter*, 307 F.R.D. at 209 (finding alleged variations in corporate decisions and procedures did not defeat typicality when the pertinent corporate practice "was uniform in all material respects"). As a result, Plaintiffs satisfy the typicality requirement.

### e. Named Plaintiffs Will Fairly and Adequately Represent the Interests of the Class

Named Plaintiffs demonstrate that they will fairly and adequately represent the interests of the class, the final requirement under Rule 23(a). *See* Fed. R. Civ. P. 23(a)(4). The adequacy requirement "is met if the named plaintiff has interests common with, and not antagonistic to, the [c]lass' interests; and . . . the plaintiff's attorney is qualified, experienced and generally able to conduct the litigation." *Milbourne v. JRK Residential Am., LLC*, No. 3:12cv861, 2014 WL 5529731, at *8 (E.D. Va. Oct. 31, 2014), *amended,* No. 3:12cv861, 2016 WL 1071571 (E.D. Va. Mar. 15, 2016) (first and third alterations in original) (internal citations and quotation omitted). "[T]he adequacy inquiry itself focuses on conflicts of interests." *Soutter*, 307 F.R.D. at 213.

Named Plaintiffs meet the adequacy requirement. First, Plaintiffs have no interests antagonistic to the class's interests. Named Plaintiffs and the class share the identical interest of establishing Defendants' liability based on the same questions of law and fact. Defendants do not contend otherwise, and the record demonstrates no conflicts of interest.

Second, nothing in the record demonstrates that either Named Plaintiffs or their attorneys are ill-suited suited to represent the class. This Court has repeatedly found Plaintiffs' Counsel qualified to conduct complex consumer class action litigation such as the one at bar. *See Clark*

*v. Trans Union, LLC*, 3:15cv391, 2017 WL 814252, at *13 (E.D. Va. Mar. 1, 2017) (collecting cases where this Court has found Plaintiffs' Counsel adequate to serve as class counsel). Specific to Think Finance-related litigation, Plaintiffs' Counsel has been involved since 2017 and has already obtained substantial relief for borrowers by securing two courts' approval of a class action settlement. (Guzzo Decl. ¶ 8, ECF No. 188-56.)  And throughout the course of this and related litigation, Named Plaintiffs have remained active participants and demonstrated a commitment to serving the interests of the class. (Guzzo Decl. ¶ 10, ECF No. 188-56; Haac Decl. ¶ 8, ECF No. 188-58.)

Accordingly, the Court finds the adequacy requirement satisfied for both the Named Plaintiffs and Plaintiffs' Counsel. *See Milbourne*, 2014 WL 5529731, at *8.

> **2.    Plaintiffs Satisfy the Predominance and Superiority Requirements of Rule 23(b)(3)**

In addition to satisfying the four requirements of Rule 23(a), Plaintiffs must also demonstrate that the Virginia Class falls within one of the three types of class actions delineated in Federal Rule of Civil Procedure 23(b).[28] Here, Plaintiffs move for certification under Rule 23(b)(3).  Certification under Rule 23(b)(3) is appropriate where the Court finds that:  (1)

---

[28] The three types of class actions in Rule 23(b) are:

(1) prosecuting separate actions by or against individual class members would create a risk of:

   (A) inconsistent or varying adjudications with respect to individual class members that would establish incompatible standards of conduct for the party opposing the class; or[,]

   (B) adjudications with respect to individual class members that, as a practical matter, would be dispositive of the interests of the other members not parties to the individual adjudications or would substantially impair or impede their ability to protect their interests;

"questions of law or fact common to the members of the class predominate over any questions affecting only individual members;" and, (2) "a class action is superior to other available methods for [the] fair[] and efficient[] adjudication of the controversy." Fed. R. Civ. P. 23(b)(3). Plaintiffs establish both predominance and superiority.

> **a.      Questions Common to the Class Predominate Over Questions Affecting Only Individual Members**

Plaintiffs satisfy the predominance requirement of Rule 23(b)(3).  Under Rule 23(b)(3), questions common to the class "must predominate over any questions affecting only individual members." *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 615 (1997) (internal quotation marks omitted).  Whether common questions predominate over individual questions "is a separate inquiry, distinct from the requirements found in Rule 23(a)." *Ealy v. Pinkerton Gov't Servs.*, 514 F. App'x 299, 305 (4th Cir. 2013) (citing *Dukes*, 564 U.S. at 359).  This requirement is "even more demanding than Rule 23(a)," *Comcast*, 569 U.S. at 34 (citation omitted), and "tests

---

(2) the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole; or[,]

(3) the court finds that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy. The matters pertinent to these findings include:

> (A) the class members' interests in individually controlling the prosecution or defense of separate actions;

> (B) the extent and nature of any litigation concerning the controversy already begun by or against class members;

> (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and[,]

> (D) the likely difficulties in managing a class action.

Fed. R. Civ. P. 23(b).

whether proposed classes are sufficiently cohesive to warrant adjudication by representation,"

*Amchem*, 521 U.S. at 623 (citation omitted).

i.    **The Qualitatively Overarching Issue Is Capable of Producing a Single, Common Answer**

"Rule 23(b)(3)'s commonality-predominance test is qualitative rather than quantitative."

*Stillmock v. Weis Markets, Inc.*, 385 F. App'x 267, 272 (4th Cir. 2010) (citing *Gunnells*,

348 F.3d at 429).  If the "qualitatively overarching issue" in the litigation is common, a class

may be certified notwithstanding the need to resolve individualized issues.  *See Ealy*, 514 F.

App'x at 305 ("Indeed, common issues of liability may still predominate even when some

individualized inquiry is required." (citation omitted)).

Plaintiffs satisfy the predominance requirement because the class claims encompass the

same essential factual and legal issues.  The central issue before the Court is whether Defendants

are liable as decisionmakers, founders, owners, or indirect beneficiaries of the tribal lending

scheme perpetuated by Think Finance.  This alone, as the qualitatively overarching issue of this

case, satisfies the predominance requirement and outweighs any issues particular to individual

class members.  *See id.*; *see also Big Picture II*, 2021 WL 3072462, at *10–11 (finding

predominance met in a tribal lending case raising RICO and state-law usury claims); *Brice I*,

2021 WL 1916466, at *5 (same).

Defendants nevertheless maintain that individualized issues predominate for four reasons:

(1) variations in the loan agreements create individualized questions of fact; and, individualized

questions of law arise in (2) unjust enrichment claims, (3) RICO claims, and (4) usury claims.

(Resp. 28–35.)  The Court considers each of these arguments in turn, finding none persuasive.

31

### ii.     Immaterial Variations in the Loan Agreements Will Not Defeat Predominance

First, Defendants submit that variations in the three tribal lending entities' loan agreements will overwhelm the Court with individualized, fact specific inquiries. (Resp. 28–29.) But as has been discussed, any differences in the terms of these loan agreements would be immaterial as to liability because the three tribal lending entities originated loans carrying interest rates exceeding the relevant statutory thresholds. (*See* Think Finance Disc. Resp. 3, ECF No. 188-54; Mobiloans Terms & Conditions 3, ECF No. 210-6.) To be sure, differences in loan terms may affect damages. But even when "some individualized inquiry" as to damages must be made, "common issues of liability" still predominate. *See Ealy*, 514 F. App'x at 305; *accord Gunnells*, 348 F.3d at 427–28 ("Rule 23 contains no suggestion that the necessity for individual damage determinations destroys commonality, typicality, or predominance, or otherwise forecloses class certification."). Moreover, any individualized inquiries pertaining to damages "can be addressed by analysis of the RSM data." *Brice I*, 2021 WL 1916466, at *5.

### iii.     Individualized Questions Do Not Predominate Plaintiffs' Unjust Enrichment Claims

Second, Defendants contend that individualized questions predominate for the unjust enrichment claim. To state a claim for unjust enrichment, a plaintiff must show:

> (1) a benefit conferred on the defendant by the plaintiff; (2) knowledge on the part of the defendant of the conferring of the benefit; and (3) acceptance or retention of the benefit by the defendant in circumstances that render it inequitable for the defendant to retain the benefit without paying for its value.

*Integrated Direct Mktg., LLC v. May*, 129 F. Supp. 3d 336, 374 (E.D. Va. 2015), *aff'd*, 690 F. App'x 822 (4th Cir. 2017) (citing cases).

According to Defendants, individualized questions predominate this claim because: (1) some class members did not confer a benefit (*i.e.*, not all class members paid back more than

they borrowed); (2) a complex web of financing agreements obscure what, if any, benefit each Defendant accepted and when; and, (3) the statute of limitations on unjust enrichment claims in Virginia may bar some class members' claims. (Resp. 30–31.)

As to Defendants' first argument, that not all class members paid back more than they borrowed, that issue can be resolved by the RSM data. "Common issues will predominate if individual factual determinations can be accomplished using computer records, clerical assistance, and objective criteria—thus rendering unnecessary an evidentiary hearing on each claim." *Soutter*, 307 F.R.D. at 214 (internal quotation marks and citation omitted). Because the RSM data could render unnecessary an evidentiary hearing on which class members received more than they paid or which class members did not pay any usurious interest, common questions predominate as to the conferral of benefit element of Plaintiffs' unjust enrichment claim. *See id.*; *see also Brice I*, 2021 WL 1916466, at *5 (finding analysis of RSM data could resolve several individual factual determinations with common proof).

As to Defendants' second argument, the difficulty in tracing payments back to each Defendant, the RSM data similarly resolve this concern. *See Big Picture II*, 2021 WL 3072462, at *10. For example, if, as Defendants assert, Haynes did not accept any benefit after 2015 and therefore cannot be liable for any loan originated thereafter, (Resp. 30–31), "that is simpl[e] math and can be easily addressed by subclassing (if appropriate) or distribution formulas," *Brice I*, 2021 WL 1916466, at *5. In any event, whether Haynes can be liable after he stopped accepting benefits implicates an issue common to the class because Plaintiffs posit that Defendants are joint tortfeasors, making them jointly and severally liable for each class member's injury. (Reply 19.) The Court can decide the merits of that theory on a classwide

basis. *See Dukes*, 564 U.S. at 350 (explaining an issue qualifies as common if "it is capable of classwide resolution").

As to Defendants' third argument, the statute of limitations,[29] Plaintiffs contend that the limitations period should be tolled as to all consumers under the doctrine of fraudulent concealment.[30] (Reply 22.) "[T]o toll a limitations period based on fraudulent concealment, a plaintiff must demonstrate: (1) the party pleading the statute of limitations fraudulently concealed facts that are the basis of the plaintiff's claim, and (2) the plaintiff failed to discover those facts within the statutory period, despite (3) the exercise of due diligence." *Edmondson*, 922 F.3d at 548 (internal quotation marks and citation omitted). To be sure, the second and the third elements of the equitable tolling framework—whether Plaintiffs failed to discover Defendants' concealment during the limitations period despite exercising due diligence—raise individualized questions because "[i]n this context, a plaintiff's knowledge typically requires individual evidence." *EQT Prod. Co.*, 764 F.3d at 370 (citation omitted).

Nevertheless, the first element of the equitable tolling framework, whether Defendants fraudulently concealed their scheme, is amenable to classwide resolution. To satisfy this element, "a plaintiff must provide evidence of affirmative acts of concealment by the defendants." *Edmondson*, 922 F.3d at 553 (internal quotation marks and citation omitted).

---

[29] A three-year limitations period applies to unjust enrichment claims in Virginia. *McPike v. Zero-Gravity Holdings, Inc.*, 280 F. Supp. 3d 800, 809 (E.D. Va. 2017) (citing Va. Code § 8:01-246(4)).

[30] Plaintiffs conflate equitable tolling with fraudulent concealment. In their briefing, Plaintiffs contend that the doctrine of equitable tolling applies because Defendants fraudulently concealed Think Finance's tribal lending scheme. (Reply 22 n.11.) Plaintiffs' conflation is understandable, however, because, as the Fourth Circuit has explained, "notwithstanding that the doctrine we term 'equitable tolling' substantively differs from fraudulent concealment and equitable estoppel, some opinions characterize all three doctrines as falling under the overarching heading of 'equitable tolling.'" *Edmonson v. Eagle Nat'l Bank*, 922 F.3d 535, 550 (4th Cir. 2019).

According to Plaintiffs, Defendants fraudulently concealed their role in the Think Finance tribal lending scheme by making it appear that the tribes originated the allegedly usurious loans. (Reply 22 n.11.) Because it is undisputed that Defendants' conduct was relatively uniform with respect to each Plaintiff and putative class member, whether that uniform conduct amounted to fraudulent concealment presents a common question. *See EQT Prod. Co.*, 764 F.3d at 370. Despite the individualized questions related to Plaintiffs' knowledge and due diligence, the "qualitatively overarching issue" regarding fraudulent concealment concerns Defendants' conduct. *Ealy*, 514 F. App'x at 305 (citation omitted). Common questions therefore predominate as to whether the doctrine of fraudulent concealment applies.

### iv.    Individualized Questions Do Not Predominate Plaintiffs' RICO Claims

Third, Defendants argue that individualized questions predominate Plaintiffs' RICO Claims because some members of the Virginia Class may have received more money than they borrowed, meaning individualized issues predominate as to establishing an injury under RICO. (Resp. 31–32.)

As discussed, analysis of classwide RSM data can resolve this concern. *See Brice I*, 2021 WL 1916466, at *5. In addition, Plaintiffs predicate their RICO injury not only on the payment of usurious interest, but also on paying the principal on debts rendered void under Virginia law. (Reply 17.) Whether that theory succeeds on the merits raises a legal question common to the entire class, which, by definition, includes only those borrowers who made payments on their loans. Finally, at least with respect to Great Plains and Plain Green, "Defendants' argument is . . . belied by the structure of their loan agreements, which requires repayment of a fixed schedule of payments, with a portion of each payment directed to interest, and a portion directed to principal." *MacDonald*, 333 F.R.D. at 350. (*See also* Edwards Agreement 4–5, ECF No. 188-3

(requiring twenty-nine payments of $136.23 each, which Great Plains applied first to any fees due, then to unpaid interest, which accrued daily at an interest rate of 249.9885% per annum, and finally to principal).)  Because each tribal lending entity charged interest rates exceeding 24% per annum, every payment made by a Virginia borrower "carried usurious interest." *MacDonald*, 333 F.R.D. at 350.

Common questions of fact and law therefore predominate Plaintiffs' RICO claims.  *See Big Picture II*, 2021 WL 3072462, at *11 ("Whether [the defendant] caused the class members' injury is a [common] merits question to be resolved at a later stage.").

### v.   Individualized Common Questions Do Not Predominate Plaintiffs' Usury Claims

Finally, Defendants urge that every usury claim requires an extensive individualized assessment because only those consumers who paid usurious interest within the statute of limitations can recover damages.  (Resp. 32–35.)  For reasons already discussed, Defendants raise either individualized factual questions susceptible to classwide proof (*e.g.*, analysis of RSM data, payment of a single installment on a Great Plains or Plain Green loan), or legal questions common to the entire class (*e.g.*, applicability of the fraudulent concealment doctrine, whether the loans at issue were void *ab initio* under Virginia law).

As earlier demonstrated, each class member's claims involve the same central questions of law and fact.  Because common questions predominate, the Virginia Class is "sufficiently cohesive to warrant" class certification, satisfying the predominance requirement of Federal Rule of Civil Procedure 23(b)(3).  *Amchem*, 521 U.S. at 623.

### b.   A Class Action Is Superior to Other Available Methods to Fairly and Efficiently Adjudicate This Lawsuit

Plaintiffs also satisfy the superiority requirement.  Superiority requires that litigation by means of a class action be "superior to other available methods for fairly and efficiently

adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). Superiority "depends greatly on the circumstances surrounding each case," and "[t]he rule requires the court to find that the objectives of the class-action procedure really will be achieved." *Stillmock*, 385 F. App'x at 274 (quoting 7AA Charles A. Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1779 (2005)). When making a "determination of whether the class action device is superior to other methods available to the court for a fair and efficient adjudication of the controversy . . . [the court should] not contemplate the possibility that no action at all might be superior to a class action." *Brown v. Cameron-Brown Co.*, 92 F.R.D. 32, 49 (E.D. Va. 1981) (citation omitted). In determining whether the class action mechanism is truly superior, the court should consider "the class members' interest in individually controlling the prosecution or defense of separate actions; . . . the extent and nature of any litigation concerning the controversy already begun by or against class members; . . . the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and[,] . . . the likely difficulties in managing the class action." Fed. R. Civ. P. 23(b)(3)(A)–(D).

A class action is "superior to other available methods for fairly and efficiently adjudicating" this case. Fed. R. Civ. P. 23(b)(3). First, "the class members' interest in individually controlling the prosecution or defense of separate actions" is minimal here, Fed. R. Civ. P. 23(b)(3)(A), considering that separate actions would not be feasible given the relatively small amount of money at issue for each loan, (Think Finance February 2011 Presentation 8 (noting that Great Plains provided installment loans "up to $2500")). Indeed, "there is a strong presumption in favor of a finding of superiority where, as here, the alternative to a class action is likely to be no action at all for the majority of class members." *Soutter*, 307 F.R.D. at 218 (internal quotation marks and citation omitted).

Second, "the desirability . . . of concentrating the litigation of the claims" in a single case is strong. Fed. R. Civ. P 23(b)(3)(C). The record indicates that 43,598 consumers belong to the Virginia Class. (RSM Decl. ¶ 10, ECF No. 188-4.) Given that common factual and legal issues predominate for each of these 43,598 consumers, their claims present "an appealing situation for class action," and that "remain[s] so despite the need, if liability is found, for separate determination of the damages suffered by the individuals within the class." Fed. R. Civ. P. 23 advisory committee's note to 1966 Amendment. Moreover, "class certification promotes consistency of results, giving [Defendants] the benefit of finality and repose." *Stillmock*, 385 F. App'x at 275 (citing *Gunnells*, 348 F.3d at 429).

Finally, "the likely difficulties in managing [the] class" appear minimal compared to proceeding by separate action for the 43,598 putative class members. Fed. R. Civ. P. 23(b)(3)(D). Indeed, "re-litigating the same issues even 100 times would be an unnecessary and untenable burden on the judicial system." *Big Picture II*, 2021 WL 3072462, at *12. Despite asserting that a class action would not be superior due to manageability concerns, (Resp. 36–37), Defendants fail to articulate how this class action would be unmanageable, arguing instead in conclusory fashion that managing this class action would overwhelm the other factors under Rule 23(b)(3). Certainly, the Court understands the complexity of this case as it has pended for three years and presented issues warranting a lengthy Memorandum Opinion by this Court and a decision by the Fourth Circuit. But the Court cannot "contemplate the possibility that no action at all might be superior to a class action." *Brown*, 92 F.R.D. at 49. Compared to proceeding by separate, individual action, litigation by means of class action under the circumstances present here is both fair and efficient. *See* Fed. R. Civ. P. 23(b)(3). "[T]he objectives of the class-action procedure really will be achieved" in this case. *Stillmock*, 385 F. App'x at 274 (internal citation

38

omitted).  As a result, Plaintiffs satisfy the superiority requirement of Federal Rule of Civil Procedure 23(b)(3).

## IV.  Conclusion

For the foregoing reasons, the Court finds that Plaintiffs meet the requirements of Federal Rule of Civil Procedure 23.  The Court will grant the Motion for Class Certification, certify the Virginia Class, appoint Plaintiffs' Counsel as Class Counsel, and appoint the Named Plaintiffs as Class Representatives.

An appropriate Amended Order shall issue.

_____
/s/
M. Hannah Lauck
United States District Judge

Date: 10/14/2021
Richmond, Virginia

39